**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| NATERA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:23-cv-629 |
| | ) | |
| NEOGENOMICS LABORATORIES, | ) | **JURY TRIAL DEMANDED** |
| INC. | ) | |
| | ) | |
| Defendant. | ) | |

## NEOGENOMICS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS OPPOSITION TO NATERA'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**PROPOSED FINDINGS OF FACT** ................................................................ 1

I.      Natera Is Unlikely To Succeed On The Merits ....................................... 1

        A.      There Is A Substantial Question As To Whether The '454 Patent Is
                Invalid As Obvious ................................................................... 1

        B.      There Is A Substantial Question As To Whether The '035 Patent Is
                Invalid As Obvious ................................................................... 6

        C.      There Is A Substantial Question As To Whether The Asserted
                Claims Of The '454 And '035 Patent Fail The Written Description
                Requirement ........................................................................... 10

                1.      The '454 Patent Includes No Description Of "Whole Genome
                        Sequencing" ............................................................... 10

                2.      Neither The '454 Nor '035 Patent Specifications Support
                        Natera's Generic Claims ............................................... 11

        D.      There Is A Substantial Question As To Whether The '454 Patent Is
                Invalid For Improper Inventorship ............................................ 14

        E.      There Is A Substantial Question As To Whether The Asserted
                Claims Of The '454 Patent Are Infringed ................................... 15

                1.      NeoGenomics Does Not Infringe Because It Does Not
                        Perform All Claim Steps In The United States ................. 15

                2.      RaDaR Does Not Literally Infringe Because It Does Not
                        Sequence "The Amplicons" Obtained From "Targeted
                        Multiplex Amplification" ............................................. 16

                3.      RaDaR Does Not Infringe Under The Doctrine Of
                        Equivalents Because There Is A Substantial Difference
                        Between Sequencing "The Amplicons" Obtained From
                        "Targeted Multiplex Amplification" And Sequencing
                        Amplicons Obtained From A Subsequent Barcoding PCR ...... 18

        F.      There Is A Substantial Question As To Whether The Asserted
                Claims Of The '035 Patent Are Infringed ................................... 20

II.     Natera Has Failed To Show It Is Likely To Experience Irreparable Harm During The Pendency Of This Case ...................................................... 23

III.    The Balance of Harms Disfavors a Preliminary Injunction. .................... 31

IV.     The Public Interest Favors the Availability of RaDaR. ......................... 32

**PROPOSED CONCLUSIONS OF LAW** ........................................................ 33

I.      Claim Construction........................................................................... 33

        A.      Construction Of The Claims Of The '454 patent......................... 33

        B.      Construction Of The Claims Of the '035 Patent......................... 35

II.     Likelihood Of Success On The Merits .................................................. 35

        A.      The Burden On A Request For a Preliminary Injunction ........... 35

        B.      Invalidity ................................................................................ 36

                1.      Conclusions Of Law Relevant To Invalidity Of The '454 Patent For Failure Of Written Description....................... 36

                2.      Conclusions Of Law Relevant To Invalidity Of The '035 Patent For Improper Inventorship ................................... 37

        C.      Non-infringement .................................................................... 37

                1.      Conclusions Of Law Relevant To Non-Infringement Of The '454 Patent....................................................................... 37

                2.      Conclusions Of Law Relevant To Non-Infringement Of The '035 Patent....................................................................... 38

III.    Irreparable Harm ............................................................................ 38

IV.     Balance of Harms ............................................................................ 40

V.      Public Interest................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbot Lab'ys v. Andrx Pharms., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) .......................................................................... 39

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......................................................................... 39

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) .......................................................................... 36

*Apple, Inc. v. Samsung Co.*,
678 F.3d 1314 (Fed. Cir. 2012) .......................................................................... 39

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) ........................................................................... 37

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) .......................................................................... 38

*Cordis Corp. v. Boston Scientific Corp.*,
99 F. App'x 928 (Fed. Cir. 2004) ....................................................................... 40

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) ............................................................................ 34

*F45 Training Pty Ltd. v. Body Fit Training USA Inc.*,
No. CV 20-1194-WCB, 2022 WL 17177621 (D. Del. Nov. 17, 2022) ......................... 37

*Guardant Health, Inc. v. Found. Med., Inc.*,
No. CV 17-1616-LPS-CJB, 2019 WL 5677748 (D. Del. Nov. 1, 2019) ................ 34, 35

*Harris Corp. v. Fed. Express Corp.*,
502 F. App'x 957 (Fed. Cir. 2013) ..................................................................... 33

*Heart Imaging Technologies, LLC v. Merge Healthcare, Inc.*,
2013 WL 443125 (M.D.N.C. Aug. 14, 2013) ..................................................... 35

*Home Gambling Network, Inc. v. Piche*,
No. 2:05-cv-00610-DAE-VCF, 2013 WL 5492568 (D. Nev. Sept. 30, 2013) ............. 37

i

*Hybritech Inc. v. Abbott Lab'ys*,
  849 F.2d 1446 (Fed. Cir. 1988) ................................................................. 40

*Impinj, Inc. v. NXP USA, Inc.*,
  No. 19-cv-03161-YGR, ECF No. 472 (N.D. Cal. Oct. 3, 2023) .................... 39

*Natera, Inc. v. ArcherDX, Inc.*,
  CA No. 20-125-GBW, D.I. 550 (D. Del. Feb. 6, 2023) ................................. 33

*Novozymes A/S v. Danisco A/S*,
  No. 10-cv-251-BBC, 2010 WL 3783682 (W.D. Wis. Sept. 24, 2010) ........................ 40

*NTP, Inc. v. Rsch. In Motion*,
  418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 37

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) .......................................................... 34, 37

*Oxford Immunotec Ltd. v. Qiagen, Inc.*,
  271 F. Supp. 3d 358 (D. Mass. 2017) ........................................................ 38

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998) ................................................................. 37

*Quad/Tech, Inc. v. QI B.V.*,
  701 F. Supp. 2d 644 (E.D. Pa. 2010) ......................................................... 38

*Renhcol Inc. v. Don Best Sports*,
  548 F.Supp.2d 356 (E.D. Tex. 2008) .......................................................... 37

*Rivera v. Int'l Trade Comm'n*,
  857 F.3d 1315 (Fed. Cir. 2017) ................................................................. 36

*STC. UNM v. Intel Corp.*,
  754 F. 3d 940 (Fed. Cir. 2014) ................................................................. 37

*Trebro Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) ................................................................. 36

*Tronzo v. Biomet, Inc.*,
  156 F.3d 1154 (Fed. Cir. 1998) ................................................................. 37

*Waters Corp. v. Agilent Techs. Inc.*,
  410 F. Supp. 3d 702 (D. Del. 2019) ........................................................... 40

*Well Cell Glob. LLC v. Calvit,*
  2023 WL 6156082 (Fed. Cir. Sept. 21, 2023) .................................................. 39

*Westinghouse Air Brake Techs. Corp. v. Siemens Indus. Inc.,*
  No. 17-1687-LPS, 2018 WL 3655782 (D. Del. Aug. 2, 2018) .................................... 40

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ................................................................................ 35, 38

*Wright's Well Control Servs., LLC v. Oceaneering Int'l, Inc.,*
  No 15-1720, 2017 WL 3706344 (E.D. La. Aug. 28, 2017) ........................................ 38

## PROPOSED FINDINGS OF FACT

**I.    NATERA IS UNLIKELY TO SUCCEED ON THE MERITS**

    **A.    There Is A Substantial Question As To Whether The '454 Patent Is Invalid As Obvious**

1.    The first step of claim 1 of the '454 patent recites "performing whole exome sequencing or whole genome sequencing on a tumor sample."  Doc. 1-1 at Claim 1.  Forshew (2012) discloses "whole-genome sequencing of tumor material."  Doc. 13-7 at 9.

2.    The first step of claim 1 further recites that such sequencing is used "to identify a plurality of tumor-specific SNV mutations."  Doc. 1-1 at Claim 1.  Forshew (2012) discloses the use of whole genome sequencing to identify a plurality of tumor-specific SNV mutations.  Doc. 13-7 at Table S7.

3.    The second step of claim 1 recites "performing targeted multiplex amplification to amplify 10 to 500 target loci each encompassing a different tumor-specific SNV mutation from cell-free DNA isolated from a plasma sample of the subject or DNA derived therefrom."  Doc. 1-1 at Claim 1.  Forshew (2012) discloses a multiplex preamplification step that amplifies between 10 and 500 loci, encompassing different tumor-specific SNV mutations, from cell-free DNA isolated from a plasma sample.  Doc. 13-7 at 2, Table S7; Doc. 116-6 at 39:19-23, 65:15-18, 66:19-24.

