**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NATERA, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>NEOGENOMICS LABORATORIES,<br>INC.,<br><br>                    Defendant. | C.A. No. 1:23-CV-00629 |

**PLAINTIFF NATERA INC.'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION**

Plaintiff Natera, Inc. ("Natera") submits the following Proposed Findings of Fact and Conclusions of Law in support of its Motion for a Preliminary Injunction.

**PROPOSED FINDINGS OF FACT**

**I.     THE ASSERTED PATENTS**

1.     For purposes of this Preliminary Injunction motion, Natera asserts Claims 1, 12, and 13 of U.S. Patent No. 11,519,035 ("the '035 Patent" and "Asserted Claims of the '035 Patent"), and Claims 1, 8, and 11 of U.S. Patent No. 11,530,454 ("the '454 Patent" and "Asserted Claims of the '454 Patent").[1] Doc. 107 at ECF 8, 11.

2.     The '035 Patent issued on December 6, 2022. Doc. 1-2 at ECF 2.

3.     The '454 Patent issued on December 20, 2022. Doc. 1-1 at ECF 2.

4.     The Asserted Claims of the '035 Patent are each entitled to a priority date of no later than May 18, 2011 based on the filing date of U.S. Non-Provisional Patent App.

---

[1]     The '035 and '454 Patents together are the "Asserted Patents." The asserted claims of the Asserted Patents together are the "Asserted Claims."

1

No. 13/110,685, which is cited on the face of the '035 Patent. Doc. 1-2 at ECF 2.

5.     The Asserted Claims of the '454 Patent are entitled to a priority date of no later than April 21, 2015 based on the filing date of U.S. Non-Provisional Patent App. No. 14/692,703, which is cited on the face of the '454 Patent. Doc. 1-1 at ECF 2.

## II.    THE LEVEL OF ORDINARY SKILL IN THE ART

6.     NeoGenomics and its expert, Dr. Brian Van Ness, do not refute Natera's description of the level of skill of one of ordinary skill in the art. Doc. 17 (Metzker Opening Decl.) ¶ 32; Doc. 116 (Van Ness Decl.) at ¶¶41-42; Ex. 1 (Metzker 11/14/23 Tr.) at 16:2-7; *see generally* Doc. 107 (PI Opposition).

## III.    NATERA HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    Natera Is Likely To Prove Infringement Of The Asserted Claims Of The '035 And '454 Patents

#### 1.    NeoGenomics' Accused RaDaR Test And The Infringing Acts

7.     NeoGenomics designs, develops, makes and uses, or directs or controls the design, development, make and use of, the RaDaR assay. Doc. 128 at ECF 9, ¶9.

8.     NeoGenomics' "laboratory is registered to Inivata, Inc., a corporate affiliate of NeoGenomics Laboratories." Doc. 128 at ECF 10, ¶41.

9.     On March 16, 2023, NeoGenomics launched the RaDaR product for sale for clinical use in the United States. Doc. 128 at ECF 10, ¶42.

10.    In its published guide for patients, NeoGenomics describes RaDaR testing as follows: "First, a custom RaDaR test is created from your tumor tissue and blood samples. . . Through tests conducted on the blood sample in our lab, RaDaR can detect extremely

small amounts of ctDNA, indicating the presence of minimal residual disease (MRD)." Doc. 1-22 at ECF 3.

11.     The InVision liquid biopsy platform on which RaDaR is built utilizes enhanced TAm-Seq™ (eTAm-Seq™) technology, "an amplicon-based next generation sequencing method for the identification of clinically-relevant somatic alterations at low frequency in ctDNA." Doc. 17-5 (Gale) at ECF 2.

12.     The eTAm-Seq technology is an adaptation of the TAm-Seq method previously first described by Forshew et al., *Science Translational Medicine* 4:136ra68 (2012). Doc. 17-5 (Gale) at ECF 2; Doc. 17 (Metzker Opening Decl.), ¶¶87-88.

13.     The TAm-Seq protocol involves a limited 15-cycle multiplex preamplification ("Pre Amp") step followed by "single-plex PCR" followed by "Barcoding PCR". Doc. 17-7 (Forshew) at Fig. 1, ECF 4; Doc. 145 (Metzker Reply Decl.), ¶¶121, 295; Doc. 116 (Van Ness Decl.), ¶131.

14.     The eTAm-Seq protocol as employed in the RaDaR assay does not use the single-plex amplification step of the TAm-Seq workflow, but rather the eTAm-Seq technology in RaDaR "utiliz[es] multiplex PCR to enable high-throughput library preparation." Doc. 17-5 (Gale) at ECF 5; Doc. 116 (Van Ness Decl.), ¶¶116-117; Doc. 116-6 (Metzker 9/26/23 Tr.) at ECF 10, 28:19-33:10.

15.     The "Pre Amp" and "Barcoding and Sequencing" described in the "TAm-Seq" protocol, as shown in Figure S1 of Forshew and described in the Forshew methods, are also performed in the accused RaDaR test. Doc. 145-1 (Van Ness Tr.) at ECF 153, 224:5-16; Doc. 116 (Van Ness Decl.), ¶¶116-117; Doc. 116-6 (Metzker 9/26/23 Tr.) at

3

ECF 10, 28:19-33:10.

**2.    RaDaR Infringes The Asserted Claims of the '035 Patent**

16.    NeoGenomics does not refute that RaDaR infringes all elements of the asserted claims of the '035 Patent except NeoGenomics alleges that RaDaR does not practice "amplifying the tagged products [by] targeted amplification" as required by Claim 1 of the 035 patent claims. Doc. 107 at ECF 11-12; Doc. 17 (Metzker Opening Decl.) at § VIII.B; Doc. 145 (Metzker Reply Decl.) at § IX.B.ii.

17.    NeoGenomics concedes that RaDaR performs tagging of cell-free DNA ("cfDNA") but alleges that RaDaR does not perform a separate additional targeted PCR after tagging. Doc. 107 at ECF 11-12; Doc. 145-1 (Van Ness. Tr.) at ECF 57, 220:1:16; Doc. 145 (Metzker Reply Decl.), ¶¶68-69.

18.    The first step of the RaDaR test employs a 15-cycle targeted PCR, called the "Pre Amp" step. Doc. 17-7 (Forshew) at ECF 4, ECF 21 (Fig. S1). Dr. Van Ness admits that in the first cycle of RaDaR, cell-free DNA is tagged with universal tail adaptors. Doc 145-1 (Van Ness Tr.) at ECF 60, 230:21-233:8. Dr. Van Ness further admits that, as a general principle in PCR, each cycle amplifies the products of prior cycles. Doc. 145-1 (Van Ness Tr.) at ECF 57, 220:1-16.

19.    After tagging during the first cycle of targeted PCR, RaDaR amplifies the tagged products by targeted amplification during the remaining 14 cycles of the Pre Amp step, amplifying the products from each prior PCR cycle, including the tagged products created after the first cycle. Doc. 145-1 (Van Ness Tr.) at ECF 60, 230:21-232:17; Doc. 145 (Metzker Decl.) at ¶¶294-300; Doc. 17-7 (Forshew) at ECF 21, Figure S1.

4

### 3. RaDaR Infringes The Asserted Claims of the '454 Patent

20.     NeoGenomics does not refute that RaDaR infringes all elements of the asserted claims of the '454 Patent, except to the extent that it alleges RaDaR does not perform "sequencing the amplicons" and, within the United States, does not perform "detecting one or more of the tumor-specific SNV mutations" as required by Claim 1. Doc. 107 at ECF 8-11; Doc. 17 (Metzker Opening Decl.) at § VIII.A; Doc. 145 (Metzker Reply Decl.) at § IX.A.v.

### (b) RaDaR Meets The "Sequencing The Amplicons" Limitation Of Claim 1 Of The '454 Patent

21.     NeoGenomics alleges that RaDaR does not practice the "sequencing the amplicons" step of claim 1 based on an interpretation that would require the amplicons produced in the "targeted multiplex amplification" step to be directly sequenced in the "sequencing the amplicons" step, and that would preclude any additional intervening steps. Doc. 107 at ECF 8-10; Doc. 116 (Van Ness Decl.), ¶¶78-81.

22.      NeoGenomics argues that in RaDaR, the amplicons produced in the "targeted amplification" step of claim 1 are not directly sequenced because there is an intervening universal PCR step between targeted amplification and sequencing. Doc. 107 at ECF 8-9; Doc. 116 (Van Ness Decl.), ¶78.

23.     Claim 1 of the '454 Patent does not recite that amplicons are "directly" sequenced after targeted amplification or that "intervening steps" are excluded.  Doc. 1-1 ('454 Patent) at claim 1; Doc. 145-1 (Van Ness Tr.) at ECF 62, 238:16-24.

24.     In RaDaR, the target loci each encompassing a different tumor-specific SNV

5

mutation are amplified by targeted multiplex amplification to produce amplicons containing the target loci. Doc. 17 (Metzker Opening Decl.), ¶¶63-68. In RaDaR, the amplicons that are sequenced contain the target loci, and the sequence reads obtained include the target loci. *Id*.

25.     The '454 Patent specification describes adding sequencing tags to amplicons by PCR prior to sequencing. Doc. 1-1 ('454 Patent) at ECF 185, 98:35-38.

26.     The '454 Patent includes dependent Claim 11, which depends from Claim 1, and recites a "barcoding PCR prior to sequencing." Doc. 1-1 ('454 Patent) at claim 1. Independent Claim 1 is broader than Claim 11, and thus permits but does not require "barcoding PCR prior to sequencing."

27.     The '454 Patent specification includes working Examples 7 and 9, which describe a separate barcoding PCR being performed after targeted amplification and prior to sequencing. Doc. 1-1 ('454 Patent) at ECF 215-216, 158:38-159-60 (Example 7) and ECF 218, 163:10-164:58 (Example 9).