4.    The second step of Claim 1 further recites that the amplification is to "obtain amplicons having a length of 50-150 bases, wherein the target loci are amplified together in the single reaction volume."  Doc. 1-1 at Claim 1.  Forshew (2012) discloses that the designed amplicons were "<120 bp to cover each mutation."  Doc. 13-7 at 2.

5.      The third and final step of Claim 1 recites "sequencing the amplicons to obtain sequence reads." Doc. 1-1 at Claim 1.  Under Natera's claim interpretation, Forshew (2012) discloses this sequencing step.  *Id.*

6.      The third step of Claim 1 also recites that the sequencing "has a depth read of at least 50,000 per target locus."  Doc. 1-1 at Claim 1.  In connection with its reply in support of its preliminary injunction request, Natera argued only that Forshew (2012) does not teach a sequencing depth of at least 50,000 and thus does not render claim 1 obvious. *See* Doc. 145 at 45-67.

7.      Natera did not present any argument regarding any other element in claim 1 of the '454 patent, nor did it present any argument specific to claims 8 and 11 of the '454 patent, which are the only other asserted claims of the '454 patent for the purposes of Natera's preliminary injunction motion.  *See, e.g.*, Doc. 145 at 45-67; Doc. 71 at 5.

8.      Dr. Van Ness explained that increasing the sequencing depth to at least 50,000 would have been obvious and would have been motivated "by both the need for higher sensitivity for testing and the lower costs with improving technology."  *See* Doc. 116 ¶¶ 143-50.

9.      The specification of the '454 Patent does not include any special guidance on increasing sequencing depth nor does it describe a sequencing depth of 50,000 as being inventive, mentioning such a sequencing depth only once among a list of possible sequencing depths that spans five orders of magnitude.  Doc. 1-1 at 68:33-39.

10.      As Dr. Van Ness opined, "this broad disclosure of potential sequencing depths is consistent with the understanding of a skilled artisan that sequencing depth is a

parameter that would be routinely adjusted to achieve whatever sensitivity is required." Doc. 116 ¶ 143.

11.    In this regard, Forshew (2012) already teaches a sequencing depth of 15,400x and confirms that there was a motivation to increase sequencing depth further and that doing so would have been obvious, as it states that "higher read depth or fidelity" allows for "enhance[d] mutation detection without change to protocols." Doc. 13-7 at 10; Doc. 116 ¶¶ 141-42.

12.    As another example, the prior art Bentley references teaches that increasing sequencing depth increases sensitivity, and expressly contemplates sequence depth as high as 200,000. *See* Doc. 99-5 ¶ 99.

13.    Likewise, increasing sequencing depth was reasonably expected to increase sensitivity as it was routine and well-known in the art, as both Natera and its experts have repeatedly previously acknowledged. *See, e.g.*, 97-10 at 26-27; Doc. 97-11 at 98:10-99:6; Doc. 97-20 ¶ 119; Doc. 116-7 ¶ 65.

14.    For example, Natera argued in support of summary judgement in *CareDx v. Natera*, No. 19-567-CFC-CJB (D. Del.) that "it was well-known by 2009" that "higher sensitivity could be achieved by sequencing more molecules." Doc. 97-10 at 26-27.

15.    Natera's expert in the *CareDx* case, Dr. Quackenbush, likewise testified on behalf of Natera that increasing sequencing depth is a "standard practice in many fields" and that "to get higher sensitivity for detecting molecules, you simply sequence more molecules." Doc. 97-11 at 98:10-99:6.

3

16.     As yet another example, in his written declaration in the *CareDx* case, Dr. Quackenbush opined that those of ordinary skill "prior to November 6, 2009 were well aware that sequencing more molecules, or increasing sequencing depth, improves sensitivity." Doc. 97-20 ¶ 119; *see also id.* ("Accuracy in NGS is achieved by sequencing a given region multiple times, enabled by the massively parallel process, with each sequence contributing to 'coverage' depth.").

17.     As yet another example, Dr. Quackenbush opined in *Foresight Diagnostics Inc. v. Personalis, Inc.*, IPR2023-00224, that "sequencing to even greater depth when required by an experiment would also have been routine, as it would require only running additional sequencing assays." Doc. 116-7 ¶ 65.

18.     Natera's expert in this case, Dr. Michael Metzker, previously opined on behalf of Natera that  in January 2010 "to increase the accuracy of the Illumina GA sequencer, it **would have been obvious in my opinion** to target regions of a chromosome **with high sequence coverage**." Doc. 97-12 ¶¶ 91, 214 (emphasis added).

19.     Dr. Metzker likewise previously opined on behalf of Natera that the "term 'coverage' means the number of unique sequence reads at a given location (base pair) on a chromosome." Doc. 97-12 ¶ 206.

4

20.     The term "coverage" is thus no different in substance from "sequence depth," which is defined in the '454 patent to mean "the number of sequencing reads that map to a given locus."[1] Doc. 1-1 at 99:6-100:9; *see also* Doc. 145 ¶ 97 n. 98.

21.     Likewise, the '454 patent states that the "the depth of read is the number of reads measured by the sequencer mapping to that locus." *Id.*; *see also* Ex. 2 at 31:14-15 (Dr. Metzker stated at the tutorial that if "you read that SNP 100,000 times, you would say you have a read depth of 100,000 times").

22.     Dr. Metzker, in attempting to rebut obviousness, opined about alleged "challenges in using next-generation sequencing" prior to 2015. *See* Doc. 145 ¶ 94.

23.     This, however, is without merit because Dr. Metzker previously opined that it was prior art knowledge that "at high sequence coverage all NGS platforms have ***excellent variant calling accuracy*** (>95%) as assessed by the detection of known SNP variants." Doc. 97-12 ¶ 213 (internal citations omitted) (emphasis added).

24.     Likewise with regard to the preparation of a cell-free DNA library for next generation sequencing, Dr. Metzker previously opined in *Natera Inc. v. Illumina, Inc.*, IPR2018-01317 that "creating a cell-free DNA library from maternal [sic] for aneuploidy detection was ***well known in the art***." Doc. 97-12 ¶ 48 (emphasis added).

25.     Dr. Metzker further opined that it was "well-known by 2008 that one could isolate, amplify, and ***sequence cell-free genomic DNA***," and that cell-free DNA has long

---

[1] During the hearing, Natera stated that "sequence coverage" is a "completely different concept" than "depth of read." Ex. 3 at 198:15-23. Proposed Findings of Fact ¶¶18-20 prove that Natera's assertion to this effect is erroneous.

5

been successfully used in amplification and sequencing.  Doc. 97-12 ¶ 116 (emphasis added).

26.     He also noted that a "kit for making a sequencing library for use with Solexa's sequencer was commercially available in 2008, underscoring ***the routine nature of sequencing library preparation***."  *Id.* ¶ 115.

27.     Thus, in view of the '454 specification, Forshew (2012), Bentley, and Natera's own admissions, it would have been obvious to use a sequencing depth of at least 50,000.  *See* Doc. 116 ¶¶ 143-50.

### B.     There Is A Substantial Question As To Whether The '035 Patent Is Invalid As Obvious

28.     The first step of claim 1 of the '035 patent recites "tagging isolated cell free DNA with one or more universal tail adaptors to generate tagged products."  Doc. 1-2 at Claim 1.  Kaper discloses tagging DNA with universal tail adaptors to generate tagged products.  Doc. 97-15 at Fig. 2A.

29.     The second step of claim 1 recites "amplifying the tagged products one or more times to generate final amplification products, wherein one of the amplification steps comprises targeted amplification."  Doc 1-2 at Claim 1.  Under Natera's claim interpretation, Kaper discloses amplifying tagged products, including with a targeted amplification step.  Doc. 97-15 at Fig. 2A.

30.     The second step of claim 1 further recites that "one of the amplifying steps introduces a barcode and one or more sequencing tags."  Doc. 1-2 at Claim 1.  Kaper

6

discloses an amplifying step wherein a barcode and one or more sequencing tags are introduced. Doc. 97-15 at Fig. 2B-C.

31. The third step of Claim 1 further recites "sequencing the plurality of SNP loci on the cell free DNA by conducting massively parallel sequencing on the final amplification products, wherein the plurality of SNP loci comprises 25-2,000 loci associated with cancer." Doc. 1-2 at Claim 1. Kaper teaches massively parallel sequencing a plurality of SNP loci on a 454 massively parallel sequencing platform, and studied 480 cancer gene exons. Doc. 97-15.

32. In its reply in support of its motion for a Preliminary Injunction, Natera argued that Kaper does not teach the use of cell-free DNA or the detection of SNPs, and thus allegedly does not render claim 1 of the '035 patent obvious. *See, e.g.*, Doc. 145 ¶¶ 156, 164.