28.     The specification of the '454 Patent includes examples using Illumina sequencing machines. Doc. 1-1 ('454 Patent) at ECF 218, 163:10-164:58 (Example 9) and ECF 220, 167:64-168:58 (Example 13). Illumina sequencing machines as used in the '454 Patent specification require the addition of sequencing tags prior to sequencing. Doc. 145 (Metzker Reply Decl.), ¶¶61, 290.

29.     NeoGenomics relies on statements made by Natera during the prosecution of a different, unasserted Natera patent, U.S. Patent No. 11,486,008 (the "'008 Patent"), to argue Claim 1 of the '454 Patent should be interpreted to exclude any intervening step

between the targeted multiplex amplification and the sequencing steps.  Doc. 107 at ECF 9; Doc. 116 (Van Ness Decl.), ¶80.

30.     Natera has not made, nor does NeoGenomics allege, any prosecution disclaimer or disavowal of claim scope in the '454 Patent specification or prosecution history.  Doc. 107 at ECF 9-11.

31.     The '454 and '008 Patent claims have materially different claim language and scopes, and the PTO found them each patentable based on different arguments during prosecution.  Doc. 145 (Metzker Reply Decl.), ¶¶277-281.

32.     Claim 1 of the '008 Patent recites "performing high-throughput sequencing to sequence the amplicons <u>obtained in the multiplex targeted amplification reaction to obtain sequence reads</u>," (Doc. 108-1 ('008 Patent) at claim 1 (underlining added)), language which does not appear in Claim 1 of the '454 Patent, (Doc. 101-1 ('454 Patent) at claim 1).

33.     One of ordinary skill in the art would have understood that sequencing amplicons could require universal amplification to add sequencing adaptors as sequencing adaptors are required for sequencing on an Illumina sequencer.  Doc. 145 (Metzker Reply Decl.) at ¶¶ 290-291. Universal PCR generally uses common primer sequences, but will preserve the relative quantities of mutations present. *Id*. One of ordinary skill in the art would have readily recognized that an additional PCR could be performed using a proofreading polymerase (as opposed to Taq polymerase), such that there is no substantial increase in error. *Id*.

### (c) RaDaR Performs "Detecting One Or More Of The Tumor-Specific SNVs" In the United States

34. NeoGenomics argues that "detecting one or more of the tumor-specific SNV mutations" is not infringed because it is a bioinformatics step that is performed on servers located outside of the United States. Doc. 107 at 6.

35. Mr. Sikri, NeoGenomics' President of Advanced Diagnostics and its corporate witness, admitted that "[t]he SNVs are detected through the sequencer that [is] where the sample is run." Doc. 144-7 (Sikri Tr.) at ECF 21, 74:17-20.

36. NeoGenomics does not dispute that the sequencers used by NeoGenomics to conduct the sequencing of the infringing RaDaR test are present in the United States where patient samples are run. *See generally* Doc. 107.

37. Dr. Van Ness, NeoGenomics' proffered expert on non-infringement and corporate witness[2], admitted that RaDaR "testing is done within the United States," and had no opinion on whether RaDaR does or does not infringe because NeoGenomics allegedly performs part of the RaDaR test outside the United States. Doc. 145-1 (Van Ness Tr.) at ECF 7, 16:15-24, 21:2-12.

38. NeoGenomics announced that the RaDaR assay is "fully available to U.S. Clinicians." Doc. 1-23. Pursuant to 42 C.F.R. §411.9, "Medicare does not pay for services furnished outside the United States." NeoGenomics represented in its insurance

---

[2]     Dr. Van Ness, NeoGenomics' proffered expert, was also designated as NeoGenomics' Fed. R. Civ. P. corporate witness on Natera's 30(b)(6) Topic No. 3 relating to the protocol(s), procedure(s), and/or method(s) used in connection with performing the RaDaR Assay. Doc. 145-1 (Van Ness Tr.) at ECF 6-7, 17:24-18:5.

reimbursement certifications and approvals, including MolDX, that Inivata is authorized to perform RaDaR tests in the United States. Doc. 1-24.

### B. NeoGenomics Did Not Raise A Substantial Question of Validity as to Any Asserted Claim of the Asserted Patents[3]

39.     NeoGenomics does not contend any asserted claim of the Asserted Patents is invalid as anticipated by the prior art under 35 U.S.C. § 102, (Doc. 145-1 (Van Ness Tr.) at ECF 26, 94:14-95:4; *see generally* Doc. 116), and thus does not dispute the novelty of the asserted claims of the Asserted Patents.

#### 1. NeoGenomics Failed To Establish *Prima Facie* Obviousness As To Any Of The Asserted Patent Claims

40.     NeoGenomics has not presented any support for a motivation to combine or modify any particular asserted reference with a reasonable likelihood of success in achieving the subject matter of any Asserted Claim. *See generally* Doc. 107; Doc. 116.

41.     Dr. Van Ness does not offer an analysis of, or opinions regarding, a motivation to combine or modify any of NeoGenomics' asserted references with a reasonable likelihood of success in achieving the subject matter of the Asserted Claims, as required to establish a *prima facie* case of obviousness.  Doc. 145 (Metzker Reply Decl.) at ¶¶75, 78; *see generally* Doc. 116 (Van Ness Decl.) §X.

42.     Dr. Van Ness's opinions are thus indicative of hindsight bias, rather than a

---

[3]  Natera does not address NeoGenomics' Section 101 invalidity argument in light of (1) the fact that the parties did not address Section 101 at the preliminary injunction hearing and (2) the Court's comments to NeoGenomics regarding its incorporation by reference of its motion to dismiss briefing into its opposition brief to the preliminary injunction. Should the Court wish to have proposed conclusions of fact and law on this argument, Natera can provide them at the Court's convenience.

Case 1:23-cv-00629-CCE-JLW     Document 163     Filed 12/01/23     Page 9 of 49

POSA's perspective regarding obviousness at the time of the priority dates of the Asserted Claims. Doc. 145 (Metzker Reply Decl.) at ¶¶77-78.

43. In rendering his opinions on obviousness, Dr. Van Ness also does not analyze any secondary considerations of non-obviousness. Doc. 145 (Metzker Reply Decl.) at ¶¶76, 78; *see generally* Doc. 116 (Van Ness Decl.).

### (a) Kaper, Combined With Knowledge In The Art, Does Not Render The Claims Of The '035 Patent Obvious

44. Kaper does not disclose the targeted amplification of SNP loci, including SNPs associated with cell-free DNA. Doc. 145 (Metzker Reply Decl.) at ¶¶164, 166, 168. Kaper also does not disclose targeted multiplex amplification of 25-2,000 SNP loci in a single reaction volume. *Id.*

45. Kaper does not disclose using cell-free DNA, including amplifying or sequencing tumor-associated cell-free DNA. Doc. 145-1 (Van Ness Tr.) at ECF 39,146:18-22; Doc. 145 (Metzker Reply Decl.), ¶156; *see also* Doc. 116 (Van Ness Decl.) ¶240 (Kaper amplifies gene exons, not cell-free DNA). The majority of amplicons taught in Kaper exceed the typical length of cell-free DNA. Doc. 145 at ¶163.

46. Kaper uses the Fluidigm Access Array. Doc. 145-1 (Van Ness Tr.) at ECF 37, 140:14-24; Doc. 145 (Metzker Reply Decl.) at ¶160. The '035 Patent discloses that the "split-and-pool methods" of the Fluidigm Access Array "are problematic for samples with a limited amount of DNA, as there is often not enough copies of the genome to ensure that there is one copy of each region of the genome in each well." Doc. 145 (Metzker Reply Decl.) at ¶160 (quoting Doc. 1-2 ('035 Patent) at 85:21-46).

10

47.     A POSA as of 2011 would have understood that Kaper teaches away from multiplex amplification of 25-2,000 loci in tumor-associated cell-free DNA based on its split-and-pool method, which may not amplify tumor-associated SNPs due to the limited amount of template DNA being divided into individual reaction wells.  Doc. 145 (Metzker Reply Decl.), ¶160 (quoting Doc. 1-1 ('454 Patent) 85:21-46).

48.     In contrast, the '035 Patent teaches its method can "effectively and efficiently amplify many PCR reactions [and] is applicable to cases where only a limited amount of DNA is available," such as in the analysis of "the free floating DNA" found in plasma. Metzker Rep. (Doc. 145) ¶160 (quoting Doc. 1-2 ('035 Patent) at 85:21-46).

49.     NeoGenomics does not identify any motivation to modify Kaper to include the elements of the '035 Patent claims that are missing, identified *supra*, or a reasonable expectation of success in doing so in the context of working with SNPs in cell-free tumor DNA to achieve the '035 Patent's claimed inventions.  *See generally* Doc. 116 (Van Ness Decl.) at ¶¶234-273; Doc. 145 (Metzker Reply Decl.) ¶¶154-169.

## (b) The Combination of Han and Wang (ARM-PCR) Does Not Render The Claims Of The '035 Patent Obvious

50.     Han and Wang do not disclose using cell-free DNA. Doc. 145 (Metzker Reply Decl.) at ¶¶173-175.  Han teaches amplifying DNA from cellular and viral sources that do not include plasma samples or cell-free DNA. *Id.* at ¶173 (quoting Doc. 116-16 (Han) at [0009]).  Wang amplifies whole genes in cellular (T-cell) DNA, not cell-free DNA. *Id.* at ¶173 (quoting Doc. 117-24 (Wang) at 1518, 1520).

51.     Dr. Van Ness admitted that Han and Wang do not "teach a motivation to use

cell-free DNA" with their disclosed methods. Doc. 145-1 (Van Ness Tr.) at ECF 43-44,169:3-170:10; *see also* Doc. 145 (Metzker Reply Decl.) at ¶¶173-175.