33. Natera did not present any argument regarding any other elements in claim 1 of the '035 patent, nor did it present any argument specific to claims 12 and 13 of the '035 patent, which are the only other asserted claims of the '035 patent for the purposes of Natera's preliminary injunction motion. *Id.*; Doc. 71 at 5.

34. Dr. Van Ness explained in his declaration that the analysis of SNPs in cell-free DNA would have been obvious. *See* Doc. 116 ¶¶ 239-48, 252-57.

35. Consistent with this, the '035 specification does not treat the analysis of cell free DNA as unique or inventive, but rather states that the "genetic measurements used as part of these methods could be made on ***any sample comprising DNA or RNA***." Doc. 1-2 at 131:51-61.

36.     As Dr. Van Ness described in his declaration, long before 2010, "the use of cell-free DNA in cancer monitoring and detection was well-known."  Doc. 116 ¶ 241.  For example, in 2009 Lo taught sequencing plasma cell-free DNA "to detect the chromosomal aberrations in the plasma DNA for the detection of a specific cancer."  Doc. 97-19 ¶ 248.

37.     Natera itself, in seeking summary judgement in the *CareDx* case, argued that cell free DNA was "routinely used before November 2009," including "tumor cfDNA in a cancer patient's blood."  Doc. 97-10 at 3.

38.     At the summary judgement hearing in the *CareDx* case, Natera's expert, Dr. Quackenbush, testified on behalf of Natera that use of cell free DNA is "completely conventional" and that this involves "using methods known in the art."  Doc. 97-11 at 108:8-20.

39.     As yet another example, Dr. Quackenbush stated in his declaration in the *CareDx* case that "scientists have long used cell-free nucleic acids to monitor disease" and that scientists "routinely applied methods for detecting and analyzing the pertinent genetic differences in samples from patients containing different genotypes in order to study conditions relating to them."  Doc. 97-20 ¶ 57.  He further testified that the relevant laboratory techniques were "standard means for detecting foreign or abnormal cell-free nucleic acids in other contexts," including "mutated tumor DNA in the blood of a cancer patient."  *Id.* ¶ 4; *see also id.* ¶ 145 (by November 6, 2009, "POSAs recognized that the same laboratory techniques for detecting genotypes in a cfDNA sample would apply to a range of natural phenomena," including cancer).

40.     Dr. Metzker, Natera's expert in this case, has previously testified that amplifying cell-free DNA for massively parallel sequencing was well known.  In his declaration in *Natera Inc. v. Illumina, Inc.*, IPR2018-01317, for instance, he stated that it was "well-known by 2008 that one could isolate, amplify, and sequence cell-free genomic DNA," and that it would have been obvious to employ it in a variety of contexts.  Doc. 97-12 ¶ 116.

41.     Dr. Metzker further testified in that same declaration that kits to prepare cell-free DNA for sequencing were commercially available as early as 2008 and that "one of ordinary skill would have ***expected success*** in being able to sequence cell-free DNA found in maternal blood."  Doc. 97-12 ¶ 115 (emphasis added).

42.     In his reply declaration in this case, Dr. Metzker nonetheless asserted that the Volik (2016) article "provides a helpful summary of certain problems and difficulties facing scientists working with cfDNA."  Doc. 145 ¶ 14.  The Volik (2016) reference, however, states that cell free DNA is "amenable for inexpensive noninvasive testing and thus presents a viable approach to serial sampling for screening and monitoring tumor progression," underscoring the routine use of cell free DNA for cancer monitoring.  Doc. 141-2 at 1.

43.     Dr. Metzker testified in his declaration that Kaper "teaches away from the use of cell-free DNA."  Doc. 145 ¶ 163.  At deposition, Dr. Metzker could not provide an example of what "teaching away" is, nor how it would apply to the teachings in Kaper.  Ex. 1 (11/14/2023 Deposition of Michael Metzker) at 61:15-62:1.

9

44.     Regarding the study of single nucleotide polymorphisms (SNPs), Dr. Quackenbush in *CareDx* described the quantification of SNPs in cfDNA based on high-throughput sequencing as a "well-known and routine practice" by 2009, stating that "I, myself, was researching cancer-related polymorphisms, including SNPs, present in cfDNA in cancer patients using high throughput sequencing data at the time." Doc. 97-20 ¶ 126.

45.     Dr. Metzker, in his November 14 deposition, likewise testified that preparing primers to analyze SNPs for the purpose of the '035 patent would have been within the knowledge of the skilled artisan, testifying that "a person of ordinary skill in the art would know how to design those target-specific primers" to analyze SNPs. Ex. 1 (11/14/2023 Deposition of Michal Metzker) at 16:9-24.

46.     Dr. Van Ness, in his declaration, testified that SNPs were understood "as useful tools in the detection of cancer" as early as 2005, underscoring the motivation for and routine and conventional nature of the use of SNPs. Doc. 116 ¶ 255.

47.     Thus, in view of the '035 specification, the prior art, and Natera's own admissions, it would have been obvious to use the method of Kaper to analyze SNPs in cell-free DNA.  *See* Doc. 116 ¶¶ 239-48, 252-57.

**C.     There Is A Substantial Question As To Whether The Asserted Claims Of The '454 And '035 Patent Fail The Written Description Requirement**

      1.     **The '454 Patent Includes No Description Of "Whole Genome Sequencing"**

48.     Claim 1 of the '454 patent recites the use of "whole genome sequencing." Doc. 1-1 at claim 1.

49. The only reference to "whole genome sequencing" in the entirety of the '454 patent is in the figure caption for Figure 51B. Doc. 1-1 at 41:57-61.

50. As Dr. Van Ness explained, this is an erroneous reference to "whole genome sequencing" because the data in Figure 51B is actually merely "whole exome sequencing" data. D.I. 116 ¶ 406-08.

51. At the hearing, Dr. Metzker confirmed that he had no rebuttal to Dr. Van Ness' opinions to this effect. *See* Ex. 3 at 46:18-24.

52. Nevertheless, Dr. Metzker testified that references to "long read sequencing" in the patent suffice to provide written description support for "whole genome sequencing." *Id.* at 41:9-16.

53. Yet, at deposition, Dr. Metzker confirmed that long read sequencing platforms need not be employed for whole genome sequencing. Ex. 1 (11/14/2023 Deposition of Michael Metzker) at 145:16-25.

54. There is thus no written description support in the '454 patent for "whole genome sequencing."

      2.    **Neither The '454 Nor '035 Patent Specifications Support Natera's Generic Claims**

55. The specifications of the '454 and '035 patents make clear that these patents purport to overcome alleged challenges in the performance of multiplex PCR, specifically, the generation of "non-target amplification products" "when multiple pairs are added to the same PCR reaction." Doc. 1-2 at 3:4-14; Doc. 1-1 at 105:49-54.

11

56. The specifications of the '454 and '035 patents state that the solution to this problem that has "unexpectedly enabled extremely high PCR multiplexing levels for subsequent analysis by sequencing" is to identify and remove "the particular primers that are most likely to cause unproductive side reactions." Doc. 1-1 at 105:54-61; *see also* Doc 1-2 at 48:14-17 ("removing problematic primers, that is, those primers that are particularly likely to firm [*sic*] dimers has unexpectedly enabled extremely high PCR multiplexing levels for subsequent analysis by sequencing").

57. The specification of the '035 patent states that the possibility of successfully performing multiplex PCR by identifying and removing the small number of primers that are likely to form unwanted side products reflected a "surprising discovery." D.I. 1-2 at 46:27-41.

58. Both the '454 and '035 patents state that the process of identifying and removing such primers that are likely to form unwanted side products is "essential" at high multiplexing. Doc. 1-1 at 108:16-22; Doc. 1-2 at 54:46-50.

59. Likewise, the '035 patent states that method of selecting and removing "the most undesirable primers" "allow" the resulting primers to simultaneously amplify a large number of target loci in a single multiplex PCR reaction." Doc. 1-2 at 46:41-48.

60. Both the '454 and '035 patent distinguish as inadequate prior art methods that do not utilize the allegedly enabling techniques for identifying and removing primers likely to form side products because they can lead to reactions wherein the unwanted side products can "dominate an entire reaction, greatly limiting amplification from intended targets." Doc. 1-1 at 108:18-22; Doc. 1-2 at 54:46-50, 47:40-49, 48:7-10.

61.     The '035 patent likewise teaches that without the use of the allegedly surprising techniques for identifying and removing harmful primers, the reaction product is ">99% of sequences being primer dimer products" for reactions that include as few as 1,042 targets, a number that is within the scope of all asserted claims. *See* Doc. 1-2 at 96:24-30; Doc. 1-1 at claims 1, 8, 11; Doc. 1-2 at claims 1, 12-13.