52.     Han and Wang do not disclose amplifying SNPs. Doc. 145 (Metzker Reply Decl.), ¶¶177, 180.

53.     Han teaches the use of a "binary" approach to identify the presence or absence of the targeted samples. Doc. 145 (Metzker Reply Decl.), ¶178. In contrast, targeting SNPs according to the '035 Patent claims does not involve a binary assay as a SNP may be one of four nucleotides. *Id.* ¶179.

54.     Wang teaches targeting only one single locus for amplification, which a POSA would understand to use a single primer pair. Doc. 145 (Metzker Reply Decl.), ¶180. It does not teach amplifying multiple SNP loci in a single reaction volume, which a POSA would understand uses multiple different primer pairs. *Id.*

55.     NeoGenomics does not identify any motivation to modify or combine Han and Wang to include the missing elements identified *supra*, or a reasonable expectation of success in doing so in the context of working with cell-free DNA to achieve the '035 Patent's claimed inventions. *See generally* Doc. 116 (Van Ness Decl.), ¶¶ 275-303; Doc. 145 (Metzker Reply Decl.), ¶¶ 170-184.

> ### (c) Forshew, Combined With Knowledge In The Art, Does Not Render The Claims Of The '454 Patent Obvious

56.     The Patent Office considered the Forshew reference during prosecution of the '454 Patent application, and issued the '454 Patent claims after Natera overcame obviousness rejections based on Forshew. *E.g.*, Doc. 116 (Van Ness Decl.) ¶¶166, 171,

12

173; Doc. 118-10 (Remarks) at ECF 3-6; Doc. 118-11 (Notice of Allowance) at ECF 8; Metzker Rep. (Doc. 145) ¶119, 120, 124.

57.     Forshew teaches that the workflow it describes was designed to rely on "individual amplification to purify and select for intended targets" using "parallel single-plex amplification on Access Array, which physically separate individual primer pairs in individual reaction columns to avoid issues such as nonspecific amplification and primer dimer formation." Doc. 118-10 (Remarks) at ECF 5 (emphasis omitted); *see also* Doc. 145 (Metzker Reply Decl.) ¶121.

58.     The USPTO found the '454 Patent claims patentable over Forshew, among other references, under 35 U.S.C. § 103. Doc. 118-11 (Notice of Allowance) at ECF 8. In allowing the '454 Patent claims, the USPTO Patent Examiner found that the prior art, including Forshew, "does not show the limitation in independent claim 1 of a sequencing read depth of at least 50,000 per target locus in the context of the claimed subject matter." Doc. 118-11 (Notice of Allowance) at ECF 10.

59.     NeoGenomics does not identify a motivation to modify Forshew, or a reasonable expectation of success in doing so to achieve the method claimed in the '454 Patent claims. *See generally* Doc. 116 (Van Ness Decl.) §X.A; Doc. 107 at ECF 13-16; Doc. 145 (Metzker Reply Decl.) ¶88, 90, 92, 103, 106.

60.     Forshew identifies multiple problems with targeted multiplex amplification, stating that "[m]ultiplex amplification using a large set of primers could result in nonspecific amplification products and biased coverage.'" *E.g.*, Doc. 145 (Metzker Reply Decl.), ¶139 (quoting Doc. 17-7 (Forshew) at ECF 4); Doc. 118-10 at ECF 5. Forshew

teaches the use of single-plex amplification.   Doc. 145-1 (Van Ness Tr.) at ECF 32-34, 125:20-127:16;; *see also* Doc. 145 (Metzker Reply Decl.), ¶121.

61.     Multiplex amplification in a single reaction volume can result in unwanted primer interactions that can interfere with target amplification.  Van Ness Tr. (Doc. 145-1) at 36, 132:5-22.  For example, multiplex amplification can generate "spurious" reaction products, including primer dimers. *E.g.*, Doc. 145 (Metzker Reply Decl.), ¶135; Doc. 1-1 ('454 Patent) at 105:51-58, 107:65-108:1).

62.     Another challenge with multiplex amplification is allelic bias, where some targets are amplified more efficiently than others, skewing the representative amounts of cancer-associated versus non-cancer-related cfDNA present in the sample.  Doc. 145-1 (Van Ness Tr.) at ECF 35, 132:23-133:3; Doc. 145 (Metzker Reply Decl.), ¶228 (quoting Doc. 1-2 ('035 Patent) at 3:4-14, 85:5-20, 85:21-33, 86:2-10).

63.     Additionally, Forshew does not disclose sequencing to a depth of read of 50,000 or more.  Doc. 116 (Van Ness Decl.) ¶142; Doc. 145-1 (Van Ness Tr.) at ECF 26-27, 97:11-99:21; *see also* Doc. 145 (Metzker Reply Decl.) ¶¶84, 85, 105, 122.  Forshew teaches sequencing cell-free DNA to no more than a mean depth of read of 7,700 per target locus.  Doc. 145 (Metzker Reply Decl.) ¶85 (citing Forshew, Table 1).

64.     A POSA would not have been motivated to modify Forshew to sequence to a depth of read of at least 50,000 per target locus with a reasonable expectation of success in achieving the method claimed in the '454 Patent in view of known errors arising from sample preparation and sequencing samples, which could interfere with the identification of rare mutations in tumor-associated cell-free DNA.  Doc. 145 (Metzker Reply Decl.),

14

¶¶94-95, 110-111.  Dr. Van Ness acknowledged there are "opportunities for errors that increase with sequencing depth."  Doc. 145-1 (Van Ness Tr.) at ECF 28, 102:2-103:14.

65.     A person of skill in the art as of 2015 would have understood that increasing depth of read in sequencing samples that contain large numbers of non-specific amplification products and products of amplification biases would only increase erroneous sequencing reads as a result of sequencing.  Doc. 145 (Metzker Reply Decl.), ¶110.

66.     A person of skill in the art as of 2015 would have understood that following the approach described in Forshew, rare genetic variants would not likely be detectable below the "noise" of the error rate of amplifying and sequencing cell-free tumor DNA even if sequenced to a depth of read of at least 50,000 per target locus.  Doc. 145 (Metzker Reply Decl.), ¶103; Doc. 13-7 at ECF 10; *see also* Ex. 1 (Metzker 11/14/23 Tr.) at 97:11-100:17.

### (d)     Bashashati, Combined With Knowledge In The Art, Does Not Render The Claims Of The '454 Patent Obvious

67.     Bashashati teaches targeted single-plex amplification of SNVs in cell-free DNA. Doc. 116 (Van Ness Decl. ¶195; Doc. 145 (Metzker Reply Decl.), ¶¶130-132 (citing Doc. 118-14 at S6-S7).

68.     Bashashati does not disclose using targeted multiplex amplification to amplify 10 to 500 different target loci from cell-free DNA in the same reaction volume. Doc. 116 (Van Ness Decl.), ¶187-215; Doc. 145-1 (Van Ness Tr.) at ECF 29, 108:2-109:16; Doc. 145 (Metzker Reply Decl.), ¶¶128-144.

69.     Persons of skill in the art as of 2015 understood that there were significant technical hurdles to performing multiplex targeted amplification of 10 to 500 target loci in

15

one reaction volume to prepare amplicons that were suitable for sequencing and detection of rare single nucleotide variants in cell-free tumor DNA. Doc. 145-1 (Van Ness Tr.) at ECF 35,132:5-133:3; Doc. 145 (Metzker Reply Decl.), ¶¶135, 139, 142-143; Doc. 1-1 ('454 Patent) at 105:51-58, 107:65-108:1.

70.    Another technical challenge facing a POSA in 2015 was that tumor-associated cell-free DNA is relatively low-abundance and highly variable within a person's cell-free DNA. Doc. 145 (Metzker Reply Decl.), ¶137. Working with cell-free DNA from plasma samples, particularly tumor-associated cell-free DNA, was challenging and unpredictable as of 2015. *Id.* ¶¶13-22.

71.    Bashashati's approach would not have been useful to identify rare genetic variants which are buried in the "noise" of the Bashashati system's error rate. Doc. 145 (Metzker Reply Decl.), ¶¶147-148.

72.    Additionally, Dr. Van Ness fails to show Bashashati achieves the claimed sequencing depth of read. Doc. 145 (Metzker Reply Decl.), ¶¶151-153. The relied-on portions of Bashashati teach a maximum read depth of 8,295. *Id.*, ¶152.

73.    NeoGenomics does not identify a motivation to modify Bashashati, or a reasonable expectation of success in doing so to achieve the '454 Patent's claimed inventions. *See* Doc. 116 (Van Ness Decl.), ¶¶ 187-215; Doc. 145 (Metzker Reply Decl.), ¶¶128-144.

### 2.    NeoGenomics Did Not Meet Its Burden to Establish A Substantial Question of Invalidity Under Section 112

74.    The Asserted Natera Patents include substantial disclosure. The '035 Patent

16

is 214 pages long, with 252 columns, 45 Figures (including subfigures), and 29 Examples. Doc. 1-2. The '454 Patent is 223 pages long, with 174 columns, 70 Figures (including subfigures), and 15 Examples. Doc. 1-1.

75.     Both Asserted Patents teach methods for multiplex amplification to prepare samples in a manner suitable for sequencing and detecting rare variants in cell-free tumor-associated DNA. Doc. 1-1 ('454 Patent) at ECF 184-187 (95:41-101:24), ECF 188-193 (103:1-113:53), ECF 212-222 (Examples 1-10, 14-15); Doc. 1-2 ('035 Patent) at ECF 90-100 (3:56-23:45), ECF 111-126 (46:36-75:6), ECF 126-132 (76:15-88:51); Doc. 145 (Metzker Reply Decl.) at §VIII.