62.     With respect to the '454 and '035 patents, there is not "any working example in the patent that did not use the techniques for targeted loci selection and primer design that are disclosed in the specification." Doc. 116 ¶ 424.

63.     While the specifications of the '035 patent and '454 patent make clear that the allegedly inventive feature that is "essential" is the identification and removal of primers most likely to lead to the creation of unwanted side products, the asserted claims of the '035 and '454 patents are silent as to the use of this (or any other) procedure for performing multiplex PCR. *See* Doc. 1-1 at claims 1, 8, 11; Doc. 1-2 at claims 1, 12, 13.

64.     The asserted claims of the '035 and '454 patents are generic with regard to the use of parameters that are allegedly "essential" for PCR multiplexing and encompass the selection of primers and loci at random without the use of the techniques that the specifications state are "unexpectedly enabling" for multiplex PCR. *Id.*

65.     There is no disclosure in either the '454 or '035 patents of a method for carrying out the claimed multiplex PCR without use of the primer design and selection approaches that the patents state are "essential." Doc. 116 ¶ 426.

66. Therefore, the generic claims of the '454 and '035 patents that include no claim requirements related to the use of primer design and selection approaches are invalid for failure of written description. *See generally* Doc. 116 ¶¶ 409-426.

### D. There Is A Substantial Question As To Whether The '454 Patent Is Invalid For Improper Inventorship

67. Example 13 of the '454 patent provides the sole possible support for the claimed method based on the use of whole exome sequencing to identify tumor mutations in a tumor sample followed by the detection of such mutations in cell-free DNA by multiplex amplification and sequencing. *See* Doc. 116 ¶ 385-86; Doc. 117-15 at 64:5-13.

68. Example 13 of the '454 patent corresponds to the material in section 5.4 of the doctoral dissertation of Mariam Jamal-Hanjani, a researcher at University College London. *See id.* ¶ 389-95.

69. Example 13 of the '454 patent was based on a collaboration between University College London and Natera, as confirmed by Natera inventor Bernhard Zimmermann. *See* Doc. 117-15 at 55:10-14, 87:13-25; Doc. 98-17 at 155.

70. For instance, as Dr. Zimmermann confirmed, it was the researchers at University College London that contributed the claimed "whole exome sequencing." Doc. 117-15 at 87:13-25, 94:1-10; *see also* D.I. 98-17 at 26 ("I wrote and developed the protocol for this study….")

71. Indeed, as Dr. Zimmermann confirmed, the first time the entire method of claim 1 of the '454 patent was put together for an experiment was in the collaboration with Dr. Jamal-Hanjani and UCL. *Id.* at 80:17-23.

14

72.     In view of the foregoing, UCL has contacted Natera regarding potential inventorship issues and correspondence is ongoing.  *See* Doc. 108-11 at 4-5; Doc. 108-12.

73.     Accordingly, there is at a substantial question as to whether the claims of the '454 patent are invalid for failing to include UCL researchers, such as Dr. Mariam Jamal-Hanjani, as inventors.  *See* Doc. 116 ¶¶ 383-403.

### E.     There Is A Substantial Question As To Whether The Asserted Claims Of The '454 Patent Are Infringed

#### 1.     NeoGenomics Does Not Infringe Because It Does Not Perform All Claim Steps In The United States

74.     Claim 1 of the '454 patent recites "sequencing the amplicons to obtain sequence reads, and detecting one or more of the tumor-specific SNV mutations," such that the step of "sequencing" is distinct from the step of "detecting…tumor-specific SNV mutations."  Doc. 1-1 at claim 1.

75.     To allege that RaDaR infringes the "detecting" step of the asserted claims of the '454 patent, Natera and its expert point to computational bioinformatics processes in RaDaR.  *See, e.g.*, Doc. 116-6 at 58:24-59:25 (Dr. Metzker refers to the "bioinformatics that RaDaR uses in its detection of ctDNA"); *id.* at 62:25-63:12 (Dr. Metzker testifies that "there's a bioinformatic pipeline to identify whether the variants that are in the assays are detected or not.");  Doc. 17 ¶ 69.

76.     The computational process to detect variants in RaDaR takes place outside the United States in Ireland.  *See generally* Doc. 112 ¶¶ 48-51.

77. Briefly, upon completion of sequencing, the "raw sequencing data for both tumor and plasma analysis is transferred to NeoGenomics's own data storage located outside the United States, in Ireland." *Id.* ¶ 48.

78. "All bioinformatics steps for detecting tumor-specific SNV mutations in the cell-free DNA from the sequence reads are then conducted in Ireland. These steps include at least demultiplexing, alignment, and SNV calling." *Id.* ¶ 49.

79. Therefore, RaDaR does not infringe the '454 patent, either literally or under the doctrine of equivalents, because it does not perform all steps of the claims within the United States.

    2. **RaDaR Does Not Literally Infringe Because It Does Not Sequence "The Amplicons" Obtained From "Targeted Multiplex Amplification"**

        a) **Proposed Findings Of Fact Related To Construction Of "Sequencing The Amplicons"**

80. Natera's U.S. Patent No. 11,486,008 (the "'008 patent") is in the same family as the '454 patent and has the same specification and title as the '454 patent. Doc. 1-1; Doc. 118-18.

81. The claims of the '008 patent are similar to those of the '454 patent. *See, e.g.*, Doc. 1-1 at claim 1; Doc. 118-18 at claims 1, 16; Doc. 116 ¶ 79.

82. Like the '454 patent, the claims of the '008 patent have sole support in Example 13, which describes identifying tumor-specific mutations in tumor tissue and tracking those mutations in cfDNA. *See* Doc. 116 ¶ 79.

83.     During prosecution of the '008 patent and to overcome rejection based on Forshew (2012), Natera distinguished its alleged invention from the Forshew (2012) reference on the basis that Forshew (2012) included intermediate steps between targeted multiplex amplification and sequencing. *See* Doc. 97-9 at 7 ("Forshew requires a subsequent and separate targeted amplification step (i.e., parallel single-plex PCR) to generate amplicons for sequencing, and therefore Forshew's amplicons for sequencing are not obtained from the alleged multiplexed targeted amplification….").

84.     During prosecution of the '008 patent, Natera inventor Bernhard Zimmermann participated in an interview with the Patent Office where he distinguished his alleged invention from Forshew (2012) on the basis of the lack of intermediate steps, explaining that "the highly accurate mutation detection obtained are ***due to*** lack of intermediate steps between the multiplex amplification and sequencing step." Doc. 99-4 at 3 (emphasis added).

        b)      **Proposed Findings Of Fact As To Whether RaDaR Satisfies The "Sequencing The Amplicons" Step**

85.     Claim 1 of the '454 patent recites "performing targeted multiplex amplification…to obtain amplicons." Doc. 1-1 at claim 1.

86.     Claim 1 of the '454 patent goes on to recite "sequencing ***the*** amplicons" that result from the "targeted multiplex amplification" step. *Id.* (emphasis added).

87.     By their plain language, and in view of relevant prosecution history, these claim elements require sequencing of the amplicons that emerge from the "targeted

multiplex amplification" without intermediate amplification or modification steps.  *See*

*infra* Part I.A (Conclusions of Law regarding claim construction of the '454 patent).

88.　　To the extent RaDaR includes a "targeted multiplex amplification," however, this targeted amplification is followed not by sequencing, but by non-targeted PCR amplification to introduce sample barcodes and sequencing adaptors.  *See* Doc. 116-6 at 54:14-25, 77:10-22; Doc 13-6 at Fig. 2A (showing the "Barcoding PCR" as happening after the "Amplicon PCR" and before the "Pool & Sequence" step).

89.　　In RaDaR, sequencing does not happen after "targeted multiplex amplification," but rather after non-targeted barcoding PCR.  Doc. 116-6 at 58:5-9 ("**Q.** Now, after the barcoding PCR you contend that's in RaDaR, the barcoded products are subject to sequencing?  **A.**  Yes.  I state that in my report at paragraph 69.").

90.　　Therefore, RaDaR does not infringe the '454 patent because it does not sequence amplicons that result from the "targeted multiplex amplification," but rather different amplicons that result from a barcoding PCR step that is not targeted.  *See generally* D.I. 116 ¶¶ 78-88; *see also* Doc. 116-6 at 58:5-9 ("**Q.**  Now, after the barcoding PCR you contend that's in RaDaR, the barcoded products are subject to sequencing?  **A.** Yes.  I state that in my report at paragraph 69.").