76.     Whole genome sequencing was known in the art before 2015. Doc. 145 (Metzker Reply Decl.) at ¶¶243-246. Dr. Van Ness admitted "there were platforms that would accomplish whole genome sequencing before . . . 2015" and that "it was known that one could do whole genome sequencing on cancer cells" before that time. Doc. 145-1 (Van Ness Tr.) at ECF 8 (22:9-16, 23:17-24:1)

77.     The '454 Patent cites references on its face from 2008 and 2012 that teach whole genome sequencing. Doc. 1-1 ('454 Patent) at ECF 8 (Ku *et al.*, "Exome Versus Transcriptome Sequencing in Identify Coding Region Variants" (2012)), ECF 9 (Bentley, David R. *et al.*, "Accurate Whole Human Genome Sequencing Using Reversible Terminator Chemistry", *Nature*, 456, 6, 2008, 53-59); Metzker Rep. (Doc. 145) ¶32, 194, 209, 235-247, 256.

78.     The '454 Patent discloses the technique of long read sequencing, (Doc. 1-1 ('454 Patent) at ECF 192, 112:50-67, 116:20-35), which Dr. Van Ness admitted "can

achieve" whole genome sequencing. Doc. 145-1 (Van Ness Tr.) at ECF 70 (270:6-10); Doc. 145 (Metzker Reply Decl.) ¶243. Dr. Van Ness further admitted he did not consider the '454 patent's long read sequencing disclosures in forming his opinions on validity. Doc. 145-1 (Van Ness Tr.) at ECF 70 (270:11-14).

79. The '454 Patent discloses the technique of phasing to determine an individual's haplotype, which is another application of whole genome sequencing. Doc. 1-1 ('454 Patent) at 112:50-56; 115:7-34 and 116:20-35. Dr. Van Ness also admitted he did not consider the '454 patent's disclosures on phasing and determining an individual's haplotype in forming his opinions on validity. Doc. 145-1 (Van Ness Tr.) at ECF 70 (271:13-17, 272:3-11).

80. The '454 Patent describes "exemplary methods for calculating the limit of detection for any of the methods of the invention," including methods "used to calculate the limit of detection for single nucleotide variants (SNVs) in a tumor biopsy." Metzker Rep. (Doc. 145) ¶258 (quoting '454 Patent (Doc. 1-1) at 157:51-55).

81. The '454 Patent teaches attaining a sequencing "depth of read greater than . . . 50,000" for single nucleotide variants, and that combined with the multiplex amplification methods described in the patent, detection sensitivity increases with increasing depth of read. Metzker Rep. (Doc. 145) ¶258 (quoting '454 Patent (Doc. 1-1) at 68:33-39, 169:57-62, Figs. 55-61).

82. The Asserted Patents describe methods that do not require selecting primers to avoid primer dimers, teaching that avoiding primer dimers is one consideration, but there are others, including avoiding allelic bias, imbalances, off-target amplification, and others.

Doc. 1-1('454 Patent) at 86:5-7, 105:48-58; Doc. 1-2 ('035 Patent) at 11:29-31, 48:30-47, 86:2-10; Metzker Rep. (Doc. 145) ¶253.

83.    Both Asserted Patents teach that selecting primers to avoid primer dimers is an optional approach.  Doc. 145 (Metzker Reply Decl.), ¶33, 251, 252, 253, 255; Doc. 1-1 ('454 Patent) at ECF 189, 105:48-58; Doc. 1-2 ('035 Patent) at ECF 94, 11:29-31; ECF 112, 48:30-47; ECF 131, 86:5-7.

84.    The '035 Patent teaches the use of "universal adaptors," which are "DNA molecules containing a universal priming sequence that can be covalently linked to the 5-prime or 3-prime end of a population of target double stranded DNA molecules."  Doc. 145 (Metzker Reply Decl.) ¶¶262-63 (quoting '035 Patent (Doc. 1-2) at 42:23-30).  The '035 Patent further teaches preparing samples by "appending universal adaptors to the DNA in the sample."  Doc. 145 (Metzker Reply Decl.) ¶¶262-63 (quoting '035 Patent (Doc. 1-2) at 32:19-23).

### 3.    NeoGenomics Has Not Shown Any Improper Inventorship

#### (a)    '035 Patent

85.    During prosecution of Patent App. Ser. No. 16/934,407 that ultimately issued as the '035 Patent, Natera submitted a Request for Correction in a Patent Application Relating to Inventorship pursuant to C.F.R. § 1.48 on May 7, 2021. Doc. 109-1 at ECF 4; Doc. 140 (Stoll Decl.) at ¶55.

86.    The Request for Correction added Johan Baner, Milena Banjevic, Allison Ryan and Zachary Demko and removed Joshua Babiarz, Tudor Pompilin Constantin, Lane A. Eubank, Eser Kirkizlar and Onur Sakarya as named inventors. Doc. 109-1 at ECF 4;

19

Doc. 140 (Stoll Decl.) at ¶55.

87.     The Request for Correction included signed statements by each added inventor under 37 C.F.R. § 1.63 agreeing to the change of inventorship. Doc. 140 (Stoll Decl.) at ¶55; Doc. 140-2 (Excerpts of '035 Prosecution History) at NAT-NEO-00002791-96. Natera also submitted an Application Data Sheet under 37 C.F.R. § 1.76 agreeing to the change of inventorship. Doc. 140 (Stoll Decl.) at ¶55; Doc. 140-2 (Excerpts of '035 Prosecution History) at NAT-NEO-00002772-86.

88.     Mr. Robert Stoll, former Director of the U.S. Patent and Trademark Office, testified that Natera followed the procedures set forth by the Patent Office to change inventorship during prosecution of the '035 Patent. Doc. 140 (Stoll Decl.) at ¶¶55-56; Ex. 2 (Stoll Tr.) at 44:14-46:12; 48:18-25. Mr. Stoll further testified that changes to inventorship during prosecution commonly occur and although the Patent Office may request substantive explanation from the Applicant, that did not happen in the case of the '035 Patent inventorship correction.  Stoll Decl. at ¶¶55-56; Ex. 2 (Stoll Tr.) at 27:19-28:15; 29:1-23.

89.     Substantively similar changes to inventors, including the addition and deletion of the same sets of inventors, were made in related Natera patents asserted against ArcherDx, and such changes were found to be proper by the jury.  Doc. 109-1 at ECF 7.

**(b)     '454 Patent**

90.     As Dr. Van Ness admits, whole exome sequencing (WES) to identify tumor-associated SNVs was known in the art as of at least 2012. Doc. 145-1 (Van Ness Tr.) at ECF 10-11, 33:14-35:25; Doc. 145 (Metzker Reply Decl.) at ¶¶240-241; Doc. 1-1 ('454

20

Patent) at ECF 8 (Ku *et al.*, "Exome Versus Transcriptome Sequencing in Identify Coding Region Variants" (2012)).

91.     Natera had the idea to combine WES to identify tumor-associated SNVs with Natera's massively multiplexed PCR (mmPCR) technology to target those SNVs in plasma samples at least as early as June 19, 2014. Doc. 144-1 at ECF 12; Doc. 144-4 (Zimmermann Tr.) at 109:24-113:19 100:24-104:8, 105:16-109:13.

92.     Natera employees first met Dr. Mariam Jamal-Hanjani, a graduate student at the University College of London (UCL), on September 10, 2014.  NAT-NEO-00653063 (cited on Slide 86 of Plaintiff's Ex. 2 at PI Hearing).  NeoGenomics does not dispute this date of first meeting.  *See generally* Doc. 107; Doc. 116.

93.     On March 31, 2015, Dr. Jamal-Hanjani sent an email to Natera, requesting help to write her thesis. NAT-NEO-00654792-93 (cited on Slide 90 of Plaintiff's Ex. 2 at PI Hearing). Dr. Jamal-Hanjani wrote, "I'm putting together my methods and materials section, which will of course acknowledge Natera for the collaboration and experiments etc., but I am struggling with the details. Is there anyone I could get this information from? Unfortunately, information from presentations and on-line won't give me enough details, and the more details the better I think." *Id.*

94.     On April 7, 2015, Dr. Jamal-Hanjani followed up on her request to Natera for "information on methods and materials" for writing her thesis and stated "it would be great to also get the primer sequences . . . and the updated figures on VAF concordance." NAT-NEO-00654792 (cited on Slide 92 of Plaintiff's Ex. 2 at PI Hearing).

95.     The exact disclosure of Example 13 appeared in U.S. Patent App. No.

14/692,703 filed by Natera on April 10, 2015 (issued as U.S. Patent No. 10,179,937), to which the '454 Patent claims priority. NAT-NEO-00004586-00004864; Doc. 1-1 ('454 Patent) at cover page.

96.     In August 2015, four months after the '703 Application was filed, Dr. Jamal-Hanjani published her doctoral thesis. Doc. 118-1 at ECF 2.

97.     On November 22, 2022, Dr. Richard Fagan of UCL contacted Natera regarding six U.S. applications, none of which correspond to the '454 Patent or any patent applications to the which the '454 Patent claims priority. Doc. 153-9 at ECF. Dr. Fagan inquired that "[i]t would . . . seem that Mariam should be named as an inventor on the patent application[s] and UCLB as a co-applicant. Is there a reason for this omission?" *Id.*

98.     On March 14, 2023, Dr. Nishita Doshi, in-house counsel at Natera, wrote to Dr. Fagan that "[w]e have reviewed the thesis by Dr. Jamal-Hanjani that you cited, but did not find anything in this thesis that changes our original inventorship assessment. If there is other evidence involving an element-by-element, claim-by-claim analysis that you would like to provide, Natera will be happy to review and consider it. Otherwise, we will consider this matter closed." *Id.* at ECF 2. As of the date of this submission, UCL has not followed up on this communication with Natera and Natera considered the matter closed.

99.     In an email dated September 18, 2023, Dr. Jamal-Hanjani stated: "[t]hus far, even after looking at the [patent], I can't easily ascertain if any data from my thesis or the work we did with Natera resulting in the Annals of Oncology publication has contributed to the patent." Doc. 144-8 at ECF 4-5.

100.    Dr. Jamal-Hanjani has never made the claim to Natera that she made any

22

inventive contribution to the '454 patent, that she contributed to any claim of the '454 patent, or that she should have been named as an inventor on the '454 patent. *See generally* Doc. 107.