　　　　3.　　**RaDaR Does Not Infringe Under The Doctrine Of Equivalents Because There Is A Substantial Difference Between Sequencing "The Amplicons" Obtained From "Targeted Multiplex Amplification" And Sequencing Amplicons Obtained From A Subsequent Barcoding PCR**

91.　　By their plain language, and in view of relevant prosecution history, the claims of the '454 patent require sequencing of the amplicons that emerge from the

"targeted multiplex amplification" without intermediate amplification or modification steps. *See infra* Part I.A (Conclusions of Law regarding claim construction of the '454 patent).

92.     Natera, through named inventor Bernhard Zimmermann, has admitted before the Patent Office that sequencing amplicons subject to further amplification steps after targeted multiplex amplification is ***not*** insubstantially different from the process of sequencing amplicons from targeted amplification without further intermediate amplification. *See* Doc. 99-4 at 3.

93.     Natera's U.S. Patent No. 11,486,008 (the "'008 patent") is in the same family as the '454 patent and has the same specification and title as the '454 patent. Doc. 1-1; Doc. 118-18.

94.     The claims of the '008 patent are similar to those of the '454 patent and require targeted amplification followed by sequencing. *See, e.g.*, Doc. 1-1 at claim 1; Doc. 118-18 at claims 1; Doc. 116 ¶ 79.

95.     During prosecution of the '008 patent and to overcome rejection based on Forshew (2012), Natera distinguished its alleged invention from the Forshew (2012) reference on the basis that Forshew (2012) included intermediate steps between targeted multiplex amplification and sequencing. *See* Doc. 97-9 at 7 ("Forshew requires a subsequent and separate targeted amplification step (i.e., parallel single-plex PCR) to generate amplicons for sequencing, and therefore Forshew's amplicons for sequencing are not obtained from the alleged multiplexed targeted amplification….").

96.     Likewise, during prosecution of the '008 patent, Natera inventor Bernhard Zimmermann participated in an interview with the Patent Office where he distinguished his alleged invention from Forshew (2012) on the basis of intermediate steps, explaining that "the highly accurate mutation detection obtained are ***due to*** lack of intermediate steps between the multiplex amplification and sequencing step."  Doc. 99-4 at 3 (emphasis added).

97.     Having acknowledged that the ability to achieve "highly accurate mutation" detection is "due to" the absence of intermediate steps between multiplex amplification and sequencing, Natera admits that processes that include such intermediate steps (such as a barcoding PCR) are not insubstantially different from those that omit such steps, such that RaDaR cannot be deemed to infringe under the doctrine of equivalents.  *Id.*

**F.      There Is A Substantial Question As To Whether The Asserted Claims Of The '035 Patent Are Infringed**

98.     The first step of claim 1 of the '035 patent requires "tagging isolated cell free DNA with one or more universal tail adaptors to generate tagged products."  Doc. 1-2 at claim 1.

99.     Claim 1 goes on to recite that one must amplify "the tagged products" "one or more times," wherein "one of the amplification steps comprise targeted amplification." *Id.*

100.    Therefore, the claims of the '035 patent require that "the tagged products" that result from the first tagging step of claim 1 are subjected to "targeted amplification." *Id.*

101.    The RaDaR product, however, never performs "targeted amplification" of "the tagged products" and hence does not infringe the '035 patent.  *See generally* Doc. 116 ¶¶ 78-88; Doc. 13-6 at Fig. 2A.

102.    Natera and its expert contend that RaDaR generates "tagged products" through the use of a multiplex preamplification step that includes 15 cycles.  *See, e.g.*, Doc. 17 ¶ 89; Doc. 13-7 at 18 ("Reactions were subjected to 15 cycles of amplification….").

103.    As Natera's expert confirmed, tagged products are generated not just during the first of these 15 cycles, but ***also*** during the subsequent 14 cycles.  *See* Doc. 116-6 at 97:4-17, 97:21-98:12, 107:6-17.

104.    Subsequent to the generation of the "tagged products" in the 15-cycle preamplification process, RaDaR employs a barcoding PCR, which is ***not*** a targeted amplification.  *See* Doc. 116-6 at 77:10-22.

105.    And subsequent to the barcoding PCR, there are no further targeted amplification steps in RaDaR.  *See id.* at 80:23-81:3.

106.    Therefore, the RaDaR product ***never*** performs "targeted amplification" of "the tagged products" and hence does not infringe the '035 patent.  *See generally* Doc. 116 ¶¶ 78-88; Doc. 13-6 at Fig. 2A.

107.    To the extent Natera contends that the first cycle of the RaDaR preamplification satisfies that "tagging" step of the claim while the remaining 14 cycles satisfy the "amplifying" step, this theory is contrary to the claim language.  *See generally* Doc. 116 ¶¶ 94-101.

108.    First, Natera contends that RaDaR satisfies the "tagging" step of the claims by the process of "amplifying." *See* Doc 17 ¶ 111-14.

109.    The '035 patent defines the term "amplifying" to mean "increasing the number of copies of a molecule, such as a molecule of DNA." Doc. 1-2 at 34:44, 42:4-5; *see also infra* Part I.B (Conclusions of Law regarding construction of claim terms in the '035 patent).

110.    As both Natera's and NeoGenomics' experts confirmed, RaDaR's preamplification step generates "copies" that allegedly correspond to "tagged products" not just during the first cycle of the RaDaR preamplification process, but during all 15 cycles. *See, e.g.*, Doc. 116-6 at 110:5-111:12; Doc. 116 ¶ 98.

111.    Therefore, the preamplification process in RaDaR does not amplify the "tagged products," but rather creates them. *See generally* D.I. 116 ¶¶ 98-99.

112.    Second, claims 12 and 13 recite that the "tagging" can be performed by "amplifying" using both a "first primer" and a "second primer" so as to introduce ***both*** a first and second universal tail adaptor. *See* Doc. 1-2 at claims 12-13.

113.    As Dr. Van Ness explains, this claim language negates Dr. Metzker's theory that "tagging" corresponds to only the first cycle of preamplification because the use of two primers to introduce two adaptors, as recited in claims 12 and 13, requires at least ***two cycles*** of the preamplification. *See* Doc. 116 ¶ 100-01.

## II. NATERA HAS FAILED TO SHOW IT IS LIKELY TO EXPERIENCE IRREPARABLE HARM DURING THE PENDENCY OF THIS CASE

114.    Natera has not carried its burden of proving it is likely to experience irreparable harm due to NeoGenomics's RaDaR product from (1) lost sales, (2) lost biopharma contracts, (3) lost first mover advantage or (4) soiled reputation.

115.    "Natera very, very rarely sees competition for its Signatera product and when it does, it is from Guardant Health."  Natera's CEO, Steve Chapman, on September 11, 2023, during a public conference while this motion was pending, emphasized this point. *See* Doc. 93-1 at NEOGEN00018317–18.   Natera's irreparable harm expert testified that it was "approximately correct," based on his research that Natera very, very rarely sees competition.  Doc. 108-7 at 24:14-25:5, 30:5-19.

116.    Natera does not expect newer competitors to be seriously considered in the near term.  Mr. Chapman stated that "the groups that are entering the space, they've got a very long way to go to sort of get to a point where it's really a part of the discussion from a physician standpoint."  *See* Doc. 93-1 at NEOGEN00018317.  And he explained that there is substantial space for competitors in the market. *Id.*

117.    Natera's corporate representative on the irreparable harm topic and head of its cancer business, Solomon Moshkevich, confirmed Mr. Chapman's statements are consistent with what Mr. Chapman had said to him. *See* Doc. 108-6 at 66:5-17.

118.    Rather than being vulnerable to competition, Natera has a "durable" market position and thus is not likely to lose its first-mover advantage or lost sales given the very large and largely unpenetrated market. *See* Doc. 108-7 at 125:13-126:10 (Natera's expert

confirming Natera's lead in the market will prove durable). The total addressable market is $20 billion, *see* Doc. 92-1 at NEOGEN00004201, but test sales are only a small fraction of that in the millions.

119.    Natera relies on an investment banker analyst report by TD Cowen from July 2023 that shows Natera is unlikely to face irreparable harm. *See* Doc. 108-7 at 90:22-24. Mr. Malani recognizes that this Cowen Report (cited extensively below) is "reliable" and a "good report." *Id.* at 90:22-24.

120.    The Cowen report shows Natera is not expected to lose much market share over the next 3-5 years even though there are many companies in the market. *See* Doc. 92-1 at NEOGEN00004210, -4215.

121.    Natera's irreparable harm expert, Dr. Malani, agrees with TD Cowen's current and future market share estimates, showing Natera is unlikely to lose significant market share and that what it does lose appears to go to market entrants other than NeoGenomics. *See* Doc. 108-7 at 98:11-99:16.