## IV. SIGNATERA PRACTICES THE ASSERTED PATENTS

101. NeoGenomics concedes that Signatera practices all limitations of Claim 1 of the '035 Patent except "amplifying the tagged products one or more times to generate final amplification products. . . wherein one of the amplifying steps introduces a barcode and one or more sequencing tags." *See* Doc. 116 (Van Ness Decl.) at ¶¶ 439-442.

102. NeoGenomics concedes that Signatera practices all limitations of Claim 1 of the '454 Patent except "amplicons having a length of 50-150 bases." *See* Doc. 116 (Van Ness Decl.) at ¶¶ 428-438.

103. Dr. Van Ness admitted that he did not analyze any of Natera's standard operating procedures for Signatera. *See* Doc. 145-1 (Van Ness Tr.) at ECF 64, 246:4-20.

104. As reflected in the literature on Signatera, Signatera practices the claim elements reciting "amplicons having a length of 50-150 bases" ('454 Patent, claim 1) and "amplifying the tagged products one or more times to generate final amplification products. . . wherein one of the amplifying steps introduces a barcode and one or more sequencing tags" ('035 Patent, claim 1). Doc. 17 (Metzker Opening Decl.) at ¶¶127-129, 135-136; Doc. 145 (Metzker Reply Decl.) at ¶¶307-312.

## V. NATERA IS LIKELY TO BE IRREPARABLY HARMED BY NEOGENOMICS' INFRINGEMENT

### A. Neogenomics' Infringement Is Likely To Cause Signatera To Lose Market Share

### 1. Absent An Injunction, Natera Will Be Forced To Compete Against Its Own Inventions

105. RaDaR and Signatera compete. NeoGenomics admits that it "face[s] increased competition from laboratories that are more specialized and focused on particular areas such as liquid biopsies or large tissue based molecular panels such as . . . Natera." Doc. 11-6 at ECF 19.; *see also* Doc. 18 (Moshkevich Decl.) at ¶20; Doc. 7 (Malani Decl.) at ¶67 ("NeoGenomics and Natera are competitors in the tumor-informed MRD testing market with direct competition between Signatera and RaDaR."). People within NeoGenomics or Inivata refer to Natera as a competitor. Doc. 144-7 (Sikri Tr.) at ECF 39, 139:20-24. Doctors looking for an MRD test at the surveillance monitoring stage could choose either RaDaR or Signatera. Doc. 144-5 (Malackowski Tr.) at ECF 24, 86:3-6. Third-party analysis confirms this competition. Doc. 7-16 at ECF 16 ("expect the possibility of rising competition from NeoGenomics (NEO) with its recent partnership and product launch with Inivata"); Doc. 7-19 at ECF 4 (NeoGenomics "previewed data comparing RaDaR to competitor MRD assays such as . . . Signatera").

### 2. Radar And Signatera Compete For Tumor-Informed MRD-Test Market Share

106. There were only three tumor-informed MRD tests on the market for clinical use—Signatera, RaDaR, and Invitae's PCM. Doc. 7 (Malani Decl.) at ¶39. The District of Delaware has now entered a judgment that the sale of PCM infringes certain of Natera's patents, *Natera, Inc. v. ArcherDX, Inc.*, 1:20-cv-125 (D. Del.) at Doc. 665, and a permanent injunction enjoining its sale, *id.* at Doc. 677. Natera supplies approximately 90% of the tumor-informed MRD testing in the U.S., and NeoGenomics supplies "the residual." Doc.

24

144-5 (Malackowski Tr.) at ECF 17, 60:7-19.

107. There is a distinct demand for tumor-informed MRD testing. 68% of oncologists prefer tumor-informed to tumor-agnostic MRD testing. Doc. 12-23 at ECF 4, 13, 51. Tumor-informed MRD testing is "preferred across tumor types by >5-to-1 ratio." *Id*. at 4, 17, 51; *see also* Doc. 144-5 (Malackowski Tr.) at ECF 18, 62:18-24 ("all else being equal, doctors currently have expressed a preference for tumor-informed"); *id*. at ECF 20, 71:15-19 (being tumor-informed drives demand for RaDaR "in some ways" and being tumor-informed has a "contributing effect" on RaDaR's demand).

### 3. Neogenomics' Relationship With Pathologists Makes Radar A Uniquely Competitive Threat To Signatera

108. NeoGenomics is a large pathology reference laboratory. Doc. 7 (Malani Decl.) at ¶¶128-29. NeoGenomics advertises itself as providing "one-stop" testing which NeoGenomics claims reduces complexity associated with multiple vendors. *Id*. NeoGenomics is employing a dual salesforce strategy that targets both the pathology and oncology communities. *Id*. at ¶129.

109. RaDaR "stands to benefit from NEO's pathology strength and comprehensive offering," "NEO believes their strong pathology relationships will be key in managing tissue logistics and customer relationships for MRD," and "NEO believes this combination of breadth and high-touch customer service gives the advantage of large reference labs . . . and specialty labs like . . . NTRA." Doc. 12-21 at ECF 2.

### 4. Signatera Is Likely To Irreparably Lose—And Radar To Gain— Market Share Absent An Injunction

110. TD Cowen predicts RaDaR's sales will grow 63% in 2023 and 91% in 2024.

Doc. 12-23 at 5. RaDaR's share of the overall MRD-test market is conservatively predicted to increase and almost double from 3% to 5% and Signatera's share to decline. *Id*.

111. The tumor-informed MRD testing market is growing, and the share of that market Natera would be entitled to if a preliminary injunction is not entered would be infeasible to determine with certainty after the fact. Doc. 7 (Malani Decl.) at ¶133.

**B.   Neogenomics Is Free-Riding On Natera's Investments In Signatera**

112. Natera's investments in reimbursement coverage allow NeoGenomics to have a simplified process to access reimbursement coverage. Doc. 7 (Malani Decl.) at ¶88. Third-party analysis confirms that NeoGenomics "hopes to piggyback off the recent CMS win from Natera." Doc. 7-19 at ECF 2.

113. On April 4, 2023, Mr. Sikri stated "In terms of adoption rates, I mean the reality is that Natera has done a good job at educating the market. And that's not a bad thing for us. It means that we don't have to start from scratch, right? I think the big thing is that we have to be a close follower here." Doc. 11-14 at ECF 39.

**C.   Neogenomics Is Irreparably Damaging Natera's First-Mover Advantage**

114. Being a first mover may drive customer adoption and investment. Doc. 144-5 (Malackowski Tr.) at ECF 25 92:7-10. Reimbursement coverage is determined by indication, each indication can be thought of as a narrower market. There is value to being the first mover in each narrower market in addition to in the broader MRD testing market. Doc. 7 (Malani Decl.) at ¶¶140-41.

115. Natera has a first-mover advantage. *Id*. at ¶¶134-141; Doc. 12-12 at ECF 11. Natera developed the first tumor-informed MRD test. Doc. 144-5 (Malackowski Tr.) at

26

ECF 25, 93:7-10; Doc. 7 (Malani Decl.) at ¶141; Doc. 18 (Moshkevich Decl.) at ¶6. Natera invested heavily to leverage its first-mover advantage. Doc. 7 (Malani Decl.) at ¶¶85-92; Doc. 18 (Moshekvich Decl.) at ¶11.

116.    RaDaR has the potential to become a 'first mover' in certain indications within the tumor-informed MRD testing market if NeoGenomics' products are chosen as a companion diagnostic. Doc. 7 (Malani Decl.) at ¶140. Should RaDaR be the first entrant into any of the narrower tumor-informed MRD markets defined by indication due to infringement, Natera's first-mover advantage would be transferred to RaDaR in those markets. *Id.* at ¶141. Loss of first-mover advantage would reduce Natera's return on investment. *Id.*

117.    NeoGenomics is currently applying for reimbursement in additional indications such as lung and head-and-neck cancers. Doc. 144-7 (Sikri Tr.) at ECF 12, 41:12-23.

118.    The impact from the loss of first mover advantages to Natera cannot be fully quantified. *Id.* at ¶¶138-141.

### D.    Neogenomics' Infringement Is Irreparably Harming Natera's Reputation

119.    Natera has a reputation as a leader in MRD testing. *Id.* at ¶¶69-70, 142.

120.    In June 2023, NeoGenomics had three posters present at an American Society of Clinical Oncology (ASCO) meeting using RaDaR. Doc. 12-21 at 3; Doc. 7 (Malani Decl.) at ¶¶143. Those presenters "indirect advised against use of NTRA's Signatera in using ctDNA to guide escalation in previously treated patients." Doc. 12-21

27

at ECF 3; *see also* Doc. 120-11 (Moshkevich Tr.) at ECF 9 (28:3-14), ECF 12-13 (41:23-42:7).

121.    NeoGenomics advertises that RaDaR is 10x more sensitive compared to other leading MRD tests, such as Natera. Doc. 18 (Moshkevich Decl.) at ¶¶21-24; Doc. 120-11 (Moshkevich Tr.) at ECF 9, 27:10-15; Doc. 7 (Malani Decl.) at ¶143. No study has compared Signatera and RaDaR head-to-head. Doc. 12-21 at 3; Doc. 18 (Moshkevich Decl.) at ¶¶21-22.

122.    NeoGenomics'  promotion of RaDaR for colorectal cancer, despite an absence of clinical evidence, can breed distrust and provoke a backlash, which can harm the MRD-testing field. Doc. 18 (Moshkevich Decl.) at ECF 10; Doc. 122-1 (Malani Tr.) at ECF 40, 148:14-150:9.

123.    The quantification of the impact of reputational damage on current and future sales is infeasible. Doc. 7 (Malani Decl.) at ¶147.