122.    Cowen projects NeoGenomics's market share will increase by only 2% over the next three to five years. *See* Doc. 92-1 at NEOGEN00004210, -4215, -4234, -4236. This July 2023 Cowen report reaches its conclusions even though it expressly recognizes that Medicare (MolDx) coverage for RaDaR for breast cancer was expected shortly. *Id.* at NEOGEN00004210, -4218.

123.    Natera currently has a 74% market share, while NeoGenomics has only a 3% market share. *Id.* at NEOGEN00004210, -4217, -4234. Over the next several years, Natera's market share is projected to decrease by 7%. *Id.* at NEOGEN00004210, -4235.

Guardant Health's market share is projected to increase by 6%. *Id.* Natera is projected to remain dominant in this market, and no lost market share is identified as going to NeoGenomics. *Id.* Natera is thus not expected to lose its first mover advantage, much less substantial sales to RaDaR. *Id.*

124.    The MRD assay market is properly defined as including both tumor-informed and tumor-naïve assays. Natera's 2023 "competitiveness" MRD market analysis, consistent with third party analysts, does not differentiate between tumor-naïve and tumor-informed methodologies. *See* Doc. 111-2, (Ex. 22) at NAT-NEO-00729506. Natera's analysis identifies NeoGenomics as a "weak" competitor and lists quite a few other competitors. *Id.*

125.    And Natera's CEO, Steve Chapman, stated that doctors agree they do not care about that distinction. *See* Doc. 93-1 at NEOGEN00018317. There are many market participants aside from NeoGenomics, including several public companies with MRD tests that use a tumor-informed approach. *See* Doc. 92-1 at NEOGEN00004202.

126.    Natera has not identified any sales it actually lost to RaDaR since RaDaR has been offered broadly to clinicians in March 2023.

127.    Natera's claimed urgency in seeking a preliminary injunction is inconsistent with its approach to its RaDaR litigation.

128.    NeoGenomics's RaDaR product has been commercially available for over three years for use with biopharmaceutical companies. *See* Doc. 7 ¶ 46. Natera's own expert witness, Dr. Malani, admits RaDaR has been active in the clinical research market for three years. *See* Doc. 108-7 at 34:18-35:4.

129.    Two years ago, Inivata publicly obtained FDA breakthrough device designation for RaDaR. *See* Doc. 7-15 at 6. By the spring of 2021, Inivata had announced biopharmaceutical deals, including F-Star.  *See* Doc. 112 ¶ 13.

130.    The unrebutted declaration of NeoGenomics's corporate representative, Mr. Sikri, shows that Natera has been aware of RaDaR's commercialization for years. *See* Doc. 112 ¶¶ 11–15.  Natera's own irreparable harm expert, Dr. Malani, admitted that it was "well known" by October 2022 that "NeoGenomics was commercializing the RaDaR test." *See* Doc. 108-7 at 76:23-77:2.  Natera now alleges that RaDaR sales to biopharma that began years earlier have been causing it irreparable harm. *See* Doc. 122-1 at 82:1-3.   Natera alleged that NeoGenomics was selling RaDaR in its December 2022 complaint alleging RaDaR infringes the '454 Patent.  *See* Doc. 91-3 ¶ 32.

131.    Natera delayed alleging RaDaR infringed the '035 patent for eight months, and failed to bring a prompt preliminary injunction motion.  *See* Doc. 91-4 at 18–19. Natera stated in discovery responses that it believed as of December 2022 when the '035 patent issued, that RaDaR infringed the '035 patent. *Id.* at 19.  It refused to explain why it delayed for eight months asserting that patent in its litigation against RaDaR. *Id.* at 19–20. Natera cannot now explain that delay because it invoked privilege when asked why it did not include the '035 Patent in its case against RaDaR based on the '454 patent.  *Id.* at 20 ("Information concerning Natera's litigation strategy regarding whether, when, or against whom to assert any patent, including the '035 Patent, is protected by the attorney-client privilege and attorney work product doctrine, and therefore not discoverable.").

26

132. Natera's failure to include NeoGenomics as a defendant in its December 2022 complaint is unjustified because it alleged NeoGenomics was selling RaDaR in that very complaint. *See* Doc. 91-3 at 10. Natera has failed to explain why it waited until August 2023 to sue NeoGenomics and it has invoked privilege when asked why. *See* Doc. 91-4 at 18–20.

133. Natera alleged RaDaR was infringing in December 2022 based on the '454 Patent but did not seek a preliminary injunction motion for eight months, even though it alleged that RaDaR was being sold since 2021 in that complaint and argues it has been suffering irreparable harm from RaDaR's biopharma business. *See* Doc. 91-3 at 10–12.

134. Natera knew NeoGenomics was selling RaDaR commercially for clinical use since at least March 2023. *See* Doc. 112 ¶ 15; Doc. 94-9.

135. Natera's assertion that RaDaR's recent Medicare coverage approval formed the impetus to move for injunctive relief is unsupported by the record. Natera's expert witness, Dr. Malani, confirms that the Medicare decision was not the basis for filing the preliminary injunction motion because that decision was in place in June 2023. *See* Doc. 108-7 at 15:6-10, 20:1-5.

136. According to the leading industry experts who have studied and surveyed what drives MRD market success, reimbursement status is not among the top 5 factors for market performance in any of four different cancer indications. *See* Doc. 110-1 at NEOGEN00004241. The Cowen report explains that "[i]nsurance coverage is not a driver of usage growth." *Id.* at NEOGEN00004202. It also explains that "the concept that insurance is critical for use is not validated by our survey." *Id.*

137. While Natera alleges NeoGenomics is free-riding on its reimbursement determination investments, the statements of Natera's CEO state the exact opposite. *See* Doc. 93-4 at 6 ("The other thing that I think is important is that this idea that you can just ride the reimbursement coattails of a company like Natera. That's proven actually to in fact not be true.").

138. Natera fails to carry its burden to show likely irreparable harm from lost biopharma sales. Natera's own irreparable harm expert could not identify any contracts that were supposedly lost in either his declaration or deposition. *See* Doc. 108-7 at 46:8– 47:5; 57:15-24. And in his preparatory discussions with Natera's Mr. Moshkevich, Dr. Malani did not learn of any lost contracts as well. *See id.* at 48:23–49:5. In the deposition of Mr. Moshkevich, who was designated to testify on lost business contracts attributable to RaDaR, could not identify any lost contracts. *See* Doc. 108-6 at 110:2-10.

139. Mr. Moshkevich could not identify any explanation for why Moderna was not interested in Natera. *See id.* at 126:7-127:7. With respect to Bristol Myers Squibb, Natera could not answer whether it had lost business to that customer. *See id.* at 128:22- 129:2. With respect to Pfizer, Natera does not know why it has been unable to develop a relationship. *See id.* at 118:8-10. With respect to F-star, Natera does not know why it has been unable to develop a relationship. *See id.* at 115:1-3. With respect to Kronos, Natera does not know whether Natera has even sought business from this customer. *See id.* at 125:23-25. Natera does not even know if it has a relationship with Takeda. *See id.* at 115:15-22. Natera does not know whether it currently has contractual relationships with Sanofi. *See id.* at 116:21-23. In its discovery responses, Natera only provided vague

information, lacking details on specific bids or clear explanations for sales losses. *See* Doc. 109-3 at 10–15.

140.    NeoGenomics is uniquely qualified to support cancer research where the high sensitivity of its 48 variant approach is needed for the research to succeed. *See* Doc. 112 ¶¶ 30–37, 39, 43–45.  The Cowen Report finds that "NEO [RaDaR] has a differentiated chemistry and targets up to 48 tumor-specific variants and has a sensitivity profile that can offer advantage over existing players." *See* Doc. 92-1 at NEOGEN00004203.  Cowen highlights the RaDaR test's "strong sensitivity profile." *Id.* at -4204.

141.    Natera has failed to show it was eligible to secure the biopharma contracts NeoGenomics has obtained over the last three years.  *See* Doc. 112 ¶ 30. The unrebutted testimony of NeoGenomics's corporate representative, Mr. Sikri, states that Signatera did not have the requisite levels of sensitivity and accuracy for Moderna and was thus not eligible for consideration in the first instance. *See id.* ¶ 32. Signatera likewise was not eligible for the Kronos contract regarding hematology, *id.* ¶ 36, or the Neogene Therapeutics, Inc. trial, *id.* ¶ 39.  This is true generally. *See id.* ¶¶ 29–37, 39, 43.

142.    The unrebutted facts show that Natera previously licensed the patent rights at issue here to Clarient, which illustrates that it can be compensated financially for use of those rights.  *See* Doc. 119-4; Doc. 119 ¶¶ 78–81.