### E.    Neogenomics' Infringement Is Irreparable Harming Natera By Taking Clinical Opportunities

124.    Winning or losing opportunities for clinical trials and projects with biopharmaceutical partners has a significant impact on Natera's long-term prospects. Doc. 7 (Malani Decl.) at ¶¶103-105. Obtaining contracts for clinical studies can lead to future sales and additional R&D opportunities. Doc. 18 (Moshkevich Decl.) at ¶26. Winning a clinical trial is part of a cycle wherein the winner generates data and credibility, thereby increasing its odds of winning the opportunity to perform additional trials. Doc. 7 (Malani Decl.) at ¶103. Clinical trials generate the data and credibility necessary to achieve positive

coverage determinations. *Id*. Clinical-trial partnerships lead to better customer relationships. Doc. 144-5 (Malackowski Tr.) at ECF 32, 121:3-9.

125.     NeoGenomics secured deals with at least Moderna, AstraZeneca, and Merck to use RaDaR for clinical studies. Doc. 18 (Moshkevich Decl.) at ¶26; Doc. 120-11 (Moshkevich Tr.) at ECF 9, 27:19-28:2. AstraZeneca previously used Signatera as part of a clinical trial. Doc. 144-7 (Sikri Tr.) at ECF 36, 134:9-19.

**F.     There Is A Causal Nexus Between Infringement Of The Asserted Patent Claims And Irreparable Harm**

126.     The patents-in-suit cover RaDaR's core workflow. Doc. 7 (Malani Decl.) at ¶¶66, 146, ECF 148. Without using the Asserted Patents and practicing the asserted claims, RaDaR would not be able to perform tumor-informed MRD testing. *Id*. at ¶¶66, 148, ECF 148.

127.     Being tumor-informed is a driver of demand for RaDaR. Doc. 144-5 (Malackowski Tri.) at ECF 20, 71:15-19.

128.     NeoGenomics contends that demand for RaDaR is driven "in part, from its use of 48 sequencing variants." Doc. 112 (Sikri Decl.) at ECF 22.  Use of 48 variants is a patented feature and without infringing the claims of the Asserted Patents, RaDaR could not use 48 sequencing variants. Doc. 17 (Metzker Opening Decl.) at ¶¶96-98.

**G.     Natera Did Not Unreasonably Delay Seeking A Preliminary Injunction**

129.     Natera moved for a preliminary injunction on July 31, 2023. Doc. 5.

130.     The Patent Office issued both of the Asserted Patents in December, 2022. *See supra*, Proposed Findings of Fact Numbers 2-3.

29

131. NeoGenomics first made RaDaR available for clinical use in March 2023. Doc. 7 (A. Malani Decl.) at ¶160.

132. Natera has been litigating patent infringement claims against ArcherDX since January 27, 2020. *Natera, Inc. v. ArcherDX, Inc*., 1:20-cv-125 (D. Del.). A jury returned a verdict that ArcherDX's sale of PCM infringed certain of Natera's patent claims on May 15, 2023. *Natera, Inc. v. ArcherDX, Inc*., 1:20-cv-125 (D. Del.) at Doc. 609. On September 19, 2023, the court in that case entered judgment in favor of Natera that ArcherDX's use of its PCM MRD test infringed certain of Natera's patent claims. *Natera, Inc. v. ArcherDX, Inc*., 1:20-cv-125 (D. Del.) at Doc. 665. On November 21, 2023, the court in that case granted-in-part Natera's motion for a permanent injunction against the accused PCM test, although as of the date of this submission that order is under seal. Doc. 157 at ECF 1. PCM is a tumor-informed MRD test. Doc. 7 (Malani Decl.) at ¶50.

133. NeoGenomics has a "[c]lear focus on establishing public and private coverage" for RaDaR. Doc. 10-40 at ECF 58. RaDaR received Medicare approval for breast cancer on July 27, 2023. Doc. 6-1; Doc. 7 (Malani Decl.) at ¶133; Doc. 8-5.

134. Medicare reimbursement coverage significantly influences oncologists' ordering of MRD tests. Doc. 7-22 at ECF 2 ("[I]t's much higher in his reimbursed patients."); *id*. at ECF 3 ("Dr. Mundia also expects to order more MRD testing as soon as Medicare coverage becomes available for additional tumor types . . . ."); *id*. at ECF 4 ("In order to increase the percentage of breast cancer patients receiving MRD testing today from 50% into the 80-90% range, he asserted that would come down to a matter of reimbursement. . . . [A]fter NTRA obtained Medicare coverage for breast cancer, his

30

volumes increased significantly"). Medicare coverage "dramatically increases [MRD tests'] attractiveness to patients." Doc. 122-1 (Malani Tr.) at ECF 14, 43:1-9. Mr. Malackowski agreed that Medicare coverage "is a factor to be considered" in what drives demand for RaDaR. Doc. 144-5 (Malackowski Tr.) at ECF 20, 71:20-24. In a survey of oncologists, "reimbursement status" ranked higher in a list of factors influencing choice of MRD test vendor than "complementary products," "quality of customer support," "cost," and "report clarity/comprehensiveness," depending on indication. Doc. 23-23 at ECF 43. Medicare reimbursement is important to the success of MRD tests given the demographics of the target market and can be a helpful gateway to broader coverage from other payers, such as private insurance. Doc. 7-31 at ECF 21.

135. Medicare coverage also increases the likelihood that an MRD test is used in a clinical trial. Doc. 122-1 (Malani Tr.) at ECF 40, 147:1-22. Medicare coverage therefore improves the competitiveness of an MRD test for clinical trials. *Id*.

### H. The Patents-In-Suit Have Not Been Licensed To Competitors

136. Natera has never licensed the asserted patents to enable direct competitors to make competing MRD tests. Doc. 18 (Moshkevich Decl.) at ¶16.

137. Natera's license with Clarient Diagnostics Services, Inc. does not suggest that the harm from infringement is not irreparable. The Clarient license was entered into in June 2015. Doc. 119-4 at ECF 2. The license was limited to a three-year term, expiring in 2018. *Id*. at ECF 4, ¶1.14. The Patent Office did not issue the asserted patents until December 2022. *See* Proposed Findings of Fact Numbers 2-3 *supra*. When the Clarient license was entered into, it was not reasonably foreseeable that the Patent Office would

31

issue the asserted patent claims in 2022. Doc. 144-5 (Malackowski Tr.) at ECF 29-30, 109:22-110:5. Signatera was not commercially launched until 2017, and even then was available only for trials. Doc. 18 (Moshkevich Decl.) at ¶7. It was not launched for clinical use until 2019. *Id.*

## V.     THE BALANCE OF HARMS FAVORS AN INJUNCTION

138.    RaDaR is not one of NeoGenomics' core products in terms of volume or revenue. Doc. 144-5 (Malackowski Tr.) at ECF 27, 98:1-6. Mr. Malackowski testified, however, that Signatera was "an important product to" Natera. Doc. *Id.* at ECF 26, 97:20-24. RaDaR accounts for a smaller percentage of NeoGenomics' revenue than Signatera does of Natera's revenue. *Id.* at ECF 27, 98:7-1; Doc. 7 (Malani Decl.) at ¶¶156-160.

139.    Natera filed a complaint alleging patent infringement against Inivata on January 20, 2021, which alleged that Inivata's products "that apply Natera's patented methods for preparing, amplifying, sequencing, and analyzing cfDNA to detect and monitor genes and genetic mutations commonly associated with cancers" infringed U.S. Patent No. 10,597,709. *Natera, Inc. v. Inivata, Inc*., 1:21-cv-56 (D. Del.) at Doc. 1.

140.    NeoGenomics acquired RaDaR and Inivata on June 18, 2021. Doc. 7 (Malani Decl.) at ¶19; Doc. 144-5 (Malakowski Tr.) at ECF 33, 124:13-18. Those acquisition costs are sunk costs. *Id.* at ECF 34, 127:6-14.

141.    Any potential harm to NeoGenomics from an injunction is the result of its infringement. Market share and clinical opportunities that NeoGenomics may lose as a result of an injunction, for example, would have been gained as the result of the infringing sale of RaDaR.

## VI.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

### I.    Radar Is Not Superior To Signatera Or Preferred By Oncologists

142.    In  a September 25, 2023 survey of oncologists who perform tumor-informed MRD testing, "there was a strong preference for Signatera, with 9/14 saying it was their preferred test." Doc. 119-1 at ECF 20. "Signatera is widely seen as the preferred test." *Id.* Published indications for Signatera include every indication NeoGenomics claims RaDaR covers. Doc. 7 (Malani Decl.) at ¶170. The clinical utility of RaDaR and Signatera are "roughly in-line." *Id.* at ¶145; Doc. 12-22 at ECF7.

143.    For example, NeoGenomics concedes that no head-to-head studies comparing performance of RaDaR vs. Signatera have been performed. Doc. 144-7 at ECF 16 (Sikri Tr.) at 54:1-4.  Moreover, clinical test performance is driven by multiple factors, not simply the number of targets in one's assay. Doc. 18 (Moshkevich Decl.) at ¶23. Clinical studies in early-stage lung cancer indicate that test performance has not been better using the 48-plex RaDaR assay, which achieved longitudinal sensitivities of 62% and 64%. *Id.* at 11 ¶22. Longitudinal sensitivities of 93% and 100% were observed in lung studies using Signatera assays with between 10-22 targets. *Id.* A survey of oncologists concluded that "they were willing to sacrifice some amount of sensitivity," Doc. 12-23 at ECF 50, demonstrating the value of an MRD test to oncologists cannot be determined by reference to sensitivity alone.

144.    NeoGenomics' view that RaDaR is superior to Signatera is undermined by its contention that its market share is unlikely to grow substantially. Doc. 107 at ECF 23.