143.    Natera has failed to show that NeoGenomics is the cause of its reputation issues and thus that its reputation is being irreparably harmed by NeoGenomics.  As the Cowen report shows, RaDaR is known in the market for its differentiated chemistry that

leads to unique sensitivity afforded by its measurement of up to 48 variants. *See* Doc. 92-1 at NEOGEN00004203, -4204.

144. Natera's reputational issues for Signatera stem from other causes. Professor Charles Swanton is one of the most prominent and influential cancer-research opinion leaders. Doc. 93-5 at 232:20–233:13, 254:25–255:19. Professor Swanton's decision to stop working with the Signatera assay created a negative reputation for Natera's MRD technology. *See* Doc. 93-6 at 549:19–550:5. Natera acknowledges that it also lost Signatera business from AstraZeneca because of Professor Swanton's negative view. *See* Doc. 93-5 at 255:20–256:4. Further, according to Natera's own witnesses, Bristol Myers Squibb also had a negative view of Signatera because of Professor Swanton's stature and steered away from Natera. *See id.* at 256:17-25.

145. Natera contends that public statements made by Dr. Nick Turner in June 2023 are irreparable harm attributable to NeoGenomics. Dr. Turner is an influential MRD opinion leader. But the record shows that Dr. Nick Turner's recent criticism of Signatera's performance had nothing to do with NeoGenomics or RaDaR, but was directed to Signatera. *See* Doc. 112 ¶ 41. Dr. Turner has worked with Signatera extensively. *Id.* And Dr. Turner was positive about RaDaR in his June 2023 presentation. *Id.*

146. NeoGenomics's corporate representative, Mr. Sikri, states that Signatera has a negative reputation for sensitivity and customer support. *See id.* ¶ 44. By contrast, he explains, numerous clinical research partners work with RaDaR in good part because of RaDaR's high degree of sensitivity. *See id.* ¶ 37; Doc. 111-8.

147.    Natera failed to prove that there is a sufficient nexus between the claimed inventions and the supposed irreparable harm.  Natera's nexus witness, Dr. Malani, failed to establish a causal nexus between RaDaR's alleged infringement and its product sales because he did not even know what the invention was in any meaningful way. *See* Doc. 108-7 at 118:19–121:23.  RaDaR's use is driven primarily by its novel, high degree of sensitivity measuring for 48 variants and using advanced bioinformatics.  *See* Doc. 112 ¶ 44.

## III.    THE BALANCE OF HARMS DISFAVORS A PRELIMINARY INJUNCTION.

148.    Natera's expert witness, Dr. Malani, concedes that NeoGenomics would face irreparable harm if its RaDaR product was removed from the market via a preliminary injunction.  *See* Doc. 108-7 at 145:1-6.

149.    A preliminary injunction against RaDaR would effectively discard years of research by NeoGenomics and severely damage the over $390 million investment NeoGenomics made when acquiring Inivata and its continuing investment into RaDaR over the last two years exceeding $87 million. *See* Doc. 112 ¶ 42.

150.    NeoGenomics has a small share of the market and is not projected to grow that share much over the next 3-5 years, as found above.  Given Natera's entrenched position as the dominant market participant with a durable market share, if NeoGenomics was enjoined from sales and had to restart after succeeding in this case on a more complete record, it would be seriously harmed.

31

## IV.  THE PUBLIC INTEREST FAVORS THE AVAILABILITY OF RADAR.

151.  NeoGenomics's new business for RaDaR generally comes from customers reaching out to NeoGenomics because RaDaR offers a novel ability to detect cancer in early stages due to its high degree of sensitivity, which is necessary for certain sample and tumor types. *See* Doc. 112 ¶ 29. Because RaDaR's high sensitivity is capable of detecting disease recurrence earlier compared to less sensitive MRD assays, *see id.* ¶ 44, this increases treatment options for physicians and can improve outcomes for patients, *see id.* ¶ 45. Numerous clients, including Scorpion, AstraZeneca, Moderna, EMD Serono, F-Star Therapeutics, Kronos Bio, and NeoGene Therapeutics, selected RaDaR over Signatera for its (i) higher level of sensitivity and accuracy and (ii) offering of up to 48 variants per assay. *See id.* ¶¶ 30-37, 39. It is critical, and in the public interest, for oncologists and medical professionals to have access to a wide array of different MRD assays. See Doc. 115-12; Doc. 112 ¶ 46.

152.  If NeoGenomics ongoing clinical trials were halted by an injunction, this would prevent over 3,800 individual patients projected to receive cancer treatment as well as countless others who would benefit from a therapy developed through NeoGenomics's collaboration with its pharmaceutical partners and academic partners. *See* Doc. 112 ¶ 47.

153.  Natera's Signatera could not substitute for NeoGenomics' RaDaR for existing patients because (1) it is dangerous and medically unethical to patients to change test methodologies during an on-going clinical trial, (2) any change to a different assay requires extensive modifications to the study protocol, (3) the associated delays could jeopardize patients' access to the clinical trial therapies, and (4) it is unlikely that the FDA

would approve a change in testing methodology during an on-going clinical trial. *See id.*
¶ 39.

154. There is no evidence in the record that Signatera can substitute for RaDaR for the type of Biopharma contracts for which RaDaR has been selected, nor is there any evidence in the record that Natera has MolDx approval for pending indications. And the direct evidence on this subject is inconsistent with this. *See id.* ¶¶ 30–37, 39, 43–45.

## PROPOSED CONCLUSIONS OF LAW

### I.    CLAIM CONSTRUCTION

#### A.    Construction Of The Claims Of The '454 patent

1. Claim 1 of the '454 patent recites "performing targeted multiplex amplification…to obtain amplicons." Doc. 1-1 at claim 1.

2. Claim 1 of the '454 patent goes on to recite "sequencing ***the*** amplicons" that result from the "targeted multiplex amplification" step. *Id.* (emphasis added).

3. By their plain language, including the use of the word "the" as an anaphoric phrase, these claim elements require sequencing of the amplicons that emerge from the "targeted multiplex amplification" without intermediate amplification or modification steps. *See, e.g.*, *Harris Corp. v. Fed. Express Corp.*, 502 F. App'x 957, 963 (Fed. Cir. 2013) ("[T]he" data in a claim step must refer to the specific data referred to in an earlier claim step "where, as here, the later instance refers to 'the' data and therefore begs for some antecedent basis."); *Natera, Inc. v. ArcherDX, Inc.*, CA No. 20-125-GBW, D.I. 550 at 8 (D. Del. Feb. 6, 2023) (""[T]he definite article 'the' in conjunction with 'universal primer' recited in the second PCR refers to the initial antecedent phrase 'universal primer' as

33

referred to in the first PCR."); *Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2019 WL 5677748, at *11 (D. Del. Nov. 1, 2019), *report and recommendation adopted,* No. CV 17-1616-LPS-CJB, 2020 WL 1329513 (D. Del. Mar. 23, 2020) ("After all, the claims do not say 'grouping any of the plurality of sequence reads' or 'grouping some of the plurality of sequence reads'—rather, they require grouping of 'the' sequence reads referred to in the prior step.").

4. During prosecution of the related '008 patent, Natera distinguished its alleged invention from Forshew (2012) on the basis of a lack of intermediate steps between "targeted multiplex amplification" and "sequencing." *See supra* Part I.E.2.a).

5. This prosecution history for the related '008 patent further confirms that the claims of the '454 patent require sequencing of the amplicons that emerge from the "targeted multiplex amplification" without intermediate amplification or modification steps. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316 (Fed. Cir. 2007) ("Moreover, the prosecution of the '562 patent, with the same specification, makes clear that the inventors understood their invention to encompass only automatic positioning because they so argued in order to distinguish their claims over Lemchen."); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (It "is irrelevant whether Elkay relinquished this potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference.").

6. Dependent claim 11 recites the performance of "barcoding PCR prior to the sequencing." Doc. 1-1 at claim 11.

7. Claim 11 is not inconsistent with interpreting claim 1 of the '454 patent to require sequencing of the amplicons that emerge from the "targeted multiplex amplification" without intermediate amplification or modification steps because claim 11 does not preclude the possibility of the barcoding PCR happening prior to or at the same time as the "targeted multiplex amplification." *See* Ex. 3 at 44:9-14; *Guardant Health*, 2019 WL 5677748, at *11 ("[T]hese claims do not actually speak to when the sequence reads must be filtered out, and thus do not seem to 'preclude filtering sequence reads after grouping[,]'").

### B. Construction Of The Claims Of the '035 Patent

8. The specification of the '035 patent defines "amplification" to mean "a method that increases the number of copies of a molecule, such as a molecule of DNA." Doc. 1-2 at 34:44, 42:4-5; *see also id.* at 42:6-13.