33

**J.** **If Radar Is Enjoined, The Public May Obtain Tumor-Informed MRD Testing From Natera In The Form Of Signatera**

145.    Natera has the capacity to increase supply for Signatera. Doc. 7 (Malani Decl.) at ¶¶173-182. From 2020 to present, Signatera testing capacity has been significantly higher than its actual and projected sales. Doc. 18 (Moshkevich Decl.) at ¶14. Natera has always been able to increase its capacity to meet the growing demand for Signatera. Doc. 7 (Malani Decl.) at ¶¶174, 179.

146.    Signatera is reimbursed for multiple indications including breast cancer indications. Doc. 7 (Malani Decl. at ¶43)..

147.    RaDaR represents approximately 3% of the total MRD-test market (Doc. 107 at ECF 7, 23; Doc. 119 (Malackowski Decl.) at ¶10), and 10% of the tumor-informed MRD-test market, (Doc. 144-5 (Malackowski Tr.) at ECF 17, 60:7-12).

**K.** **A Preliminary Injunction Will Not Affect Ongoing Clinical Trials**

148.    The proposed injunction allows NeoGenomics to "continue to make, use and sell the Accused Assay solely for continued use of the Accused Assay, if necessary, for those patients already using it prior to the entry of this injunction." Doc. 5-1. It would not affect ongoing clinical trials for which patients have already been enrolled. Doc. 144-5 (Malackowski Tr.) at ECF 36, 134:6-11.

Based on the foregoing findings of facts, the Court makes the following:

## PROPOSED CONCLUSIONS OF LAW

149.    Natera has met the requirements for obtaining preliminary injunctive relief based on at least one asserted patent claim because it has shown the following: (1) a

likelihood of success on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips its favor, and (4) that it is in the public's interest to grant a preliminary injunction. *BlephEx, LLC v. Myco Indus., Inc*., 24 F.4th 1391, 1398 (Fed. Cir. 2022).

## I.  LIKELIHOOD OF SUCCESS ON THE MERITS

150.   The requested preliminary injunction should be granted here because Natera has shown it is likely to prove infringement of the asserted claims of the Asserted Patents, and NeoGenomics has not raised a substantial question concerning patent validity as to any asserted claim.

### A.  Infringement

151.   "[I]n cases involving multiple patent claims a patentee seeking a preliminary injunction need only demonstrate that it will likely prove infringement of one of those claims." *Pods, Inc. v. Porta Stor, Inc*., 177 F. App'x 73, 75 (Fed. Cir. 2006).

152.   A party who "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a); *see also CLS Bank Int'l v. Alice Corp. Pty*., 667 F.Supp.2d 29, 36-38 (D.D.C. 2009) (a party may be found liable under 271(a) for selling a method within the United States); *Quanta Computer v. LG Elecs*., 553 U.S. 617, 628-29 (2008); *WesternGeco v. ION Geophysical*, 138 S.Ct. 2129, 2137 (2018) (there may be patent liability "[i]f the conduct relevant to the statute's focus occurred in the United States even if other conduct occurred abroad").

35

153. Natera has demonstrated a high likelihood of success on the merits of its claim that NeoGenomics infringes the asserted claims of the '035 Patent through the infringing acts identified above. *See* Section III.A.2 *supra*.

154. Natera has demonstrated a high likelihood of success on the merits of its claim that NeoGenomics infringes the asserted claims of the '454 Patent through the infringing acts identified above. *See* Section III.A.3 *supra*. To the extent NeoGenomics does not literally infringe, it infringes the asserted claims of the '454 patent under the doctrine of equivalents. *See Spectrum Pharm.*, 802 F.3d at 1337.

## B. Validity – Generally

155. In cases involving multiple patent claims, "the patentee must demonstrate that . . . at least one [of the] allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Amazon.com, Inc. v. Barnesandnoble.com*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

156. The asserted claims of the Asserted Patents are all presumed valid. 35 U.S.C. § 282(a). Section 282 codified this "presumption based on 'the basic proposition that a government agency such as the [PTO] was presumed to do its job'" in evaluating and issuing the patent claims. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 97 (2011) (abrogated on other grounds)).

157. NeoGenomics bears the initial burden to come forward with evidence of invalidity by asserting a defense that the patentee cannot show lacks substantial merit. *BlephEx*, 24 F.4th at 1399. The Court should then consider the evidence on both sides to determine if NeoGenomics has raised a substantial question of validity. *Id.*

36

## C.    Validity – Obviousness

158.    Obviousness "requires finding that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Regents Univ. Cal. v. Broad Inst*., 903 F.3d 1286, 1291 (Fed. Cir. 2018).   "A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017).

159.    "[A] party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination." *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1350 (Fed. Cir. 2017) (internal quotations omitted).

160.    NeoGenomics has failed to raise a substantial question of obviousness for any asserted claims of the Asserted Patents.  NeoGenomics failed to identify a motivation to modify or combine the asserted prior art with a reasonable expectation of success of achieving the claimed inventions.  In addition its expert did not identify any secondary consideration that allegedly supported the obviousness of the asserted claims of the Asserted Patents. *See generally* Doc. 116.

161.    Absent a motivation to modify or combine the prior art and reasonable expectation of success in doing so, NeoGenomics' positions reflect impermissible hindsight.  Without any explanation as to how or why the references would be modified to arrive at the claimed invention, a court is "left with only hindsight bias that *KSR* warns

37

against." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017); *see also BlephEx*, 24 F.4th at 1403-04 (failure to present evidence of a motivation to modify cannot carry burden of showing a substantial question of validity to avoid preliminary injunction).

162. NeoGenomics has not, and cannot show, that the '035 Patent claims are obvious over the knowledge of a POSA and Kaper (Doc. 116-15) or the combination of Han (Doc. 116-16) and Wang (Doc. 117-4). Doc. 145 (Metzker Reply Decl.); *see* Section III.B.1 *supra*. NeoGenomics has not, and cannot show, that the '454 Patent claims are obvious over the knowledge of a POSA and Forshew (Doc. 17-7) or Bashashati (Doc. 118-14). Doc. 145 (Metzker Reply Decl.); *see* Section III.B.1 *supra*. These arguments lack substantial merit.

### D. Validity – Written Description

163. The test for adequate written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

164. Based on that inquiry, the patent specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed. *Ariad*, 598 F.3d at 1351. "[T]he [written] description requirement does not demand any particular form of disclosure." *Id.* at 1352. It "does not demand either examples or an actual reduction to practice." *Id.* Nor must "the specification recite the claimed invention *in haec verba*." *Id.*

38

165.    Those of ordinary skill in the art would have understood the asserted claims of the Asserted Patents to have sufficient written description support for all of their elements.  *See* Section III.B.2 *supra*.  NeoGenomics' arguments to the contrary lack substantial merit.

### E.    Validity – Inventorship

166.    The listed inventorship on an issued patent is presumed valid. *Eli Lilly & Co. v Aradigm Corp*., 376 F.3d 1352, 1362 (Fed. Cir. 2004).Natera properly complied with 35 U.S.C §116(c)[4] and all of the Patent Office's procedures to correct inventorship of the '035 Patent during prosecution.  *See* Section III.B.3 *supra*.  NeoGenomics' arguments to the contrary lack substantial merit.

167.    The focus of the inventorship determination is assessing contribution to the *claims*, not to the specification, and inventorship is determined on a claim-by-claim basis. *See Intermec Techs. Corp. v. Palm Inc.,* 738 F. Supp. 2d 522, 563 (D. Del. 2010), *aff'd*, 466 F. App'x 881 (Fed. Cir. 2012).  "[A]n alleged co-inventor must supply evidence to corroborate his testimony." *Ethicon, Inc. v. U.S. Surgical Corp*., 135 F.3d 1456, 1461 (Fed. Cir. 1998).

168.    "A person must contribute to the conception of the claimed invention to qualify as a joint inventor."  *Vanderbilt Univ. v. ICOS Corp*., 601 F.3d 1297, 1303 (Fed. Cir. 2010).  "Conception is the touchstone of invention."  *Sewall v. Walters*, 21 F.3d 411,

---

[4]    "Whenever through error a person is named in an application for patent as the inventor, or through error an inventor is not named in an application, the Director may permit the application to be amended accordingly, under such terms as he prescribes." 35 U.S.C. §116(c).

415 (Fed. Cir. 1994); *see also Burroughs Wellcome*, 40 F.3d at 1228 ("An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan.").

169.    "One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor." *Ethicon Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).  "A contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception." *Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004).

170.    Natera identified the proper inventors of the '454 patent, and NeoGenomics has not shown, and cannot, show that Natera omitted an valid joint inventor of the '454 patent.   *See* Section III.B.3 *supra*.   NeoGenomics' arguments to the contrary lack substantial merit.

## II.    IRREPARABLE HARM

### A.    Irreparable Harm to Market Share

171.    Irreparable harm may be established where the parties are "competitors and [the patentee] lost market share while [the infringer] gained it." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013). "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345. "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of

40

the right to exclude." *Presidio Components*, 702 F.3d at 1363. A "rise in [the infringer's] market share from zero to about 5% in three years while infringing" may irreparably harm the patentee. *Douglas Dynamics*, 717 F.3d at 1345.

172.    It is error to conclude "that the presence of additional competitors, without more, cuts against a finding of irreparable harm." *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1151 (Fed. Cir. 2011). "While the existence of a two-player market may well serve as a substantial ground for granting an injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee—the converse is not automatically true . . . ." *Id.*

173.    A patentee is "not required to prove that its specific customers stopped using [the patentee's] products because they switched to the infringing . . . products." *i4i Ltd. P'ship v. Microsoft Corp*., 598 F.3d 831, 862 (Fed. Cir. 2010).

174.    Natera will likely suffer irreparable harm to its market share and clinical opportunities if a preliminary injunction is not entered. Signatera and RaDaR compete in both the broad MRD-test market, where there are multiple competitors, and the tumor-informed MRD test submarket, where the only two products with significant market share are RaDaR and Signatera. Natera has marketed RaDaR to and targeted Natera's customers. RaDaR's market share is predicted to rise and Signatera's to fall.