9. Therefore, in the claims of the '035 patent, the term "amplifying" means "increasing the number of copies of a molecule, such as a molecule of DNA."

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The Burden On A Request For a Preliminary Injunction

10. A preliminary injunction is an "extraordinary remedy." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

11. Plaintiffs have the high burden to prove all four preliminary injunction factors favor it. *Heart Imaging Technologies, LLC v. Merge Healthcare, Inc.*, 2013 WL 443125, at *3 (M.D.N.C. Aug. 14, 2013).

35

12.    The Court should deny Natera's motion if there is a "substantial question" regarding infringement or validity. *Trebro Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014).

13.    If NeoGenomics raises a "substantial question concerning either infringement or validity, i.e., asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350–51 (Fed. Cir. 2001).

14.    Natera bears the burden of showing that any substantial question raised by NeoGenomics lacks substantial merit, and this is true for substantial questions related both to invalidity and infringement.  *Id.*

### B.    Invalidity

#### 1.    Conclusions Of Law Relevant To Invalidity Of The '454 Patent For Failure Of Written Description

15.    "The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322 (Fed. Cir. 2017).

16.    Where a specification emphasizes a particular feature as being essential to the alleged invention, teaches only methods that use that particular feature, and criticizes prior art approaches that ***do not*** utilize that feature, generic claims that include no elements related to that feature are invalid for failure to satisfy the written description requirement.

36

*See, e.g.*, *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1343–44 (Fed. Cir. 2022); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998).

### 2. Conclusions Of Law Relevant To Invalidity Of The '035 Patent For Improper Inventorship

17. A patent is invalid if the correct inventors are not identified. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349-50 (Fed. Cir. 1998).

18. A "patent co-owner seeking to maintain an infringement suit must join all other coowners." *STC. UNM v. Intel Corp.*, 754 F. 3d 940, 944 (Fed. Cir. 2014).

### C. Non-infringement

### 1. Conclusions Of Law Relevant To Non-Infringement Of The '454 Patent

19. The "use of a patented method does not infringe unless 'each of the steps is performed within this country.'" *See NTP, Inc. v. Rsch. In Motion*, 418 F.3d 1282, 1318 (Fed. Cir. 2005); *see also, e.g.*, *Home Gambling Network, Inc. v. Piche,* No. 2:05-cv-00610-DAE-VCF, 2013 WL 5492568, *6 (D. Nev. Sept. 30, 2013); *F45 Training Pty Ltd. v. Body Fit Training USA Inc.*, No. CV 20-1194-WCB, 2022 WL 17177621, at *16 (D. Del. Nov. 17, 2022); *Ormco Corp. v. Align Technology, Inc.*, 609 F.Supp.2d 1057, 1067 (C.D. Cal. 2009); *Renhcol Inc. v. Don Best Sports*, 548 F.Supp.2d 356, 366 (E.D. Tex. 2008).

20. The Federal Circuit has made clear that "Congress has consistently expressed the view that it understands infringement of method claims under section 271(a) to be limited to use." *NTP*, 418 F.3d at 1319.

21. "Neither the Federal Circuit nor the Supreme Court has ever recognized that one may infringe a method claim by selling or offering to sell a service that performs the method." *Wright's Well Control Servs., LLC v. Oceaneering Int'l, Inc.*, No 15-1720, 2017 WL 3706344, at *3 (E.D. La. Aug. 28, 2017).

## 2. Conclusions Of Law Relevant To Non-Infringement Of The '035 Patent

22. The claims of the '035 patent recite separate "tagging" and "amplifying" steps. *See* Doc. 1-2 at claim 1.

23. Therefore, it is presumed that these are different steps that correspond to different components of the invention, and hence different components of an allegedly infringing method. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, *LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.").

## III. IRREPARABLE HARM

24. A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

25. Even if a likelihood of success on the merits is proven, the movant still must also show that irreparable harm is indeed likely absent such an injunction. *Id.* at 24-25.

26. Delay "undercuts the urgency that forms the cornerstone of injunctive relief." *Quad/Tech, Inc. v. QI B.V.*, 701 F. Supp. 2d 644, 657 (E.D. Pa. 2010). In *Oxford Immunotec Ltd. v. Qiagen, Inc.*, "[plaintiff] knew in January, 2017, that [defendant] was

about to apply for FDA approval of the [alleged infringing product] and planned to launch [it] in the second half of 2017. [However,] [i]t waited until August 30, 2017, to file its motion for a preliminary injunction and its explanation for the delay [was] underwhelming." 271 F. Supp. 3d 358, 368 (D. Mass. 2017).

27. Potential lost sales alone do not demonstrate irreparable harm. *See, e.g.*, *Abbot Lab'ys v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) (observing that to find "[p]otential lost sales alone demonstrate manifest irreparable harm…would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances"); *Impinj, Inc. v. NXP USA, Inc.*, No. 19-cv-03161-YGR, ECF No. 472, at 3 (N.D. Cal. Oct. 3, 2023) (noting that in two-player market, defendant's "superior read sensitivity" did not cause plaintiff's alleged irreparable harm).

28. Natera's unsupported, subjective beliefs that it is irreparably harmed are insufficient to support a finding of irreparable harm. *See, e.g.*, *Well Cell Glob. LLC v. Calvit*, 2023 WL 6156082, at *3 (Fed. Cir. Sept. 21, 2023) (non-precedential) (finding district court abused its discretion by issuing preliminary injunction where movant's "irreparable harm allegations rested on unsubstantiated assertions").

29. Harm caused by alleged infringement is quantifiable, and thus not irreparable, if that patented product was licensed. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1338 (Fed. Cir. 2012).

30. To establish irreparable harm due to lost sales, a casual nexus between the alleged infringement and product sales is required. *See, e.g.*, *Apple, Inc. v. Samsung Co.*, 678 F.3d 1314, 1323–24 (Fed. Cir. 2012).

## IV. BALANCE OF HARMS

31.    Courts have found the balance of harms disfavors an injunction where the moving party has the majority market share. *See, e.g.*, *Waters Corp. v. Agilent Techs. Inc.*, 410 F. Supp. 3d 702, 717 (D. Del. 2019) (finding balance of harms disfavored injunctive relief where "[t]he 'status 'quo' include[d] a 75-80% market share for [plaintiff's product] and 20-25% market share for [defendant's accused product]"); *Novozymes A/S v. Danisco A/S*, No. 10-cv-251-BBC, 2010 WL 3783682, at *10 (W.D. Wis. Sept. 24, 2010) ("Plaintiffs have 60 percent of the market share; defendants have between 30 percent and 35 percent. As discussed above, plaintiffs have not shown that their market share is likely to dwindle further if no injunction is granted. However, if defendants are enjoined, they may very well be crippled and unable to recover even if the injunction is lifted after trial.").

32.    An accused infringer's investment in its unique and independently developed product weights against an injunction.  *See Westinghouse Air Brake Techs. Corp. v. Siemens Indus. Inc.*, No. 17-1687-LPS, 2018 WL 3655782, at *1 (D. Del. Aug. 2, 2018).

## V. PUBLIC INTEREST

33.    The "focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988) (finding public interest favored availability of an accused cancer test).  In *Cordis Corp. v. Boston Scientific Corp.*, the court found that a "strong public interest support[ed] a broad choice [for a particular medical device]" where "the record contain[ed] evidence that some doctors

40

prefer[red] the [defendant's medical device] over [plaintiff's]." 99 F. App'x 928, 935 (Fed.

Cir. 2004).

December 1, 2023

Respectfully submitted,

WOMBLE BOND DICKINSON (US) LLP

*/s/ John F. Morrow, Jr.*
John F. Morrow, Jr. (N.C. Bar No. 23382)
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: 336.721.3584
Facsimile: 336.733.8429
John.Morrow@wbd-us.com

Edward R. Reines*
Derek C. Walter*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com

*Counsel for Defendant NeoGenomics Laboratories, Inc.*

*\* Special Appearance Under Local Rule 83.1(d)*

41

## CERTIFICATE OF WORD COUNT

The undersigned counsel hereby certifies that this brief complies with the word count limitations of Local Rule 7.3(d). This certificate was prepared in reliance on the word count feature of the word processing software used to prepare this document.

December 1, 2023

/s/John F. Morrow, Jr.
John F. Morrow, Jr. (N.C. Bar No. 23382)
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: 336.721.3584
Facsimile: 336.733.8429
John.Morrow@wbd-us.com

42

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of

Court using the CM/ECF system.

December 1, 2023

/s/John F. Morrow, Jr.
John F. Morrow, Jr. (N.C. Bar No. 23382)
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: 336.721.3584
Facsimile: 336.733.8429
John.Morrow@wbd-us.com

43