## B.    Irreparable Harm To First-Mover Advantage

175.    A patentee may be irreparably harmed by being deprived of a first-mover advantage. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc*., 967 F.3d 1353, 1378 (Fed. Cir. 2020). "Money damages alone" may not "restore the technological lead-time that [a

patentee] would have enjoyed but for the infringement." *EyeTicket Corp. v. Unisys Corp.*, 155 F. Supp. 2d 527, 548 (E.D. Va. 2001).

176.    Natera is likely to suffer irreparable harm to its first-mover advantage if a preliminary injunction is not entered. Natera was first to market with an MRD test. Absent competition from RaDaR, Signatera would be the only tumor-informed MRD test with significant market share. If an injunction is entered, there is a substantial likelihood that RaDaR could obtain private or public reimbursement coverage for RaDaR with respect to certain indications before Signatera.

### C.    Irreparable Harm to Reputation

177.    "Even absent consumer confusion . . . there can still be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors." *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). A patentee's reputation may be injured "if customers found the same 'innovations' appearing in competitors'" infringing products or if infringement causes other to believe the patentee "did not enforce its intellectual property rights." *Id* at 1344-45. "Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation." *Id.* at 1345.

178.    Natera is likely to suffer irreparable injury to its reputation because NeoGenomics is using Natera's inventions in competing products, infringement could cause others to believe that Natera does not enforce its intellectual property, and because infringement has enabled NeoGenomics to market tumor-informed MRD tests in a manner that disparages Natera and its Signatera MRD test.

42

### D. Causal Nexus

179. The patentee must show a causal nexus, which requires evidence that the patented feature is "a significant reason consumers bought" the infringing product. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019). The patentee need not prove that the patented feature is "the only basis of consumer demand." *Id.*

180. There is a causal nexus between infringement and the identified irreparable harms because the patents-in-suit underlie RaDaR's core workflow, without using the Asserted Patents, RaDaR would not be able to perform tumor-informed MRD testing, and being tumor-informed is a driver of demand for RaDaR. Nor, without infringing, could RaDaR target up to 48 tumor-associated variants, which NeoGenomics contends is a driver of demand. Doc. 17 (Metzker Opening Decl.) at ¶¶96-98.

### E. Delay

181. "The period of delay exercised by a party prior to seeking a preliminary injunction in a case involving intellectual property is but one factor to be considered by a district court in its analysis of irreparable harm." *Hybritech*, 849 F.2d at 1457. "[A] showing of delay does not preclude, *as a matter of law*, a determination of irreparable harm." *Id*. Litigation against other infringers may justify delay in seeking a preliminary injunction. *See Hybritech Inc.,* 849 F.2d at 1457. "Picking off one infringer at a time is not inconsistent with being irreparably harmed." *Pfizer, Inc. v. Teva Pharms. USA, Inc*., 429 F.3d 1364, 1381 (Fed. Cir. 2005).

182. Natera did not unreasonably delay seeking a preliminary injunction. Natera moved for a preliminary injunction on July 31, 2023. The Patent Office issued the asserted

patents only in December 2022. Natera moved for a preliminary injunction only four days after RaDaR received Medicare coverage for breast cancer, and Medicare coverage substantially increases the demand for an MRD test. Further, Natera has been litigating against ArcherDX, another provider of tumor-informed MRD testing, since 2020 and obtained a judgment of infringement in its favor only on September 19, 2023. Under these circumstances, the timing of Natera's motion for a preliminary injunction was reasonable.

### F.    Licensing

183.    That Natera has not licensed the patents-in-suit for use in competing MRD tests weighs in favor of a finding of irreparable harm. "Unwillingness to license favor[s] finding irreparable injury." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

184.    Even assuming NeoGenomics demonstrated that Natera had licensed its patents, that would not demonstrate an absence of irreparable harm. "A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008). "While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider. The fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement." *Id*. NeoGenomics cites a 2015 license to Clarient, but

44

that agreement was entered into years prior to the issuance of the patents in suit or the release of Signatera, and it expired in 2018.

## III.   BALANCE OF HARMS

185.   Factors that the Court may consider in balancing the harms include whether the patentee will "lose the value of its patent [and] suffer the irreparable harms" found by the Court, whether the losses alleged by the defendant upon a preliminary injunction would also be incurred by the patentee absent a preliminary injunction, whether the defendant's losses from a preliminary injunction "were the result of its own calculated risk in selling a product with knowledge of [the patentee's] patent," *Celsis In Vitro*, 664 F.3d at 931, and whether the "defendant's injuries [would] result solely from its own deliberate acts of infringement," *LEGO A/S v. ZURU Inc*., 799 F. App'x 823, 832 (Fed. Cir. 2020).

186.   The defendant's sunk costs, such as expenses incurred in creating the infringing product, are not relevant to the balancing of harms. *Bio-Rad Lab'ys*, 967 F.3d at 1378. "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l Inc. v. AMF, In*c., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); *see also i4i Ltd. P'ship*, 598 F.3d at 863 ("The district court's analysis properly ignored the expenses Microsoft incurred in creating the infringing products."); *Acumed*, 551 F.3d at 1330 ("We also see no abuse of discretion in the court's decision not to consider Stryker's expenses in designing and marketing the T2 PHN, since those expenses related to an infringing product.").

187.   That the defendant is able to "sustain its business operations through the sale

of its other products and services not alleged to be infringing on Plaintiff's patent if an injunction were to issue" weighs in favor of a preliminary injunction. *Morris & Assocs., Inc. v. Cooling & Applied Tech., Inc*., No. 5:09-CV-23-BR, 2010 WL 4484640, at \*10 (E.D.N.C. July 30, 2010).

188.   "[A]uthorizing the wrongdoer to continue the wrong, only not at an increased rate, is in no realistic sense maintaining the status quo." *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1231 (Fed. Cir. 1985).

189.   Natera has demonstrated that the balance of harms weighs in favor of a preliminary injunction. RaDaR accounts for a smaller portion of NeoGenomics' revenue than Signatera does of Natera's revenue. The harms that NeoGenomics points to from an injunction, such as lost market share, are the same harms that Natera would suffer absent an injunction. NeoGenomics does not contend that it cannot sustain its business or would be required to impose layoffs if an injunction is entered. NeoGenomics was also aware that Natera had pending patent infringement claims against Inivata, the developer of RaDaR, when NeoGenomics acquired Inivata. The costs that NeoGenomics incurred in acquiring Inivata are sunk costs and therefore irrelevant to the balancing of harms. Finally, NeoGenomics contention that maintaining the status quo requires permitting it to maintain the same market share by providing infringing RaDaR tests at the same rate is contrary to *Atlas Powder*, 773 F.2d at 1231.

## IV.   PUBLIC INTEREST

190.   The public has an interest in enforcing valid patents, *Celsis In Vitro*, 664 F.3d at 931, and in the judicial protection of property rights in inventive technology." *Douglas*

*Dynamics*, 717 F.3d at 1346. The exclusionary rights conveyed in valid patents serves the public interest in encouraging investment in medical technologies. *See Celsis In Vitro*, 664 F.3d at 931.

191.    Where the parties "sell the same product and are in direct competition" and the public "can obtain the products from [the patentee]" the public does not have an interest in obtaining the defendant's infringing product. *Id.* at 932. The public interest does not prohibit injunctions against life-saving products generally or medical products specifically. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017) ("But eliminating a choice of drugs is not, by itself, sufficient to disserve the public interest."); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1342-43 (Fed. Cir. 2016) (rejecting "a categorical rule denying permanent injunctions for life-saving goods, such as many patented pharmaceutical products").

192.    The public interest weighs in favor of the narrow injunction it has requested. The public interest in weighs in favor of enforcing Natera's patents. Natera does not seek to enjoin NeoGenomics from providing RaDaR to pre-existing patients, and the proposed injunction will therefore not affect ongoing clinical trials. Natera has the capacity to meet demand, and that oncologists prefer Signatera to RaDaR. NeoGenomics has not demonstrated that RaDaR is superior to Signatera or that Signatera is not an adequate substitute for RaDaR.

Respectfully submitted on this the 1st day of December, 2023.

By: _/s/ Sandra Haberny_                     _Counsel for Plaintiff Natera, Inc._
Sandra Haberny, Ph.D.*
QUINN EMANUEL URQUHART                      *Special Appearance under Local Civil
    & SULLIVAN, LLP                          Rule 83.1(d).*
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000
sandrahaberny@quinnemanuel.com

_/Robert C. Van Arnam/_
Robert C. Van Arnam (N.C. 28838)
Andrew R. Shores (N.C. 46600)
WILLIAMS MULLEN
P.O. Drawer 1000
Raleigh, NC 27602-1000
Telephone: (919) 981-4015
rvanarnam@williamsmullen.com
ashores@williamsmullen.com

Kevin P.B. Johnson*
Victoria F. Maroulis*
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
555 Twin Dolphin Shores, 5th Floor
Redwood Shores, CA  94065
(650) 801-5000
kevinjohnson@quinnemanuel.com
victoriamaroulis@quinnemanuel.com

Andrew M. Holmes
Sam S. Stake
Tara Srinivasan, Ph.D.*
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600
drewholmes@quinnemanuel.com
samstake@quinnemanuel.com
taravasan@quinnemanuel.com

48

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this day, I electronically filed the foregoing using the Court's

CM/ECF system, which will send a notification of such filing to all counsel of record.

This, the 1st day of December, 2023.

By: */s/ Robert C. Van Arnam*
Robert C. Van Arnam (N.C. Bar No. 28838)
Andrew R. Shores (N.C. Bar No. 46600)
WILLIAMS MULLEN
P.O. Drawer 1000
Raleigh, NC 27602-1000
Telephone: (919) 981-4015
Fax: (919) 981-4300
rvanarnam@williamsmullen.com
ashores@williamsmullen.com

*Counsel for Plaintiff Natera, Inc.*

49