```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   NATERA, INC.,                    Civil Action
                                      No.  1:23CV629
 4        Plaintiff,

 5   vs.                             Greensboro, North Carolina
                                      August 8, 2025
 6   NEOGENOMICS LABORATORIES, INC.,

 7        Defendant.
     _____/
 8

 9              TRANSCRIPT OF MOTION PROCEEDINGS
              BEFORE THE HONORABLE CATHERINE C. EAGLES
10            CHIEF SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:   ROBERT VAN ARNAM, ESQ.
                          KEVIN SMITH, ESQ.
13                        WILLIAMS MULLEN

14                        VICTORIA MAROULIS, ESQ.
                          SANDRA HABERNY, ESQ.
15                        TARA SRINIVASAN, ESQ.
                          QUINN EMANUEL
16

17   For the Defendant:   JOHN F. MORROW, JR., ESQ.
                          JOHN D. WOOTEN, IV, ESQ
18                        WOMBLE BOND DICKINSON

19                        DARALYN DURIE, ESQ.
                          AARON FOUNTAIN, ESQ.
20                        ANNIE LEE, ESQ.
                          MORRISON FOERSTER
21

22   Court Reporter:      J. Allen, RPR
                          (336) 332-6033
23                        Jane_Allen@ncmd.uscourts.gov

24

25              Proceedings reported by stenotype reporter
         Transcript produced by computer-aided transcription.
```

<u>**P R O C E E D I N G S**</u>

1

2            (Court in session at 9:40 a.m.)

3            **THE COURT:**  Good morning.  Law clerk transition time.

4   I had to make Ms. Winchester move so my experienced clerk and

5   my new clerk could both sit and see you-all.

6            We're here this morning on the Natera versus

7   NeoGenomics, 23CV629.  Let me get everybody to introduce

8   themselves first.  I know pretty much everybody, but we'll be

9   reminded.

10           **MR. VAN ARNAM:**  Good morning, Your Honor.  Rob Van

11  Arnam.

12           **THE COURT:**  You need the microphone.

13           **MR. VAN ARNAM:**  Rob Van Arnam, Williams Mullen.  With

14  me is Victoria Maroulis.

15           **MS. MAROULIS:**  Good morning, Your Honor.

16           **MR. VAN ARNAM:**  Dr. Sandra Haberny, Dr. Tara

17  Srinivasan and Mr. Kevin Smith.  Kirk Evans is the trial

18  graphic wizard with us.

19           **THE COURT:**  Okay, good.

20           **MR. VAN ARNAM:**  Hopefully we'll get that right for

21  you.

22           And from Natera, Dr. Mashada Dotti (ph).

23           **THE COURT:**  I think she's been here before.

24           **MR. VAN ARNAM:**  And Dr. Shawn Boyle, director of IT.

25           **THE COURT:**  He looks familiar, too.

1          At the other table.

2          **MR. MORROW:**  John Morrow, Womble Bond Dickenson.

3  With me at counsel table from Morrison Foerster is Annie Lee,

4  Aaron Fountain, Daralyn Durie.

5          Also with the Womble firm is J.D. Wooten, who is back

6  behind us.  We also have in-house attorneys from NeoGenomics

7  Allie (indiscernible) and Sarah Kelly.

8          **THE COURT:**  Glad to see everybody.  So those of

9  you -- most of you have been here before.

10          I know usually when we have a hearing, I've read the

11  briefs several times, I have an agenda, I have a bunch of

12  questions, and I have a draft opinion and I'm ready to go.  Not

13  today.  Okay.

14          As at least a couple of the local folks probably

15  know, we are about to be down a judge, and already, Judge Biggs

16  is not taking new cases this year.  Her cases are being

17  reassigned, and three us are doing the criminal docket instead

18  of four.  I was in trial all week until a verdict yesterday at

19  quarter of five.

20          So I have read the briefs and I do have some

21  questions, but I'm not as on top of things as some times -- or,

22  in fact, usually I am.  So I just tell you that, just kind of

23  to let you know.

24          I do still remember the standard for summary

25  judgment.  You do not have to tell me that.  I know a lot of

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 3 of 156

1  stuff generally.  I do have kind of a grip on the issues that
2  are here today, but I need some help from you-all.

3          Apparently, Ms. Hull, I thought I printed it, but I
4  don't seem to have my questions.

5          I do have my questions.  I'm more organized than I
6  thought.  Thank you.

7          So I just want to go ahead and tell you all that when
8  I set this trial date a year ago, I did not know that Judge
9  Biggs was going to leave, and did not know that the President
10 and the Senate, were going to poke along and not give us any
11 new judges.  It is almost certain I'm going to have to continue
12 the trial date, because the trial date assumes that I would be
13 able to give you-all a decision on summary judgment in order
14 for you to do the trial preparation work.

15         Now, I may get the summary judgment decision done by
16 the end of the month but, you know, it is a complicated case,
17 in fairness, and I really don't like to make people do
18 unnecessary trial preparation work if I'm going to grant
19 summary judgment on some or all of the issues, because that
20 seems like -- you know, the lawyers probably don't care, but
21 the clients do.  And then, once you do all that work, you don't
22 have to give it to me, whether or not I need it or not.

23         So the reality is, I'm probably going to have to
24 continue that.  And I know that you-all already have your first
25 deadline, I think it is next week, to exchange witness lists,

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 4 of 156

1  deposition designations and exhibit lists, and even in my best

2  days, I was probably not going to get a summary judgment order

3  done in five days, or a week from today, but that really just

4  seems problematic to me.  So let me just say that first.

5          Second, I need you-all to help me figure out the

6  order of things to decide, because ordinarily, I would have

7  done that before today, but it has been a little complex to try

8  to figure that out, especially given what you-all agree on and

9  what you don't agree on.

10          So, you know, I'll just tell you how I usually look

11  at it.  It is like, what is the -- if I rule on this in favor,

12  usually of the defendant, then I don't have to decide anything

13  else.  Is there an issue like that?  And, that's what I will go

14  to first, because if the Defendant wins on that, I don't have

15  to deal with anything else.  I think there may be a couple of

16  those in this case.  If, of course, they don't win, then what?

17  Then what?

18          Then if the Defendant doesn't -- if we end up needing

19  a trial on some things, but maybe not everything, is it a jury

20  trial?  Is it a bench trial?  You know, and I will say it

21  looked to me like the motions, the *Daubert* motions are all

22  directed to trial.  I did not see any of their testimony was

23  directed to the summary judgment motions or any other pending

24  motions.

25          I'm getting a big yes over here and a little yes over

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 5 of 156

1  here.

2          **MS. DURIE:**  Yes, yes.

3          **THE COURT:**  So I will tell you, I don't even want to

4  talk about that today, because they are not relevant to summary

5  judgment or any other pending matter.  Let's talk about them

6  later.

7          Even if I can get summary judgment to you by the end

8  of the month, I have the criminal term in September, and I'm

9  doing the best that I can.

10          So I do need your help on -- and that's

11  actually -- when I let you-all talk finally, that's what I want

12  to know first.  I don't want you to talk about the merits of

13  nothing.  Nothing, nothing, please.  I want you to say, in my

14  opinion, Judge, you should do it this way.  Here is my decision

15  tree.  That would just be so helpful to me.

16          So after I talk for a while, I'm actually going to

17  take a little break and let you-all talk about that, okay, with

18  your own sides, even if you don't talk to each other about it.

19          Hold on.  Now there is no motion pending about this

20  notice that Natera filed, but you-all briefed those issues and

21  they do appear to matter for what I have to decide at summary

22  judgment.  So I get -- you know, I might as well take it up,

23  because there it is.  I have some questions about that, that,

24  you know, we're going to need -- because it does impact the

25  bench trial issue, it seems like.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 6 of 156

1          If there is no damages, then I'm not ruling, okay.

2   If there is no damages and no willful infringement claim and we

3   don't have to try the Defendant's noninfringement claims, then

4   we can have a bench trial.

5          Let me just say, I don't like bench trials.  They are

6   way more work for me, but if everybody agrees on a bench trial,

7   you know, I go along.  They are way more flexible, because we

8   can do two days, we can -- you know, we have more scheduling

9   flexibility, which everybody usually likes.  But, you know, we

10  kind of have to work through, and you-all don't appear to agree

11  on all of those things.  And I will say, I haven't completely

12  studied that, but I need to know, because if the Defendant has

13  noninfringement claims, they are entitled to have those

14  resolved, I think, and, I think, those are resolved by a jury,

15  unless the Plaintiff takes a dismissal with prejudice, in which

16  case maybe that's not the case.

17         So I have told you that I didn't know anything.  I

18  just told you that I did know something.  But, you know, I kind

19  of -- it is not so much the merits, it is like what are the

20  implications of this.  You know, I kind of -- I, unfortunately,

21  have a case management mindset.  That's really what I want to

22  know first, because it helps me figure out what do I need to

23  decide first, okay.

24         I mean, I'm going to decide everything that I have to

25  decide, and I'm going to decide nothing that I don't have to

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 7 of 156

1  decide.  I don't have time to decide stuff I don't need to

2  decide.  So I need you-all to kind of work through this with

3  me.

4         Then after we do all of that, then I want to hear you

5  on your summary judgment motion, which is no doubt why you have

6  all of these boxes and printouts and all of that.  I'm ready to

7  hear from you, and I've read the briefs through completely

8  once, and I've gone back and looked at some, and my law clerk

9  did some work.  I'm not completely unprepared about that.  So

10 that's where I am.

11        What I propose to do in the short-run is, to take a

12 little break, give you-all 15 minutes or so, talk to your own

13 sides.  If you want to talk to the other, that's always a good

14 thing.  And then we'll come back and talk about, you know, as I

15 say, the order of doing things and the implications about that.

16        You-all can figure out who is going to talk to me

17 about that.  Very likely at the end of the day I'm going to

18 suspend all of these deadlines.

19        I can't try it this fall, unless you want a non-jury

20 trial, in which case I can probably squeeze you in doing a day

21 or two here and there.  I would be able to do that.  I'm

22 not -- let me be really clear, but I'm happy to do a jury

23 trial, too, if that's what needs to be done, but it is going to

24 have to be next year if we have a jury trial, and that may be

25 the easiest thing to do, whether it is bench or jury.

1          I'll probably just say, let's all go look at our

2   schedules.  We'll confer through Ms. Winchester, through the

3   courtroom deputy, and we'll figure out a date next year and

4   I'll set some deadlines for you-all, or I may just wait until

5   the summary judgment is decided to give you deadlines.

6          Okay.  Anybody have any initial questions that you

7   want to ask before I give you a break to talk?

8          **MS. MAROULIS:**  No, Your Honor.

9          **MS. DURIE:**  Not here.

10          **THE COURT:**  Okay.  We'll take a 15 minute recess.

11          (Recess take from 9:51 to 10:12 a.m.)

12          **MS. DURIE:**  We have each conferred, but --

13          **THE COURT:**  I'll give you a few more minutes.  You

14   tell Ms. Winchester when you are ready for me.

15          **MS. DURIE:**  We will do that.

16          (Recess taken.)

17          **THE COURT:**  Okay.

18          **MS. MAROULIS:**  Good morning, Your Honor, Victoria

19   Maroulis for Plaintiff Natera.  We conferred internally and

20   also had a chance to confer with counsel on the other side, and

21   we tried to come up with an agenda that works to help with the

22   case management issue that the Court spoke of in terms of the

23   schedule, in terms of sequencing of things, and we agree that

24   we should tackle the bench trial motion first, followed by

25   issues related to claim narrowing and movement issues, and then

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 9 of 156

1 as to substantive motions, we do disagree.

2          Natera proposes we start with our affirmative

3 infringement motion that cuts across all the claims of the

4 case, and then go to inventorship issues.

5          It is our understanding, that NeoGenomics would like

6 to start with the Section 101 motion and then transition to

7 inventorship and infringement issues.

8          I should note, Your Honor, in the narrowing, we'll

9 address briefly the fact that we believe Section 101 should not

10 be resolved at all, because NeoGenomics was supposed to narrow

11 their invalidity defenses to --

12          **THE COURT:**  Wait.  I was writing something down and I

13 kind of zoned out.  Just a second.

14          Okay.  I'll let you address it then.

15          **MS. DURIE:**  That's right.  We are largely in

16 agreement.  We think it makes sense to what Your Honor flagged

17 as case management issues, and then our view is on the merits,

18 Section 101 is a pure legal question, and so that's why we

19 would suggest that we start there.

20          **THE COURT:**  All right.  Well, how about we do this.

21 Let's talk about the bench trial.  Let's talk about claim

22 narrowing.  I'll probably break after that and, you know, I

23 think I have something this afternoon, but not until three

24 o'clock or so.  We'll see how long we are here today.  We're

25 not going until five o'clock, because I have people coming for

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 10 of 156

dinner. So I'm available to you the biggest chunk of today, so whatever time you need. All right.

So a bench trial. Let's see, the Plaintiff moved --

**MS. MAROULIS:** Yes, Your Honor. It is our motion.

**THE COURT:** Why don't we start then with the Plaintiff on that, and take a little time. Go ahead.

Who is going to argue?

**MS. MAROULIS:** It is me, Your Honor, Victoria Maroulis. It is our motion for bench trial. It is a motion under Rule 39(a)(2), and the reason that's important is, that's a section that allows the Court -- directs the Court in Federal Jurisprudence to have a bench trial when there is no jury issues in the case. And the jurisprudence of the Federal Circuit, most importantly in *Tegal* and the *In Re: Tech Licensing* cases that we briefed and other the side responded to, direct that when Plaintiff withdraws a claim for damages, the case is triable to a bench.

The *Tegal* case dealt with affirmative defenses of invalidity of noninfringement, and *In Re: Tech Licensing* further extended it to the counterclaims of invalidity on enforceability and infringement. These cases firmly hold if there are no damages in the case and if the Plaintiff moves, or party moves for a bench trial, bench trial is appropriate.

These two cases are particularly instructive, not just because they are patent cases and Federal Circuit cases,

1  but they address a number of supposed impediments that

2  NeoGenomics raised in their papers.  One is the timing of the

3  motion.

4         As Your Honor will see from the cases we cited, there

5  is no deadline to bring this type of motion and, in fact, in

6  the *Tegal* case, the motion was made only six days before trial,

7  and the *Licensing* case, it was made on the eve of trial, one

8  day before.  We, of course, moved months before the trial date.

9         **THE COURT:**  Can I ask you, you are not -- what about

10 your willful infringement claim?  I mean, are you abandoning

11 that?

12        **MS. MAROULIS:**  Your Honor, the willfulness claim is

13 currently in the case; however, there is no exception for

14 willfulness claims in the Federal Circuit cases.  Specifically,

15 *In Re: Tech Licensing*, while it didn't discuss in the opinion

16 the lower court pleadings, it contained a claim of willfulness,

17 and they did not stop the granting of a bench trial.

18        **THE COURT:**  Just to state the obvious, if you are not

19 seeking damages, you're not seeking treble damages.

20        **MS. MAROULIS:**  Correct, Your Honor.  Absolutely.  So

21 there is no relevance in terms of the damages of willfulness,

22 but willfulness can come in as to equitable remedies.  For

23 example, some courts consider willfulness in the analysis of

24 the balance of equities in the permanent injunction.

25        So, willfulness still has some relevance to the

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 12 of 156

1  equitable evidence; however, willfulness is not something that

2  would prevent the Court from granting a bench trial, once the

3  damages remedies are withdraw.

4          NeoGenomics sites to the *Exmark* case that has in line

5  with it, talking about willfulness issues being tried to the

6  jury but, Your Honor, this is a very different context.

7          In the *Exmark* cases, and cases like it, the question

8  was the balance between the Court and the jury, the subjective

9  or objective intent in the context of the damages enhancement;

10  in other words, what is triable to the jury, and what is later

11  considered by the Court when you are trebling damages.  Here,

12  this is not an issue.  The *Exmark* case in no way addressed the

13  bench trial motion, or the situation that we have here.

14          The cases on point are the *Impax* case and their

15  progeny, and nothing that the Federal Circuit has done has

16  changed this dynamic, which is no damages, no jury trial.  So

17  there's nothing we're doing in the case that warrants a jury

18  trial.

19          And, of course, Your Honor, there are some practical

20  implications and positives for having a bench trial for this

21  District.  Your Honor commented on the backlog of cases --

22          **THE COURT:**  We don't have a backlog yet.

23          **MS. MAROULIS:**  It is coming.

24          **THE COURT:**  If we don't get new judges, it will be

25  coming, that's for sure.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 13 of 156

 1          **MS. MAROULIS:**  Your Honor, in this instance where it

 2    would be easier to schedule a trial earlier and both parties

 3    are seeking a trial as early as possible, we, as the Plaintiff,

 4    want the resolution of our claims, but we also believe that

 5    NeoGenomics previously stated that they also wish an earlier

 6    trial.

 7          A bench trial can be scheduled around the Court's

 8    time.  It does not involve impaneling a jury.  It does not tax

 9    the community.  Folks could be sitting on criminal cases

10    instead.  It reduces the burden on the Court on avoiding jury

11    instructions, motions in limine and various bench conferences.

12          **THE COURT:**  But then I have to make findings of fact

13    and conclusions of law, and I'm positive somebody is going to

14    ask me to do that.

15          **MS. MAROULIS:**  With the help and guidance of the

16    parties and briefing, it should be a lesser burden than

17    convening a jury trial and impaneling a jury and all the

18    implications of that.  The burden of the parties are less

19    important than the Court and public.

20          Obviously, it is also more significant with jury

21    trials on the burden on the community, all of that is avoided

22    by a bench trial, but more importantly, it is not really

23    discretionary when there is no damages, it follows that there

24    should be a bench trial.

25          The few arguments that Neo raised in their papers, I

Natera vs. NeoGenomics    1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 14 of 156

1  am sure they will repeat here.  I've already discussed

2  willfulness, which is not an issue.  They mentioned that we

3  should have filed an amended complaint.  That also is not

4  required by Federal Circuit cases and was not the case in the

5  jurisprudence we cited.

6        Consent is not required because it is (a)(2) not (1),

7  that deals with consent.  There is no damages counterclaim that

8  they say they pled.  It actually is not a separate

9  counterclaim, but in any event, the courts do not recognize

10 that as a separate issue.

11       Very briefly, Your Honor, before I cede to my

12 colleague here.  NeoGenomics also said maybe we should just

13 have an advisory jury.  That is kind of the worst of all

14 worlds, because then you burden the jury and burden the Court,

15 it actually does not help to insulate someone's right to jury

16 because you either have it or you don't, and if you have it,

17 having an advisory jury does not cure taking away the right.

18       There is a standard for when one impanels an advisory

19 jury, and this case is not it.  The standard is there are

20 multiple claims; some are jury claims, some are claims that

21 overlap.  That is not the case here.  Or other special factors

22 suggesting that members of the community would be particularly

23 helpful.  That is likely cases like maybe zoning or negligence,

24 where there is a standard of community practices and such, but

25 this is a patent case and the Court is tremendously equipped,

Natera vs. NeoGenomics      1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 15 of 156

 1  having construed the claims, presiding over the injunctive

 2  proceedings, and otherwise been familiar with this case for two

 3  years.

 4          **THE COURT:**  Some of that is true.  I'm very familiar.

 5  I don't know that -- you know, I'm not a DNA person.

 6          Proceed.

 7          **MS. MAROULIS:**  I think, Your Honor, you are, by

 8  virtue of this case, and it is the result of the Court's work

 9  on this case, tremendous work.

10          So in sum, Your Honor, this is not a discretionary

11  issue.  The rule, Federal Rule and Federal Circuit cases direct

12  the Court to move this to a bench trial, and that's one of the

13  reasons we wanted to start with this today, because there is a

14  lot of motion practice before the Court.

15          Once the Court decides it is a bench trial, obviously

16  the *Daubert* rulings do not need to be done at this stage.  It

17  can be done later as part of the determination of the expert

18  testimony, and even summary judgment motions, to some extent,

19  if the Court is going to tackle those issues, they also can be

20  addressed at a later time.

21          Your Honor, I will stop now to see if the Court has

22  any questions.

23          **THE COURT:**  Thank you.  I don't.

24          For the Defendant.

25          **MS. DURIE:**  Thank you, Your Honor, and good morning.

1    **THE COURT:**  Good morning.

2        **MS. DURIE:**  So there is a willfulness claim that

3    remains in the case.  The Federal Circuit has said willfulness

4    is a question for the jury, and there is no Federal Circuit

5    case that says that we lose that right to a jury trial on

6    willfulness, simply because Natera is electing to forego a

7    claim for past damages.

8        To be clear, if NeoGenomics were found to infringe,

9    and if the patents were found to be valid, Natera is making an

10   argument in the alternative, that the Court should award it a

11   forward going royalty.

12       So Natera is maintaining a claim in this case that if

13   there is not a permanent injunction, it is entitled to be paid

14   money going forward in the form of, essentially, a compulsory

15   license, and willfulness is relevant to that inquiry and to the

16   amount of money that NeoGenomics might be required to pay.  It

17   could be --

18       **THE COURT:**  Okay.  Thank you for pointing this out.

19   I hadn't really thought about this.  But let me ask you, the

20   jury would not decide between the permanent injunction and

21   royalty, that's --

22       **MS. DURIE:**  Correct.

23       **THE COURT:**  You agree that is for the Court?

24       **MS. DURIE:**  Absolutely.  That is absolutely for the

25   Court, but typically the jury would decide the question of

Natera vs. NeoGenomics    1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 17 of 156

1  willfulness, and that jury finding is something the Court would
2  then take into consideration with respect to that determination
3  as between a permanent injunction and money, and it could be
4  relevant to the amount of money.  It could also be relevant to
5  other monetary relief that Natera has not foresworn, like
6  attorney's fees, which could be available in the event of a
7  willfulness finding, and is money, and that's why I think it is
8  important that the Federal Circuit has not resolved this
9  question.

10        There is certainly no authority that Natera can point
11  to where the Federal Circuit has said even in this situation,
12  you lose your right to a jury trial on willfulness, and this is
13  why -- and, I think, this was the *Theranos* case where Judge
14  Grewal said -- in that case he found -- he thought there was
15  probably not a right to a jury trial, but he said, I'm going to
16  impanel an advisory jury any way, because if I'm wrong about
17  that and we have a bench trial, it was a waste of time.

18        If we impanel an advisory jury, that is a jury trial,
19  and in the event that the Court later concludes that there was
20  or wasn't a right to a jury trial that is not going to be
21  reversible.

22        I disagree with counsel, I think that to the extent
23  that the Court impaneled an advisory jury and then made a
24  contrary decision, to be clear, the fact that there was an
25  advisory jury would not in that circumstance, be protected.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 18 of 156

1 But here, the reason Judge Grewal did what he did was, because

2 we could have what would be, in substance, a normal jury trial,

3 and then in the event the Federal Circuit were to conclude that

4 this was a jury issue, our rights would have been preserved.  I

5 think that is true as a matter of law.  In fact, if that needed

6 to be true as a matter of stipulation, it could be.

7          The final just scheduling practical point I want to

8 note in this case, with respect to trying to do sort of jury

9 trials -- I'm sorry, a bench trial on various days, I have

10 another trial that is scheduled for November.

11      **THE COURT:**  I'm going to accommodate you-alls other

12 trial schedules.

13      **MS. DURIE:**  I just want to let the Court know, I have

14 another trial in December.  And, we anticipate that we may have

15 foreign witnesses.

16      **THE COURT:**  Foreign?

17      **MS. DURIE:**  Foreign witnesses, and I think having

18 some certainty pretty far in advance about when the trial is

19 going to be --

20      **THE COURT:**  You will have certainty pretty far in

21 advance, because I need that, too.  I'm not going to be saying,

22 oh, how about next week.  I'm not going to be doing that to

23 you-all.

24      **MS. DURIE:**  Good.

25      **THE COURT:**  Let me ask you one more question, just to

1  confirm I'm correct.  The only -- in the current state of the

2  case and imagining nobody got summary judgment on anything, the

3  only issue that you think requires a jury trial is willfulness?

4  I mean, that's the reason you think you still get a jury trial?

5         **MS. DURIE:**  So to the extent that Natera formally

6  dismisses its damages claim, I think that it is -- I think

7  that's right.  I think it is willfulness that gives us that

8  right.  I will note, however, that I think that is significant.

9         **THE COURT:**  Oh, yeah.  I'm just --

10        **MS. DURIE:**  That needs to be dismissed with prejudice

11  out of the case, not coming back in the case under any

12  circumstances.  I think if Natera were to do that, then it

13  would be the willfulness issue that gives us that right to a

14  jury trial.

15        **THE COURT:**  I just am confirming that.

16        **MS. DURIE:**  Yes.

17        **THE COURT:**  All Right.  Any brief rebuttal?

18       **MS. MAROULIS:**  Your Honor, a couple of very brief

19  points.  The first one is willfulness, since it is at the top

20  of the Court's mind.  The cases that counsel referenced

21  including the *Exmark* case, are in a different posture.  In

22  those cases the plaintiffs sought monetary remedies, so when

23  the Court was deciding whether the judge or the jury addresses

24  willfulness issues, it was in the context of the jury trial

25  already.  So that language, which, by the way, is dicta as to

1  this ruling, it is not dispositive in our case, because it does

2  not face the same posture.

3          For example, as Your Honor knows, the *Markman* case,

4  the seminal *Markman* case, the court said that infringement

5  cases must be tried to a jury but, when the plaintiff

6  withdraws -- it is separate from *Markman* -- but when a

7  plaintiff withdraws damages, the cases do not go to the jury,

8  even though it is still a patent case.

9          Same with willfulness.  The willfulness here was

10  discussed in the context of a jury trial, because it was

11  already a jury trial for damages, so it is a very, very

12  different situation, and there is no carve-out as to

13  willfulness in the *Tegal* and *In Re: Tech Licensing* and its

14  progeny.  So that's number one.

15          Number two, Your Honor, a case from this Circuit

16  called *Williams versus Centerra* in the District of South

17  Carolina in 2022, addressed whether an advisory jury preserves

18  the parties' rights, and it said, "The use of an advisory jury

19  does not satisfy a party's constitutional right to a jury

20  trial."  So we could have a situation where there is an

21  improper advisory jury trial, but that would not save the case

22  from being retried and readdressed if there is a mistake as to

23  that.

24          So, Your Honor, with those two points, if the Court

25  has any additional questions, I'm happy to answer, otherwise, I

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 21 of 156

 1  rest.

 2          **THE COURT:**  Thank you.

 3          Anything you want to say?

 4          **MS. DURIE:**  I just wanted to be clear on that last

 5  point.  Again, I think that depends on the way that the

 6  advisory jury is constituted.  To be clear, we would stipulate

 7  that a trial in front of an advisory jury that proceeded in the

 8  form of a normal jury trial would satisfy our constitutional

 9  right to a jury trial, if the Court of Appeals were to agree

10  that we have one.

11          **THE COURT:**  All right.

12          Well, I'll work through that.

13          **MS. MAROULIS:**  Is the Court ready?

14          **THE COURT:**  I'm taking notes.  Pardon me.  I do

15  better remembering things if I write them down, even if I never

16  look back at my notes.  Okay.  Hold on.

17          Now, I think that that takes us to the next question

18  you-all agree that we should address, which is claim narrowing

19  and mootness.

20          **MS. MAROULIS:**  Yes, Your Honor.  Let me address this

21  briefly, and then as needed I will call on my colleagues.  So

22  there is two separate issues that we wanted to discuss here.

23  One has to do with the Court's case management order, which is

24  Document 330, and the parties' obligations to narrow claims for

25  the case.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 22 of 156

 1          So we had a case management order contemplating two
 2   rounds of narrowing.  The first one happened a while ago,
 3   uneventful.  Both sides narrowed their claims and defenses.
 4   Here, Natera elected its final seven claims and provided notice
 5   to NeoGenomics, and as part of that, Natera decided that it
 6   would be prudent to let the Court know that there are some
 7   motions in front of the Court that are no longer relevant,
 8   because Natera dropped specifically Claim One on the '454
 9   Patent.  So we filed a very simple non-argumentative notice
10   with the Court, letting the Court know in Document 549, that
11   certain portions of the summary judgment motion and Lennon
12   *Daubert* were no longer relevant because Natera dropped the
13   claim.
14          The notice was intended solely to help the Court
15   manage the workload preparing for this very voluminous hearing.
16   We were somewhat surprised that NeoGenomics oddly disputed that
17   very non-argumentative notice and filed a lengthy brief, but
18   the upshot of that is, we understand that NeoGenomics is
19   arguing that their noninfringement claim as to the dropped
20   claim is still live, because the claims were not dismissed with
21   prejudice.
22          Two points here, Your Honor.  One is, that we
23   narrowed the case based on the Court's order, so it was not a
24   voluntary abandonment of claims that does appear in some cases.
25   It was pursuant to a Court order, Court directive to narrow the

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 23 of 156

1  case.

2  **THE COURT:**  Well, that seems to support their

3  position.

4  **MS. MAROULIS:**  No, Your Honor.

5  **THE COURT:**  You are saying you did it -- I mean, I

6  guess I'm just having a little bit of trouble, because, I mean,

7  what you seem to be saying is, you've dropped your claims of

8  infringement on Claim One, two different uses of the word

9  "claim" there, and you're entitled to decide whether that is

10  decided or not, but it is not actually decided.  You can raise

11  it later, you seem to be saying.  And, I have a little bit of a

12  problem with that.  I mean, if you-all filed another lawsuit

13  and wanted to talk about Claim One, I would have to retire.

14  I'm joking.  But I'm having a little trouble about

15  understanding exactly what you're saying here, because you seem

16  to be saying we're not pursuing it now, but we could later.  I

17  don't know about that.

18  **MS. MAROULIS:**  Your Honor, two things.  One is, that

19  the case narrowing orders around the country are without

20  prejudice, because a case narrowing order is a tool to help the

21  Court and the parties.  It is not a -- you don't, like, force

22  someone to just drop their claims with prejudice.

23  I direct the Court's attention to the case of *Oyster*

24  *Optics versus Cisco Systems*.  It is from the Texas Court, not

25  this Circuit, but it collects the cases that support the

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 24 of 156

1 proposition that the patentee's voluntary withdrawal of a

2 previously asserted patent claim for the purpose of narrowing

3 the case is pleaded as a dismissal without prejudice.

4          So Natera narrowed the claims before NeoGenomics ever

5 raised this issue.  We narrowed claims, again, per the Court

6 order --

7          **THE COURT:**  Well, wouldn't that be better off? I

8 mean, if that's true, why don't I just say, I'm not making you

9 narrow your claims anymore, and I'm giving you a week to try

10 the case?  I don't understand why anybody would ever do that.

11 Anybody like any judge would ever do that, aside from the fact

12 that people -- I don't know, that people don't actually then

13 file another lawsuit, and maybe that's the reality, but if

14 that's the reality, then why are you-all fighting?

15          **MS. MAROULIS:**  Your Honor, the reality is, that if

16 once there is a judgment, for example, if there is a judgment

17 of infringement, we likely will be barred from asserting this

18 claim by the Doctrine of Claim Splitting, Preclusion, at that

19 point.

20          **THE COURT:**  That seems so to me.

21          **MS. MAROULIS:**  But the concern is, and we don't

22 actually know why they are fighting us.

23          **THE COURT:**  I'm asking why you are fighting it.  I

24 understand why they are fighting it.  I don't understand why

25 you are fighting that.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 25 of 156

 1          **MS. MAROULIS:**  What we don't want, we don't want a

 2    statement, for example, if we seek -- if we win permanent

 3    injunctive relief, them claiming that they received this

 4    dismissal with prejudice that is somehow either a covenant or a

 5    license that is unpaid, and basically using that to try to

 6    defeat the various equitable remedies.

 7          We usually proceed this way in patent cases, because

 8    there is a lot of cases that say that narrowing is usually

 9    without prejudice, so that is, Your Honor, what the concern is

10    here.

11          Then as to specifically once we kind of get past

12    that, if possible, there is case law by the Federal Circuit as

13    to whether there is still jurisdiction over the declaratory

14    relief claim, when the claims are dropped, and that is the

15    Strick case and in the Strick --

16          **THE COURT:**  What case?

17          **MS. MAROULIS:**  It is called Strick.

18          **THE COURT:**  S-T-R-I-C-K?

19          **MS. MAROULIS:**  It is actually Streck, S-T-R-E-C-K.

20    *Streck versus Research Diagnostic Systems*.  It is a Federal

21    Circuit 2012 case, and it said, Where the patentee narrowed

22    pursuant to local rules disclosures, there was no more

23    declaratory relief claim after the narrowing as to the dropped

24    claims.  So there is support for our position across the board.

25          We complied with the Court's orders in good faith.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 26 of 156

1   We've done this in other cases.  We were surprised that this is

2   a dispute, but mostly we wanted to be upfront with the Court

3   about the order.

4              **THE COURT:**  I mean, I appreciate that.  If I don't

5   have to decide it, great, but I do think understanding what

6   that means is important, because that's where you-all appear to

7   disagree, and I am not interested in Claim One infringement

8   coming up ever again.  If it is ever going to come up again, I

9   just as soon do it now.  So I'm having some trouble

10  understanding exactly what you all -- why you all think -- not

11  just you, Defendant, too.  I mean, how is this going to come up

12  again?

13             You have raised -- I mean, you appear to say, okay,

14  without prejudice, but if we ever tried to raise it again, we

15  would have a claim splitting problem.  You have this sort of --

16  I didn't -- I don't know if the word is speculative or

17  hypothetical concern that they would say because you dropped

18  Claim One, you lose.  That seems -- I don't understand how that

19  could be.  Maybe they can address that.  But that appears to be

20  your concern.  That's the only reason that I have heard you

21  say, and so maybe I've missed something.

22             **MS. MAROULIS:**  Your Honor, that is definitely what I

23  articulated.  Another aspect of that is, if the Court is going

24  to determine noninfringement of that claim, there is no benefit

25  to Natera narrowing, because --

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 27 of 156

1       **THE COURT:**  That's right.  I agree with that.

2       **MS. MAROULIS:**  So we were attempting to confirm the

3   Court's order and comply with it and narrow the case for trial.

4   So the effect of this is not narrowing, because we still have

5   to fight infringement issues.

6       **THE COURT:**  I mean, I understand that.  That, the

7   Defendant is going to have to address.  You know, that

8   makes -- I do understand that's a reason, but that's not -- it

9   almost doesn't address the -- how does it -- how if ever does

10  it come up again in the future problem.

11      **MS. MAROULIS:**  Correct.  We were addressing the

12  question as to the current product in the case on this.  If in

13  the future they have some other complete different product, we

14  could still asserted various claims because it is not -- it is

15  a different product and wouldn't be the case adjudicated here.

16      **THE COURT:**  Okay.  Anything else you want to say?

17      **MS. MAROULIS:**  Your Honor, there is another aspect of

18  the narrowing that is slightly different.  It is about the 101

19  motion, and very simply here, Defendants were supposed to

20  narrow their defenses to four -- I'm sorry, three, but they

21  listed four, and the listing said that this is subject to

22  summary judgment motion, and that once the Court decides

23  summary judgment, you have to pick the first three.

24          The 101 invalidity is listed as the fourth defense.

25  It is our position, that they were limited to three defenses

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 28 of 156

per claim, that listing four was not compliant with the Court's
order, but also importantly, if 101 is the fourth defense, then
we shouldn't even take it up today because it is out of the
case.

We did not think the Court meant narrowing subject to
the summary judgment. The whole point of narrowing before
summary judgment scheduling was to reduce the issues.

So it is a different variant, it is not mootness as
such. It is a lack of compliance with the Court's directive to
limit to three invalidity defenses.

**THE COURT:** If I can ask you what I did, since I
don't remember. I do have written down the deadline for
election of your claims, but --

**MS. MAROULIS:** Yes, Your Honor.

**THE COURT:** Where is that?

**MS. MAROULIS:** So there are two relevant orders. In
the order Number 330, it says, final election of three
invalidity arguments per claim by NeoGenomics, and that is
August 1, 2025. Now we asked for a short extension. It was
reciprocal, so they ended up serving it on August 4th, but it
is the same idea.

So it is very simple, they were supposed to do three,
their notice states four. One should come out. We understand
the last one comes out and the last one is 101.

**THE COURT:** Okay. One, gotcha. Thank you.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 29 of 156

1          **MS. MAROULIS:**  Thank you, Your Honor.

2          **THE COURT:**  For the Defendant.

3          **MS. DURIE:**  Thank you, Your Honor.  I'm trying

4    to -- first thing, Your Honor, we do not think it makes sense

5    to leave unresolved in this case issues for some future case

6    on, for example, Claim One of the '454 Patent.

7          Now to be clear, the suggestion that they wanted the

8    ability to assert that patent potentially in future litigation

9    against a different product, is not germane.  They could always

10   do that.

11         The judgment in this case will be for validity, which

12   is dispositive with respect to the claims at issue, but for

13   infringement, only with respect to the products that are at

14   issue in this case or products that are insubstantially

15   different.  So I think that's just a red herring.  They are

16   always going to be able to assert that claim, unless it is

17   invalidated against a different product.

18         Our understanding, and I think this is consistent

19   with typical practice is, that the case narrowing was intended

20   to narrow the issues for trial, because we have a one week,

21   essentially trial, and the parties, often in my experience in

22   these cases agree, and the Court then directs the parties to

23   select the claims and defenses that will be presented to the

24   jury at trial, but that is separate from summary judgment and

25   the legal issues that will get resolved in advance of trial.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 30 of 156

1     I would suggest it doesn't make any sense to me that
2 we would be in a position where we are foregoing defenses, but
3 the Plaintiffs are not, in substance, foregoing claims.  They
4 are pulling them out of this case but reserving the right to
5 assert them in other cases, especially when we have a
6 declaratory judgment claim of noninfringement, and the issues
7 are fully briefed, and T-ed up and ready for decision.

8     So I agree as a practical matter with Your Honor's
9 initial suggestion, if Natera is not -- I will say the
10 suggestion the courts routinely handle it this way is not
11 correct.  Plenty of judges insist that these dismissals be with
12 prejudice.  Conolly in the District of Delaware is one of them,
13 precisely for this reason, that it doesn't make sense to have
14 these claims to be litigated in subsequent cases.

15     My suggestion would be where I think Your Honor
16 started, if Natera's position is that they are reserving this
17 dismissal without prejudice, let's just do away with the case
18 narrowing and resolve all the issues, and Your Honor is going
19 to impose time limits on the trial, that's going to serve the
20 same effect forcing function.  It means we won't get a preview
21 and usually why you agree is to get a preview, but so be it.

22     I think the thing that is overridingly important is
23 that we get certainty and we get a resolution.

24     **THE COURT:**  But if I were to agree that I were to
25 decide your noninfringement issue as to Claim One of the

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 31 of 156

1 patent, and say I decide that in your favor, that's just Claim

2 One, right?  I mean, that doesn't resolve any of the case,

3 other than as to Claim One.

4        **MS. DURIE:**  It resolves it as to Claim One and its

5 dependents.  I guess my point would be, I think the judgment in

6 this case at the end of the day ought to resolve all claims.

7        **THE COURT:**  I'm just -- I'm not disagreeing with you.

8 I'm not deciding.  I'm not trying to disagree with you on that

9 point.  I'm just trying to understand what would it mean if I

10 agreed with you that we should decide -- we don't decide their

11 infringement claim.  This is kind of bizarre, but we do decide

12 your noninfringement, but we're only talking about Claim One.

13 So all the rest of it is still out there to be decided.

14        **MS. DURIE:**  That's right.  Your Honor has in front of

15 you, and I think both sides agree, that you will ultimately

16 resolve the infringement issues on the other claims unless you

17 invalidate the patent, in which case it doesn't matter.

18        The question really is, in the event that you don't

19 invalidate the claims, are you going to resolve infringement

20 with respect to all claims or are you going to resolve it with

21 respect to a subset of claims, or is the jury going to hear a

22 subset of claims leaving Natera free, if it loses, to go try

23 again.

24        I want to note, the claim splitting issue in their

25 brief, what they say is, NeoGenomics would be free to argue

claim splitting in the future.  They didn't say that that would
be a prevailing argument and that they wouldn't be able to
reassert the claims.  They said, essentially, kick the cow down
the road, they could file another lawsuit that could assert
Claim One against the same product and we would be free to
argue claim splitting, and that just doesn't make any sense to
me.  There's no reason to burden Your Honor or another court
with another lawsuit over Claim One of the '454 Patent directed
to this product.

It is all T-ed up, it is fully briefed.  We've got a
counterclaim for noninfringement, and we ought to resolve that
issue.

**THE COURT:**  So I am just not remembering it.  I'm not
the most experienced patent judge in the world.  I'm so happy
not to be in Delaware.  But in the couple of dozen that I've
had, I don't remember this coming up, I guess because what I
hear you-all saying is, usually the plaintiff says, I'm not
going to pursue infringement on this claim, and the defendant
says, and we're not going to pursue noninfringement.

**MS. DURIE:**  That's right.  That's the normal course,
and I want to just go back.  The order that was entered by Your
Honor just a little while ago, it said, "Natera's deadline for
electing its seven patent claims to assert at trial is
extended, and the deadline for NeoGenomics identifying which
three invalidity arguments for asserted claims is extended."

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 33 of 156

1  We understood all of this to be what we're going to assert at
2  trial.  Life is short, we got a week.  We're trying to do each
3  other a favor by letting each other know at trial what claims
4  and defenses we're actually going to be asserting with the
5  understanding that we are each foregoing what is not being
6  asserted.

7          I want to emphasize, what Natera is trying to achieve
8  here, would be incredibly unfair.  They would pull out of the
9  case claims where summary judgment is fully T-ed up for a
10 further lawsuit, where we would then have to re-do everything,
11 and, our election of defenses, in their view, is dispositive.
12 We can't reassert the invalidity defenses that we're dropping.
13 We would have no way to do that.  So they asking -- they are
14 trying to get the Court to adopt this fundamental asymmetry.

15         **THE COURT:**  I mean, you are supposed to only elect
16 three, and part of -- I don't actually remember this normal
17 order, I think is in our patent local rules.

18         **MS. DURIE:**  Exactly.

19         **THE COURT:**  But, you know, one function of doing it
20 when it is done is, everybody had the benefit of the summary
21 judgment briefing and could say, let's just withdraw one of
22 these and moot that.  And so, I mean, it is done before -- I
23 mean, I guess not necessarily before a decision on summary
24 judgment.  In theory, I could have decided -- let's see, the
25 replies were due July 18th.  I guess in theory I could have

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 34 of 156

 1  gotten that done by August 8th, but it is -- you got three.  It

 2  says you get three.

 3          **MS. DURIE:**  So, Your Honor, the reason that it is set

 4  up this way --

 5          **THE COURT:**  Under your argument, they could have

 6  narrowed to ten.

 7          **MS. DURIE:**  Our point is, we are electing claims and

 8  defenses for trial, and so the point is, these are what we are

 9  going to present to the jury.  It is not an election for

10  summary judgment.

11          **THE COURT:**  And you listed four.

12          **MS. DURIE:**  But we put an asterisk, because it

13  depends on the Court's summary judgment rulings.  In other

14  words, which one we're electing may depend on how the Court

15  rules.

16          **THE COURT:**  But what gives you the right to do that?

17  I'm asking you, I'm not arguing.  I know I sound kind of like

18  I'm arguing with you, but I don't mean to be.  I mean to be

19  asking you.  The order says, three at trial.  It

20  doesn't -- that doesn't say at trial that you get to decide

21  later from some larger list after the Court decides summary

22  judgment.

23          **MS. DURIE:**  I guess -- I think that's fair, and I

24  understand Your Honor's concern, and were that the case, what I

25  would say is, for trial, we would elect the first three, but we

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 35 of 156

1  would still ask the Court to rule on summary judgment on our

2  101 motion.

3          I will say, in my experience the reason the schedule

4  is set up this way, you make your election and claims for trial

5  after the summary judgment briefing, as Your Honor said, with

6  the benefit of that briefing, but sometimes summary judgment

7  doesn't get decided until right before trial.

8          **THE COURT:**  This is true.  Not everybody is as

9  considerate as you all.

10         **MS. DURIE:**  I will say, I have a case that is going

11 to trial Monday, and we don't yet have a summary judgment

12 ruling on one of the patents.  The pretrial conference is this

13 afternoon, and I'm guessing we'll probably get it this

14 afternoon.  And so we made our claim election.  We had the

15 benefit of briefing.  We didn't have the benefit of a summary

16 judgment ruling, because I think the Court appreciated we might

17 not get that in time for claim election, but that doesn't mean

18 the judge isn't going to rule on the pending summary judgment

19 motions, because it is a claim election for trial.

20         So to the extent that the Court feels, and I get it,

21 that we should be making that election now without regard to

22 what the Court's rulings would be, I think we were including

23 101 to make clear we're dropping that as a defense in the case.

24 We want the Court to rule on our pending summary judgment

25 motion, but I think if we were forced to pick without knowing

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 36 of 156

1 how the Court is going to rule on any of the pending motions,

2 we would pick the other three for trial.

3          I think the sort of predicate problem -- other reason

4 we flagged it that way, Your Honor, was this predicate problem

5 that if the Court agrees with us that we should not be in a

6 position where we are having to make a binding election when

7 Natera is not, and one solution of that is, just fine, no

8 further election on either side, we're fine.  We can just --

9 we'll deal with the trial, and the time limit will be the

10 enforcement mechanism.

11          **THE COURT:**  All right.  Thank you.

12          Any rebuttal?

13          **MS. MAROULIS:**  May I respond very briefly?  The

14 schedule was not set the way Counsel describes.  There was

15 never discussion of narrowing for trial, but not for motion

16 practice.  The way the schedule was set up is, there was no

17 conceivable way the summary judgment would come down in time.

18 So Natera narrowed its claims without the benefit or

19 conditional reservation, but NeoGenomics chose not to narrow

20 the claims to three, so it is very important.  There is nothing

21 in the schedule, nor have they articulated to us --

22          **THE COURT:**  Why do they get to -- why are you forcing

23 them to do that, when you are saying you don't have to do it,

24 that your narrowing of the claims is, I'm going to exaggerate,

25 meaningless, but theirs is not.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 37 of 156

 1      **MS. MAROULIS:**  Your Honor, it is not meaningless,

 2  because we limited ourselves to seven.  We dropped -- I think

 3  we dropped seven.

 4      **THE COURT:**  But you are saying you can raise them

 5  later, and yet -- so what does that mean about them?  They can

 6  later, in this hypothetical future lawsuit, they are going to

 7  be able to raise their 101 defense?  I mean, what's the point?

 8      **MS. MAROULIS:**  Your Honor, the point of the schedule

 9  is, that we relied on and it we acted consistently with it, but

10  it appears that they are preserving a right to shuffle their

11  four defenses and select after the Court rules, which does not

12  seem fair to us, because we read the schedule as having the

13  parties engage in narrowing before summary judgment.  I don't

14  want to belabor the point, but that's our reading.

15      **THE COURT:**  That's consistent with what you have

16  done, sort of.

17      **MS. MAROULIS:**  Your Honor, very briefly.  There were

18  some Delaware cases mentioned, the two Delaware cases cited in

19  the briefing the *Bio-Rad* and the other case, both were

20  addressing the dropping of the full patent, not selected

21  claims.  Also, that was done on the eve of trial, for whatever

22  reason, not as part of the orderly claim narrowing order that

23  Your Honor prescribed in this case.

24      If there are any additional questions, I'm happy to

25  address, Your Honor.

 1          **THE COURT:**  I thought I understood you, and I must

 2   have misunderstood.  I understand that NeoGenomics did file a

 3   counterclaim for noninfringement, invalidity, and

 4   un-enforceability, and I thought you told me they had only

 5   raised noninfringement as an affirmative defense.

 6          **MS. MAROULIS:**  No, Your Honor, they absolutely filed

 7   counterclaims.

 8          **THE COURT:**  Hold on.  If I wrote that down, I want to

 9   be sure I mark through it.  I must have misunderstood you.

10   Thank you.

11          **MS. MAROULIS:**  Thank you for clarifying that, Your

12   Honor.

13          **THE COURT:**  Anything else for the Defendant?

14          **MS. DURIE:**  No, Your Honor.

15          **THE COURT:**  Let's take a ten minute recess.  We'll

16   come back and I'll tell you what we're going to address first

17   at that point.

18          (Recess taken from 10:58 to 11:19 a.m.)

19          **THE COURT:**  Good morning again.

20          **MS. MAROULIS:**  Your Honor, we have a couple of things

21   to report to the Court, hopefully, to the Court's satisfaction.

22   We used the break to meet and confer.

23          So, Your Honor, we talked about the claim narrowing

24   some more, and we agreed between the parties that Natera will

25   dismiss the previously narrowed claims with prejudice.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 39 of 156

NeoGenomics will withdraw both their EJ claim as to these
patents, both non-infringement, validity and such, and also
will withdraw their motion currently pending before the Court
regarding noninfringement of these claims.

**MS. DURIE:** And just to be make sure I'm precise for
the record, we agree that Natera's withdrawal of those claims
with prejudice, moots our counterclaims with respect to those
claims, and moots the pending summary judgment motion with
respect to infringement of those claims because they're being
withdrawn with prejudice.

**THE COURT:** So this is good news, because you have
now made my job easier and removed some things from my
decisions, so that's very good for me.

So what I would like you to do is memorialize that.

**MS. MAROULIS:** Yes, Your Honor.

**MS. DURIE:** Yes.

**THE COURT:** And if you are able -- if you are able
next week to file something -- is that feasible?

**MS. MAROULIS:** Yes, Your Honor.

**MS. DURIE:** That seems reasonable.

**THE COURT:** Just be pretty explicit with me about
what that withdraws from my consideration and what I am hearing
is, it definitely means I do not have to consider at all
infringement of Claim One of which patent?

**MS. MAROULIS:** '454.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 40 of 156

1          **MS. DURIE:**  Correct.

2          **THE COURT:**  And I think that's all it may --

3          **MS. DURIE:**  Correct.

4          **MS. MAROULIS:**  There is also a portion of the *Daubert*

5     that relates to that, but it sounds like Your Honor is not

6     looking at that.

7          **THE COURT:**  I'm not looking at that right now.

8          It would be helpful at some point for you to tell me

9     that, if and when I otherwise would get to it.  Okay.  Great.

10    Thank you.

11         And that includes the dependent claims, right?

12         **MS. MAROULIS:**  Yes.  Your Honor, secondly, this is a

13    unilateral statement, but Natera is going to -- well, it is not

14    required any way for a bench trial to proceed.  To simplify

15    things going forward, Natera is going to drop its willfulness

16    claim.  We can memorialize that in some submission to the

17    Court.

18         **THE COURT:**  All right.

19         **MS. DURIE:**  Your Honor, we also ask that in context

20    of doing that, that Natera formally withdraw any damages claims

21    in the case as well with prejudice.

22         **THE COURT:**  I don't know that that's technically

23    required, but some of the case law it seems to indicate that it

24    is not.  I mean, I think if they tell me they are not going to

25    pursue it, I can for sure say they cannot pursue it.

 1          **MS. DURIE:**  I understand.  I want a clean record on

 2    that.  I just don't want a situation where they come back and

 3    want to go on the record and say the situation has changed.

 4          **THE COURT:**  Well, maybe you-all can work out a

 5    submission on that, hopefully, that satisfies everybody, even

 6    though it is a unilateral decision by that.  So the

 7    consequences of that would seem to be that in a trial you-all

 8    are dumping it on me?

 9          **MS. MAROULIS:**  Your Honor, it means that it is a

10    bench trial.

11          **THE COURT:**  You-all can tell that I'm really kind of

12    kidding, right?

13          **MS. MAROULIS:**  We will make it as easy and convenient

14    as possible.

15          **THE COURT:**  I know you will.  I joke about patent law

16    because there is so much work, but really one of the lovely

17    things about patent trials is, I always have good lawyers.  So,

18    you know, thank you for doing that, because really patent

19    lawyers generally do make it easy for the judges, at least as

20    easy as possible within the context of how hard they are.

21    Okay.  Great.

22          So that means that we can now turn -- you-all are

23    going to file something, hopefully next week, and I will be

24    able at that point, to turn my attention to the summary

25    judgment issues.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 42 of 156

1             Did you-all work out the order on that?

2             **MS. DURIE:**  We disagree about the order on that.

3             **THE COURT:**  You still disagree about that.  Well, I

4    will work that out for you then.  What I want to do is talk

5    about -- and this is not dealing with the -- doesn't imply any

6    ruling on the narrowing of the Defense's issues, but I want to

7    start with the 101 argument.  Then I want to do the

8    infringement issues that are left.  Then we can talk about

9    inventorship, because -- and when we get to inventorship, I

10   remember from back in the day, or I think I remember when this

11   came up before, that the remedy, even if I agree that the

12   inventors aren't there, the remedy is just amending the patent.

13   It is not dismissing the case.

14            Do you agree with that?

15            **MS. DURIE:**  Absolutely.  The remedy, I mean, the

16   remedy can be to add those two individuals as inventors to the

17   claim.

18            **THE COURT:**  Okay.  So that's why I'm doing it last,

19   because it doesn't seem to really -- or at least might not get

20   rid of anything for trial, but when we get to that, you-all can

21   address that.  I'm just explaining to you why I'm doing it

22   last.

23            So let's talk about the Section 101 argument.  I

24   believe that is Defendant's argument.

25            **MR. MORROW:**  That's us, Your Honor.  May it please

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 43 of 156

1  the Court.

2          Can everybody see it?  Can we get our slides pulled

3  up for the screens for the Defense slides.

4          **THE COURT:**  Yes.  Give the court reporter a moment.

5          **THE COURT REPORTER:**  I don't usually do this, so just

6  bear with me.  I'll get used to it quickly.

7          **THE COURT:**  Can everybody see it?  Hold on.

8          Ms. Winchester, can you make it so that I can see it

9  on the screen?  You cannot.  That's all right, I'll turn my

10 head.

11         Go ahead.

12         **MR. MORROW:**  Thank you, Your Honor.  May it please

13 the Court.

14         **THE COURT:**  You've given me printouts?

15         **MR. MORROW:**  We do have printouts.

16         **THE COURT:**  Thank you.

17         **MR. MORROW:**  I know the Court is already aware of the

18 two part Alice test.  We have it up on the screen here.  It is

19 fairly simple.

20         The first step being the Court has to decide if the

21 patent is directed to a natural phenomenon and if, and only if

22 the Court decides that it is, you move to step two, which

23 involves deciding the claims recite an inventive concept that

24 is sufficient to ensure that the patent in practice amounts to

25 significantly more than a the natural law itself.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 44 of 156

1        Addressing step one, Your Honor.  The claims here are

2   certainly focused around the tech and the presence of something

3   that exists in nature, tumor-specific mutations in cell-free

4   DNA that is circulating in a cancer patient's blood.

5        The identity and the locations of those mutations

6   exist in nature.  They are not changed through the patented

7   process, and consequently, the claims themselves are

8   necessarily directed at a way to find something that exists in

9   nature.

10       There are a couple of cases that have addressed

11  similar types of claims.  Your Honor is going to hear about

12  them from myself, as well as, I'm sure, opposing counsel.  They

13  are discussed in the briefing at length as well.

14       **THE COURT:**  Right.  I mean, it seems fairly certain

15  on at least whether it is directed to a natural phenomenon, it

16  seems like that.

17       **MR. MORROW:**  We think so as well.  I can run through

18  that quickly, Your Honor.  I think the *CareDX* case, which is

19  the case that we think is the most on point and should control

20  the Court's ruling in this case is especially instructive here.

21       The claims involve collecting a plasma sample from a

22  patient, analyzing cell-free DNA using PCR multiplex

23  sequencing, which I know will sound familiar to this Court, and

24  then identifying naturally occurring cell-free DNA from tissue.

25       You can see the *CareDX's* court summarization of those

Natera vs. NeoGenomics     1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 45 of 156

1 claims. I quoted that. I won't read the claim, but when Your

2 Honor reads through it, it will sound -- a lot of the steps

3 involved will sound familiar, as well as the objective of the

4 claim.

5 The asserted claims here are similar. They focus on

6 ways to find cancer or mutations and blood samples using what

7 we believe are conventional techniques.

8 **THE COURT:** That's kind of what it boils down to.

9 **MR. MORROW:** I think it is, Your Honor. I can jump

10 to that if Your Honor would prefer. There are some arguments

11 that Natera made in the *CareDX* case. Ironically, the party

12 involved in that case that was successful in invalidating the

13 *CareDX* Patent claims, and the arguments that it made to the

14 Court --

15 **THE COURT:** Natera was?

16 **MR. MORROW:** Natera, yes, Your Honor.

17 **THE COURT:** Okay.

18 **MR. MORROW:** That's the irony here. But the

19 arguments that they made to the court are very difficult to

20 reconcile with the arguments that they are making to Your Honor

21 in this case.

22 I pulled a few quotations out from the *CareDX*

23 decision where the court, the Federal Circuit was actually

24 stating what the specific arguments were. The issues really

25 were that the claims were directed at detecting a natural

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 46 of 156

phenomenon, and they recited performing the detection using

collection and measurement techniques that the specification

admitted were conventional, and it could be used or performed

using existing technology, which is important as well, and that

existing technology did not have to be modified in order to

perform the claims.

**THE COURT:** One of the things, I'll just tell you all

because, you know, patent law sometimes is confusing for those

of us that don't do it all the time. I'll just say it that

way. I don't know why it is not confusing to you-all. That

sounds sort of almost like obviousness, but I know that it is

not.

**MR. MORROW:** I'll explain the difference here. If I

could just kind of summarize that issue, Your Honor, in the

context of 101. I have some slides on this.

The real issue is, when you are dealing with a

natural phenomenon, which we have here, the courts, the Federal

Circuit has made it clear, that your claims have to be more

specific. They have to show the how of the invention. They

have to not be drafted in results-based language, because if

they are not, the problem you face is, you are essentially

granting a broad based monopoly in something that is detecting

a natural phenomenon, which for obvious reasons, we don't want

to have happen, in particular, in relation to cancer detection.

So it gets to the specifics that are contained within the

1  claims themselves, whereas when you are dealing with

2  obviousness, the courts are more inclined to go back and look

3  at the specification and allow a specification to teach what

4  the claims are trying to say.

5         In the 101 context, the decisions are all very clear.

6  We have to look at the claim language itself and that claim

7  language has to contain the juice.  It has got to contain the

8  specifics of how you do this.

9         I'm going to skip over this *Ariosa* decision.

10        The *CareDX* court relied heavily on *Ariosa*, which we

11  think is another case that should be governed in this case.

12  And there is a quotation here.  You have a slide deck.  I will

13  move over that decision, but it was also very instructive to

14  *CareDX* and we think applicable to the claims at issue here.

15        Natera, still at step one, Natera has argued that

16  these claims aren't directed at detecting, but rather are

17  directed at preparing samples.  A unique way to prepare

18  samples, instead of a unique way to detect the mutations.

19        Notably, Natera added that language to the claims

20  very late in prosecution.  They did it in a manner to try to

21  distinguish the claims from this Federal Circuit Jurisprudence

22  that was coming out about these detection claims.

23        We pointed here the *Alice* decision, which makes it

24  clear that really smart patent lawyers can't get around 101 by

25  putting claim language into the claims that's really just makes

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 48 of 156

1   it a --

2            **THE COURT:**   That really what?

3            **MR. MORROW:**   That essentially makes the pending

4   eligibility on how clever the patent prosecution attorneys

5   were, and we think that's what Natera did here.   Late in

6   prosecution they were deal with a 101 rejection, and then they

7   added this to the preamble, this sample preparation language.

8   But if you look at what that preamble says and what Natera has

9   admitted regarding the preamble on this slide, Natera in its

10  opposition brief, actually acknowledged that the claims

11  themselves define a concrete, specific, and structurally

12  complete invention in the claim body, and use the preamble only

13  to state a purpose or intended use of the invention.   That

14  really ends the discussion with respect to whether the preamble

15  is limiting in any respect.

16           The *Shoes by Firebug* case we cite here is right on

17  point, where the Federal Circuit found the preamble

18  non-limiting because of this exact same acknowledgment.   The

19  patentee had defined structurally complete invention in the

20  claim body and use the preamble only to state a purpose.

21           **THE COURT:**   Let me interrupt you, and I apologize.   I

22  think everybody agrees that the Section 101 issue has not

23  raised disputed questions of fact and has to be decided by the

24  Court.

25           I'll let the Plaintiff address that when they speak.

1    Do you agree?

2            **MR. MORROW:**  Agreed.

3            **THE COURT:**  Go ahead.  I apologize.

4            **MR. MORROW:**  No problem.  Welcome your questions, as

5    long as we can answer them.

6            **THE COURT:**  I'll try to stump you.

7            **MR. MORROW:**  I'm sure you will.

8            The *Catalina Marketing* case, another case, Your

9    Honor, that just stands for the general proposition here that

10   as a general matter the preambles are nonlimiting, unless they

11   recite some essential structure, or where they are necessary to

12   give life, meaning, and vitality to the claim.  That's not the

13   case here.  The preamble language doesn't do any of that.

14           I'll end on this point by reminding the Court that

15   Natera never requested a construction during *the Markman* phase,

16   to the preamble that would happen if anything -- that would

17   have had to have happened to limit the claims themselves.

18           Your Honor can also look at the specification, if you

19   had any doubt.  I mean, from day one, Natera has been pounding

20   the table about how these inventions are approved methods to

21   detect.  It's all about detection, detection, detection.  You

22   don't have to look any further than the specification on this

23   point.  The title, the abstract, the field of the invention and

24   the background of the invention, they all focus on how these

25   are detection claims.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 50 of 156

 1          **THE COURT:**  So NeoGenomics has not filed any patents?

 2          **MR. MORROW:**  In this arena, NeoGenomics has, and the

 3  key, going back to my point earlier is, the claim language

 4  itself.  More specific claim language spelling out how you

 5  achieve the invention.  And, obviously, those patents are not

 6  at issue here.

 7          **THE COURT:**  They are not.  I was just asking.

 8          **MR. MORROW:**  I understand the point of Your Honor's

 9  question.

10          **THE COURT:**  Because if it's not patentable, it is not

11  patentable.

12          **MR. MORROW:**  The name of the game is the claim.

13          So turning to *Alice* step two, Your Honor.  Go back to

14  the *CareDX* case, because there was argument from Natera that I

15  think is right on point here.  In *CareDX*, Natera was successful

16  in step two, because they argued, and were correct, that the

17  claims recited performing the detection itself using collection

18  and measurement techniques that the specification acknowledged

19  are conventional, and further admitted that can be used or

20  performed using existing technology, and that's appropriate

21  here.  It is applicable here.

22          The *CareDX* court went on to add, the conventional

23  steps were specified at a high level of generality.  Don't

24  qualify when you are dealing with a natural -- a claim directed

25  at a natural phenomenon in step one.

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 51 of 156

1          The specification of the patents at issue in this
2    case, Your Honor, there is a section here, the Exemplary Sample
3    Preparation Methods, that discusses how these things -- the
4    preparation of the DNA and RNA involve amplification,
5    separation, purification, isolation, preferential enrichment,
6    preferential amplification, which I know Your Honor's heard a
7    lot about.  Targeted amplification --

8          **THE COURT:**  That's the thing I remember is, the
9    targeted, for better or worse.

10         **MR. MORROW:**  "Or any of a number of other techniques
11   either known in the art or described herein."

12         Natera in this case, their arguments about what are
13   nontraditional elements in the claims, don't hold up.  Their
14   first argument is to this 50 target loci limitation in the same
15   reaction volume and claimed read depth of at least 50,000 per
16   target locus.  That should resonate with Your Honor, because
17   we've heard a lot about it in the papers.

18         The patents themselves and the specification, they
19   incorporate by reference the Rabinowitz prior art reference
20   that teaches that exact same thing.  It teaches performing
21   targeted multiplex PCR of up to 50 target loci or more, and the
22   same reaction volume, and says it was traditional.

23         The quote from the Rabinowitz reference is on the
24   slide, "Whereas traditional multiplex PCRs evaluate up to 50
25   loci simultaneously."

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 52 of 156

1          Dr. Zimmerman, who is a Natera witness, also

2    acknowledged that "using a commercially available sequencing

3    instrument, one only needs to sequence more in order to achieve

4    a much higher depth of read," and that's common sense.  That's

5    how these sequencers work, commercially available sequencers

6    that existed at the time of the applications.

7          Their second argument goes to the ability or the

8    claims recitation that you can detect at .015 percent or lower,

9    but the patents themselves, just like the patents in *CareDX*

10   explain that the limit of detection decreased.  In other words,

11   SNV sensitivity increased with increasing the depth of read.

12   The patent's written description states that, "higher sensitive

13   can be achieved simply by sequencing more molecules, using more

14   channels."

15         Also of note, Your Honor, getting back to the

16   specificity required in claims or claims directed at natural

17   phenomenon, those teachings are not in the claims themselves.

18   In other words, while they detect result space, you got to be

19   able to detect at .015 percent or lower.  There is nothing in

20   the claims that says how you do that.  It just says, wherein it

21   is detected to that level.

22             Here are some cases that support this --

23             **THE COURT:**  The depth of read issue, that's in Claim

24   One that we're not talking about?

25             **MR. MORROW:**  Could be in the dropped claims.  It

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 53 of 156

1 actually makes our argument stronger, because it's not a

2 limitation of the claims that are currently asserted. It

3 doesn't exist in the other claims.

4        The slide I have up currently, Your Honor, just cites

5 a number of cases from the Federal Circuit that all make it

6 clear that in this 101 context, when you are dealing with

7 natural phenomenon, that the claims themselves must teach

8 inventive concepts. The *RecogniCorp* case says, "an inventive

9 concept must be evident in the claims."

10        The *Two-Way Media* case says, you can't get around the

11 abstraction issue by merely reciting result-based functional

12 claim language.

13        In *CareDX* again, the Court said, *CareDX* does not

14 actually claim any improvements in laboratory techniques,

15 rather -- and, again, the language is actually claim. It's not

16 teaching the specification, it's actually claim any

17 improvements in laboratory techniques. The actual claims of

18 the patent merely recite the conventional use of existing

19 techniques to detect naturally recurring cell-free DNA.

20        The claims process in Illumina involved preparing a

21 fraction of cell-free DNA from a pregnant woman that is

22 enriched with fetal DNA, which made it easier to distinguish

23 the fetal DNA from the maternal DNA in the mother's

24 bloodstream.

25        *Illumina* is the case that Natera seems to lean on

Natera vs. NeoGenomics      1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW      Document 555      Filed 08/13/25      Page 54 of 156

1 most heavily, Your Honor. We believe it is distinguishable.

2 The claims process in Illumina involved preparing a fraction of

3 cell-free DNA from a pregnant woman that is enriched in fetal

4 DNA, which made it easier to distinguish the fetal DNA from the

5 maternal DNA from the mother's bloodstream.

6 Importantly, the claims in that case, and the court

7 noted this, actually disclosed how to achieve the novel aspect

8 of the invention that taught how to increase the relative

9 sample of fetal DNA, as compared to maternal DNA in a sample.

10 Here is the claim language from the Claim One of

11 *Illumina*. I highlighted the most important language that goes

12 to that issue where, again, we're producing a fraction of the

13 DNA extracted by size discrimination of extracellular

14 circulatory DNA fragments, and selectively removing the DNA

15 fragments greater than approximately 500 base pairs. The

16 *Illumina* court leaned on this language. It emphasized this

17 language as being important in step two, sufficient to overcome

18 the natural phenomenon problem in step one, because the claims

19 themselves had that specificity. The specific process of size

20 discriminating and selectively removing DNA fragments that are

21 above a specific size threshold. Those process steps change

22 the composition of the mixture, resulting in the DNA fraction

23 that is different from the naturally-occurring fraction in the

24 mother's blood. So they were producing something different.

25 *CellzDirect* is another cases. It's the last one I'll

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 55 of 156

discuss that Natera leans on. In that case, the claims involved an improved process of preserving the hepatocytes, and like in Illumina, the claims included language describing a number of concrete steps that somebody had to perform in order to better preserve those sites.

Here's the actual claim language, the actual claim language for Claim One, *CellzDirect*. As you can see, it is specifically spelling out the details of what you have to do to achieve that result.

The Federal Circuit emphasized, again, like it did in Illumina, the importance of that specific claim language at step two, stating that The method requires an artisan to carry out a number of concrete steps which are in the claims to achieve the desired preparation.

I highlighted those three steps that came from the claim language that the court relied upon.

In conclusion, Your Honor, I think everybody should be in agreement that at step one this is not a close call. This is directed at a natural phenomenon. In step two, there is not sufficient detail in these claims. The claims rely on conventional techniques and don't spell out in enough detail how you apply those techniques to provide the inventive concept that is actually required.

**THE COURT:** All right. Thank you.

For the plaintiff.

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 56 of 156

 1          **MS. HABERNY:**  Thank you, Your Honor, Sandra Haberny

 2   on behalf of Natera.  If we could switch over to our slides.

 3   And I do have some copies of our slides, if I may hand them up.

 4   You may have them already.  May I approach?

 5          **THE COURT:**  You may.  I did already have them.  Is

 6   this it?

 7          **MS. HABERNY:**  No, Your Honor, it is --

 8          **THE COURT:**  Yes.  I see it.  Okay.

 9          **MS. HABERNY:**  Thank you, Your Honor.

10          I would like to start out with the question that Your

11   Honor asked about whether the issues involving Section 101 are

12   purely legal issues or whether they involve disputed facts, and

13   the case law is clear, that routine-ness and conventionality is

14   a question of fact.  That is disputed, heavily disputed in this

15   case.  In fact, we point out a battle of the experts at page 24

16   of our opposition, which is at Docket No. 514.  So the

17   conventionality of Natera's claims is hotly disputed, and it is

18   an issue of fact.

19          I also wanted to address Your Honor's question about

20   the difference between Section 101 and obviousness.  I'll wait

21   for Your Honor to take notes.

22          **THE COURT:**  Yes.

23          **MS. HABERNY:**  So the obviousness is -- they are

24   overlapping concepts.  Obviousness generally is determined

25   based on combinations of specific prior art references, so you

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 57 of 156

1  look at, you know, reference one, reference two, reference

2  three, say in combination do they render something obvious.

3          Section 101 is more about what was known in the art

4  and difficulties and obstacles that were well known in the art,

5  and not limited to particular references, so if that helps Your

6  Honor understand some of those differences better.

7          **THE COURT:**  I kind of worked my way through it, but I

8  guess for full disclosure, I did find it confusing.

9          **MS. HABERNY:**  I think many jurists have expressed the

10  same sentiment.

11          So I would like to start out just framing the *Alice*

12  inquiry.  First, we look to whether the claims at issue are

13  directed to a patent held ineligible concept.  Here, that's a

14  question of whether the Natera claims are directed to what

15  NeoGenomics is alleging is a natural phenomenon, and in the

16  cases that have found diagnostic claims directed to a natural

17  phenomenon, and I will say that I was the author of both the

18  *Ariosa* briefing and the *CareDX* briefing, so I have looked at

19  this quite a bit, and in all of the cases where the diagnostic

20  claims have been found to be directed to a natural phenomenon,

21  it was because they merely stated to detect that natural

22  phenomenon without anything transformative or nonconventional

23  in the claim.

24          So the first order of business is to say, is this --

25          **THE COURT:**  Doesn't that go to the second part of the

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 58 of 156

1  test, what you just said?  It seems like it does.

2          **MS. HABERNY:**  Many courts have struggled with the

3  difference between step one and step two.  I think what Your

4  Honor needs to look at is --

5          **THE COURT:**  At least we only have two steps.

6          **MS. HABERNY:**  Fair enough.  I think what Your Honor

7  needs to look at is whether the claim is directed to just, here

8  is a natural phenomenon, find it; or if there is something

9  transformative going on, something human-created that is being

10 recited by the claim, that is the purpose of claim, that is

11 what the claim is instructing someone to do.  So that's step

12 one.

13          Then step two -- and if Your Honor finds at step one

14 that it is not directed to a natural phenomenon, it is fair to

15 end there.  *Alice* and Supreme Court jurisprudence says that the

16 inquiry is over.  Only if Your Honor finds that the claim is

17 directed to a natural phenomenon, or something else, or

18 directed to a natural phenomenon, must Your Honor look to the

19 rest of the claim to see if there's anything else that makes it

20 patentable.  So there may be a method saying detect natural

21 phenomenon, but if the rest of the claim recites something not

22 routine, not conventional, then that is a patentable claim

23 under Section 101.

24          **MR. MORROW:**  I'm sorry, Your Honor.

25          I don't have your 101 deck.  You gave us a second

1   copy of this one.

2          **MS. HABERNY:**  Apologize.

3          **MR. MORROW:**  I'm sorry, Your Honor.

4          **THE COURT:**  We're only on page two.

5          **MR. MORROW:**  That's why I interrupted, Your Honor.

6          **THE COURT:**  Go ahead.

7          **MS. HABERNY:**  So here are the claims.  I'm on Slide 3

8   of our deck, and this is Claim 14 of the '454 Patent, it states

9   in the preamble that it is directed to a method for preparing a

10  plasma sample.  It is not saying there is a natural phenomenon,

11  go detect it.  It's preparing a plasma sample that's useful for

12  detecting one or more single nucleotide variant mutations.  And

13  there are a lot of things that need to be done to that sample,

14  to make it useful for that purpose, to make it sensitive, and

15  not to actually enable the detection of these very rare single

16  nucleotide variants.

17         Slide 4 is Claim One of the '596 Patent, which

18  likewise is directed to a method for preparing biological

19  samples.  It doesn't say, there is cancer, go detect it.  It is

20  a method of preparing a sample, useful for detecting it, which

21  others in the field before Natera had incredible difficulty

22  doing, and incredible difficult coming up with a method

23  sensitive enough to detect these ultrarare variants.

24         I want to point out a very important quote from the

25  *Illumina v Ariosa* case.  So NeoGenomics is just focusing on the

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 60 of 156

 1  word detecting, and they are ignoring this law.  The *Illumina*

 2  case very clearly distinguished between diagnostic cases and

 3  methods of preparation cases, even methods of preparation that

 4  are useful for detecting something.  In fact, the claims at

 5  issue in *Illumina v Ariosa* did recite a method of preparation

 6  useful for detecting a natural phenomenon, and that was found

 7  to be patentable.

 8          On Slide 7 is another quote.

 9          Slide 8, another quote from the *CellzDirect* case, and

10  this is also emphasizing that patent claims are directed to new

11  and useful laboratory techniques for doing something to a

12  natural phenomenon.

13          **THE COURT:**  My page numbers are not matching up with

14  your page numbers.

15          **MS. HABERNY:**  Okay.  Just a second.  I apologize.

16          **THE COURT:**  Is that seven that is on the screen?

17          **MS. HABERNY:**  Yes.

18          **THE COURT:**  I should be looking behind tab two, not

19  tab one.  My mistake.  Go ahead, call it up.

20          **MS. HABERNY:**  I apologize.

21          **THE COURT:**  No, no.  Go ahead.

22          **MS. HABERNY:**  Okay.  So this is another quote from

23  the *CellzDirect* case in which the patent claims were found

24  patent eligible as methods of preparation, and it's instructing

25  that claims that are directed to new and useful laboratory

1 techniques for doing something to a natural phenomenon are

2 patentable. Those are methods of preparation claims that are

3 patentable under step one. At that point if Your Honor finds

4 that our claims --

5          **THE COURT:** That sort of begs the question, is it new

6 and useful. I mean, that --

7          **MS. HABERNY:** That's right, Your Honor. And as I

8 will now present, Natera's claims are directed to method of

9 preparation that is new and useful. First, Natera's claims do

10 not simply recite natural phenomenon, they recite creating

11 human-made synthetic DNA. This is something that does not

12 occur in nature and this is what the Natera's claims do, a new

13 and useful method for preparing human-made synthetic molecules,

14 and they are directed to patentable methods of preparation

15 under *Illumina* and *CellzDirect*, because they change the

16 composition and the mixture.

17          So the claim recites starting with plasma from a

18 patient's blood, and -- well, starting with identifying

19 mutations specific to a cancer patient's tumor, and then taking

20 a sample of the patient's blood and transforming that, changing

21 the composition into a completely synthetic human-made mixture

22 of amplification products that are synthesized to a very

23 sensitive level.

24          **THE COURT:** I don't think I'm understanding how you

25 are creating human-made synthetic DNA. That does not sound

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 62 of 156

1  like what you just described.

2      **MS. HABERNY:**  So the product, the workflow of the

3  claims is, you obtain a sample, and then you obtain a sample of

4  their blood, and in that blood is cell-free DNA, and what

5  Natera's claims instruct to do is, massively multiplex

6  amplification of that DNA, and this is a picture -- I don't

7  know if Your Honor remembers on Slide 8, a picture from the

8  preliminary injunction --

9      **THE COURT:**  But amplification is not changing the

10  amplicons or creating, it is amplifying.  I understand what

11  amplify means.

12      **MS. HABERNY:**  What it is doing is, it is enriching

13  for particular pieces of DNA.  So in the blood, in the blood

14  sample, there's going to be all kinds of DNA; normal DNA from

15  all over the body, non-cancer DNA.  DNA from 50, 500,000 genes,

16  I don't know how many, but what Natera's method recites to do

17  is target only some of those.

18      **THE COURT:**  Right.

19      **MS. HABERNY:**  So now you're getting rid of everything

20  else.

21      **THE COURT:**  I understand that.

22      **MS. HABERNY:**  That's synthetic.

23      **THE COURT:**  I don't understand how that creates new

24  synthetic DNA.  I don't understand that.

25      **MS. HABERNY:**  A synthetic population of DNA with

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 63 of 156

1  synthetic molecules that have barcodes on them that can be
2  tagged, that can have sequence tags added to them.
3         **THE COURT:**  But then it's like the DNA from the
4  person, isn't it?  That's the whole point that you have tagged,
5  that you have bar-coded.
6         **MS. HABERNY:**  No, Your Honor.
7         **THE COURT:**  I'm not -- I must be missing something.
8         **MS. HABERNY:**  This is similar to the claims at issue
9  in the *Illumina v CareDX* case.  They recited enriching the DNA
10 for fragments of certain sizes and various steps that take the
11 naturally occurring population of DNA and make a preparation
12 that is different than what's naturally occurring.
13        **THE COURT:**  I understand that.
14        **MS. HABERNY:**  That's what Natera's methods do, they
15 use targeted PCR to amplify only certain pieces of DNA that's
16 in this large ocean of all of the other DNA that exists in the
17 blood plasma, and that's synthetic, that's artificial.  That
18 set of, you know, exponential numbers of copies of only a few
19 fragments out of the vast ocean that are floating around in the
20 blood, that is artificial, that never occurs in nature.
21        **THE COURT:**  So you are detecting something that
22 occurs in nature by amplifying it?
23        **MS. HABERNY:**  By creating an artificial population
24 that doesn't occur in nature, but reflects something that did
25 occur in nature.  It is creating that artificial population

1  through new and innovative means that is what renders this

2  invention patentable, right, and that makes it not a natural

3  phenomenon, but a human-made preparation.

4          **THE COURT:**  So they say, NeoGenomics says you are

5  using traditional methods.  I mean, that -- I know I said I

6  wasn't prepared, but possibly I was not completely accurate.

7          **MS. HABERNY:**  So that is a disputed fact.  That is a

8  battle of the experts, classic battle of the experts.  Their

9  expert says that our techniques are conventional.  Our expert

10 and our witnesses say it is not.  We believe the patent office

11 has said it is not, so even the patent office and the file

12 histories of both have said this is the apparent application of

13 the '454 Patent, and it had similar claims, had the same

14 specification, and the invention was -- this is the notice of

15 allowance for that patent, and that even the patent office

16 said, the invention is an improvement to cancer diagnostic

17 technology, and the amplification methods that are in the

18 patents were not well known and conventional in that

19 technology.

20         So the patent office has said that Natura's

21 technology, and the technology in its patent is not routine and

22 conventional.

23         It was also -- there was also a rejection in the

24 history of the '596 Patent during prosecution, and Natera

25 amended the claims, and the Section 101 rejection was withdrawn

Case 1:23-cv-00629-CCE-JLW      Document 555      Filed 08/13/25      Page 65 of 156

1 by the examiner.

2          So there are -- I know that there is a dispute and

3 their expert says our claims are not patentable or are routine,

4 and our expert's documents say they are not routine and

5 conventional, that there is plenty of evidence that should be

6 tried to the finder of fact on that issue.

7          As to the preamble, going back to this step one

8 argument, there was a quote on NeoGenomics' slide, and that was

9 in error in our briefing.  We accidentally quoted the wrong

10 portion of a case, but this is the same case, *Shoes By Firebug*,

11 and the intended portion is shown on Slide 14, and so that was

12 what we intended to quote.

13          The preamble here, we believe, is limiting.  It

14 recites essential structure of steps.  The structure.  It is

15 the intended use of the claim was, to prepare a preparation

16 useful for monitoring these aspects of cancer.  And even if the

17 preamble weren't limiting, it wouldn't matter, right.  You can

18 look at the claim as a whole.  You can look at the claim as a

19 whole and see that it is a method of preparation that's

20 sensitive enough to be able to accomplish the goal of the

21 claim.

22          So counsel sort of skipped over the *Ariosa* claim --

23          **THE COURT:**  The what?

24          **MS. HABERNY:**  Skipped over the *Ariosa versus Sequenom*

25 case and the claim at issue there, but our claims are highly

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 66 of 156

distinguishable from that claim.  So the claim -- this was a
*Sequenom* claim, actually, that *Ariosa* invalidated, and it
recited a method for detecting a nucleic acid.  Also, it is
amplifying and detecting.  And the order went forward and said
there's nothing in the specification telling you how to do that
in a special way.

    **THE COURT:**  Do you agree the first step is sequencing
and identifying these mutations, that's not invented, right?

    **MS. HABERNY:**  In combination with the rest of claim,
it is.

    **THE COURT:**  But by itself, it is not?

    **MS. HABERNY:**  It is by itself not, but often
patentable claims are made up of combinations that are new.

    **THE COURT:**  I understand.  I am just trying to figure
out what I have to address, and I don't have to address that by
itself, that is not inventive?

    **MS. HABERNY:**  Well, no.  It is the combination of all
of it as a whole.  This is on Slide 21 of our slide deck.

    **THE COURT:**  I'm not saying you lose because of that.
I'm just making sure I understand.

    **MS. HABERNY:**  Right.  Just to help guide Your Honor
towards the case law that controls, the *Alice* case does
instruct that the claim elements individually and in
combination must be considered as a whole.

    **THE COURT:**  Right.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 67 of 156

1     **MS. HABERNY:** So Natera's claims, the claims method

2 in combination steps do provide a new and innovative and useful

3 solution to problems that others couldn't solve in the prior

4 art.

5          So if Your Honor remembers from the preliminary

6 injunction proceedings, we discussed -- we discussed split and

7 pull prior art methods, where instead of doing PCR

8 amplification of a bunch of target loci together in a same

9 reaction volume they would split the molecules into separate

10 individual reaction volumes and amplify them, and that was

11 problematic, because especially in the context of what's being

12 claimed in Natera's claims, there was cell-free tumor DNA that

13 was very -- in very, very low abundance, and so when you do the

14 split and pull method, you may miss the low abundance DNA

15 because you don't split all of the DNA that's an example, just

16 a small part of it. And so Natera figured out ways, and these

17 are described in many places in Natera's patent. There's

18 limiting primer conditions in the '454 Patent at column 64,

19 lines 63 to 67. There's temperatures amplifying --

20          **THE COURT:** In the specification?

21     **MS. HABERNY:** These are in the specification, but

22 this informs how to perform the claims. The claims have to be

23 informed by the specification.

24          We have here -- this is a callout from the '454

25 Patent, column 64, lines 63 to 67. So they are talking about

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 68 of 156

1  limiting primer conditions.  That's something that tells a

2  person of skill in the art different ways to limit the primer

3  conditions.

4          Then we have column 97, lines 36 to 51, and this is

5  talking about different temperatures that can be used, specific

6  ways that one can amplify in this massively multiplex manner in

7  a single reaction volume to obtain a product that is pure

8  enough, that's clean enough to be sequenced and detect these

9  very low abundance fragments of DNA.

10         We also have the '454 Patent, column 97, line 66 to

11  98, line 27.  And this is a large number of different PCR

12  parameters that can be modified to achieve these results.  And

13  this is just a small example.  There are many more in the

14  hundreds of pages of this patent.

15         So this is very different than -- can we skip to

16  Slide 22, please.  This is very different than the *CareDX*

17  Patent that counsel was discussing earlier.  The *CareDX* Patent

18  admitted that each step in the purported invention requires

19  only conventional techniques and commercially available

20  technology.  That is very different than Natera's

21  specification, which called out actual parameters.

22         So in the *CareDX* Patent, the specification just

23  describes collecting patient samples using, "any technique

24  known in the art."  They never specified a single one that

25  would work better than another or a different way to do it.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 69 of 156

1  They said genotyping donor and recipient to create SNP profiles

2  could be done using quote, "any suitable method known in the

3  art."

4          Natera's patents actually spells out temperatures to

5  use.  They spell out lengths of amplicons.  They spell out

6  different concentrations, primer limiting conditions.

7          **THE COURT:**  So Mr. Morrow says it is the claim

8  language that matters, not the specification.

9          **MS. HABERNY:**  *Clearly in CareDX* the specification did

10 matter.  The *CareDX* court did look at the specification to say,

11 is this specification telling you how to perform the claims.

12 And if Your Honor thinks about it as a matter of logic, what

13 would the specification be for if it weren't to tell someone

14 had to carry out the claims.

15         So claims were drafted to have certain breadth and

16 cover different embodiments, and you can say performing PCR,

17 and your specification tells you various ways to do.  You can

18 have a claim that covers all of those different ways.  If you

19 were to import all of what is in the specification into the

20 claim itself, you would have a claim that is 200 pages long.

21 So that's what the specification is for.  And the CareDX court

22 says, the specification does matter when you are looking to see

23 what is claimed.

24         This is, again, an admission directly from the *CareDX*

25 specification that said -- this was right up front in the

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 70 of 156

1  *CareDX* specification, "The practice of the present invention

2  employs, unless otherwise indicated, conventional techniques of

3  immunology, biochemistry, chemistry, molecular biology,

4  microbiology, genomics, and recombinant DNA, which are within

5  the skill in the art."  And that's how it defined the

6  overarching written description of the patent as it pertains to

7  what it is claiming.

8          **THE COURT:**  So the '454 Patent does expressly

9  incorporate prior art describing the amplification.

10         **MS. HABERNY:**  In certain places, but not everywhere.

11 I provided Your Honor with other places where it doesn't, and

12 like I said, it is very clear in the jurisprudence,

13 combinations of prior art can be patentable.  In fact, most

14 patents involve some aspect of prior art and combinations that

15 together are not prior art, and are not conventional.

16         **THE COURT:**  All right.  Talk to me about what the

17 words "reaction volume" mean.

18         **MS. HABERNY:**  Right.

19         **THE COURT:**  I don't know how I'm supposed to know how

20 this is, what the extrinsic evidence is, at least -- I mean,

21 maybe everybody agrees on what it means, but I don't know what

22 it means.

23         **MS. HABERNY:**  I think Your Honor does need extrinsic

24 evidence, and that's another reason why this is involving

25 disputes of fact and the need for expert explanation, but I can

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 71 of 156

1    explain to Your Honor.

2           So a reaction volume is a liquid in which PCR is

3    performed.  I'll go back to Slide 17 in our slide deck.

4           So if you imagine all of this DNA, right?  You can

5    put it into one test tube and you can put PCR reagents that

6    will amplify all of those different little pieces of DNA, each

7    of them, but all together in that same test tube of liquid, or

8    you can split and have a 96 well plate, for example, and have

9    different volumes of liquid in each of the 96 wells.

10           **THE COURT:**  Ninety-six what?

11           **MS. HABERNY:**  Wells.

12           **THE COURT:**  Wells.

13           **MS. HABERNY:**  And put a small amount of DNA into each

14    of those wells, and reagents that will amplify only one target

15    into each well, and a different target in each well.  So those

16    are separate reaction volumes.

17           Doing this in a single reaction volume in the way

18    that Natera claims, was nonconventional.  No one else could

19    make it work before Natera.  And the reason is, because those

20    reagents that are used to amplify the DNA during PCR or

21    amplification, can react with each other, and they can create

22    fake products and they cannot bind well at certain

23    temperatures.  Some need one temperature, some need a different

24    temperature, and so you're not getting uniform amplification,

25    and there's many, many problems that can occur when you try to

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 72 of 156

1  do this in one reaction volume.

2          Natera figured out a way to do that, and in its

3  specification, it has, you know, 200 pages showing this, and

4  many, many columns worth of parameters that can be applied.

5  And so that's why the Natera claims taught by what is in the

6  specification, are something new and innovative and they are

7  patentable, not conventional.

8          **THE COURT:**  Just to be sure I'm correct procedurally,

9  Natera did not move for summary judgment on this affirmative

10  defense.

11          **MS. HABERNY:**  That's correct.

12          **THE COURT:**  Okay.  Go ahead.

13          **MS. HABERNY:**  So to help Your Honor, I believe

14  perhaps the *Diamond v Diehr* at *450 U.S. 175, 188 to 89, 1981*

15  gives a little explanation of how novelty is distinct from

16  Section 101.

17          So I just would like to -- let me jump to Slide 18.

18  In the briefing, NeoGenomics mischaracterized some of the

19  testimony of Natera's witnesses.  One of them was Dr. Bernard

20  Zimmerman.  He's an inventor on the asserted patents, and he

21  never said, as NeoGenomics contends, that any of these

22  techniques were conventional.  He says, "Outside of Natera,

23  people were not able to do massively multiplex PCR."  This is a

24  fact witness.  This is what he testified to as an inventor.

25          Another fact witness, Natera's former CEO and also

Natera vs. NeoGenomics    1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 73 of 156

1  inventor on the asserted patents, he testified that Natera was

2  the first company to perform massively multiplex PCR, and he is

3  also a fact witness, testified that this was not conventional

4  technology.

5          NeoGenomics also mischaracterized Natera's expert,

6  Dr. Metzger's testimony.

7          **THE COURT:**  Hold on.  You say that other companies

8  were able to do multiplex PCR around the same timeframe as

9  Natera?  Is that -- I got 455-9 at 34.  I don't know, these are

10 rough notes, so I can't really tell you where.  I'm assuming

11 that's his deposition.

12         **MS. HABERNY:**  So other companies were trying to do

13 massively multiplex PCR.  They could not accomplish it to the

14 sensitivity that Natera could.  They could not accomplish it in

15 a single reaction volume to sensitivity, and on Slide 20 is a

16 summary of the testimony from Dr. Metzker and some citations.

17 There was too much to put it all on a slide.  NeoGenomics

18 contends that he confirmed that the claim combination was

19 straightforward and logical and conventional, but he was

20 actually testifying about what Natera thought about prior art,

21 not its own technology, and saying other things that were done

22 before might have been conventional, but what Natera was doing

23 was not.  Natera's witnesses uniformly testified that their

24 technology was not conventional.

25         So if Your Honor has no further questions, I'll --

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 74 of 156

1          **THE COURT:** All right. Thank you.

2          Rebuttal?

3          **MR. MORROW:** Yes, Your Honor, thank you. A couple of

4     things. I'll try to be quick.

5          Both the *CareDX* and *Ariosa* cases that we cited, those

6     are summary judgment cases. While they are factual

7     determinations that need to be made by the Court, clearly this

8     is something that is ripe for summary judgment.

9          With respect to the sample preparation preamble

10    language -- if we could pull my deck back up. Thank you.

11         Let's go back to Slide 7. I don't know how they get

12    around this, Your Honor. First, the preamble doesn't add

13    anything to their claims. The preamble was language that was

14    clearly added after the *CareDX* decision was rendered by the

15    Federal Circuit, to try to get around that problem, and the --

16    but fundamentally, their opposition brief admits that the

17    preamble does what the Federal Circuit has said is non-limited.

18    It defines a concrete specific structurally complete invention

19    in the claim body, and then uses the preamble only to state a

20    purpose or the intended use of the invention. That's their

21    opposition brief at Page 21. It fits, and it shoehorns in the

22    *Shoes By Firebug* decision.

23         Again, I'll go back to where were these arguments

24    during the *Markman* phase, arguing about how these should be

25    construed.

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 75 of 156

1    Dr. Metzger actually did admit that the DNA is

2  unchanged, and that's fundamental.  I think Your Honor hit on

3  this.  Right at the beginning of the argument my opposing

4  counsel said, the DNA molecules themselves, the mutations,

5  those don't change, otherwise it would defeat the whole point

6  of the invention of identifying other molecules that existed in

7  the cell that are now in the blood.  They don't change.  Dr.

8  Metzger admitted that.  Some of his testimony is at Docket 480

9  at page 304, lines one through six.  Docket 300 -- pages 300 --

10  or excuse me, same Docket 480, page 300, lines 15 through page

11  301, line 13.  And then Page 306 at 12 through 20.

12    Some more cases that I note, while getting all of

13  these case cites, the BRCA line of cases, you can find at 774

14  F. 3d. 755.

15    **THE COURT:**  Is that the breast cancer gene?

16    **MR. MORROW:**  That's right.  And the District Court

17  opinion is also relevant in that case, which is at 3 F. Supp.

18  3rd 1213, where the court held that manipulating DNA using

19  barcodes massive multiplex PCR doesn't change anything --

20    **THE COURT:**  I mean, would you agree that if there

21  is -- I mean, it is there, these little -- I'm just going to

22  call them cancer precursors, for lack of a better term.  If

23  they are in the body but nobody can find them, if somebody

24  figures out a way to find them, why is that not inventive?

25    **MR. MORROW:**  Could be.  Got to be in the claim.  We

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 76 of 156

get back to the claims and the specificity that's laid out in
the claims at step two, and the Federal Circuit decisions that
say when you're dealing with this type of a natural phenomenon,
you've got to put the juice of the invention into your claims.
That's the difference between -- that's why I can point back to
the specification and say, well, it's in the spec, it may not
be in the claims.  We got 200 pages and we're not required to
draft 200 page claims, I understand that, but you still have to
put the details of how you get to this specific result in your
claims when you're dealing with a one-on-one issue.

We've seen how it applies in the real world in this
case, Your Honor, because they are asserting the '454 Patent at
the beginning of this case.  It's RaDaR, original RaDaR.  We
then make what we believe are really substantive modifications.
We don't, NeoGenomics does, it comes out with RaDaR 1.1, and it
is -- guess what, it is still covered by the '454.  That gets
to the problem of when you got generalized results based
language, that it goes to a natural phenomenon, it is not good
enough, because you're excluding the field from addressing a
natural phenomenon, which is why it is different than just a
standard.

**THE COURT:**  Maybe this gets to infringement.  I'm
trying not to have a headache.

**MR. MORROW:**  I'm not answering your questions.

**THE COURT:**  If they come up with a way to detect -- I

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 77 of 156

1  mean, it sort of relates to infringement, because if you came

2  up with a different way to detect it, you are saying that

3  wouldn't infringe, and part of the problem you are saying is,

4  they are just claiming detecting it?

5       **MR. MORROW:**  The problem on the infringement side is

6  just that, it is how broadly they claim it in the claims

7  without giving specificity, so it is difficult to get around it

8  on a noninfringement argument.

9       It goes back to what the Federal Circuit says, when

10  you are dealing with a natural phenomenon, it is a different

11  type of invention.  This is something the public should have,

12  but if you are going to be given a patent, then make sure your

13  claims are specific enough.

14       **THE COURT:**  Can you direct me to exactly where in the

15  *CareDX* case or what other case you're saying says that in a

16  natural phenomenon case the claim language has to be more

17  specific?  Where is it that that is said, so I don't have to go

18  find it myself or miss it?

19       **MR. MORROW:**  Sure.  So, Your Honor, I got up Slide 12

20  from our deck which cites a number of cases.  There are many

21  others, but in *CareDX*, it is page 13, where it says, *CareDX*

22  does not actually claim any improvements in laboratory

23  techniques, rather as previously discussed the actual claims of

24  the patent, it merely cites conventional use.

25       **THE COURT:**  Okay.  You answered my question, so you

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 78 of 156

1  don't have to answer it further.

2        **MR. MORROW:**  I was actually going to that.  I mean,

3  or related to that.

4        The targeted PCR, you know, Ms. Haberny spoke about

5  that as being the inventive concept.

6        **THE COURT:**  Pull the mic a little closer, especially

7  when you look down.

8        **MR. MORROW:**  I'm sorry.

9        Let me get the exact language.  Again, if you look at

10  Slide 11 of our deck, the patents themselves incorporate the

11  Rabinowitz prior art reference, which actually teaches, whereas

12  traditional multiplex PCRs evaluate up to 50 loci

13  simultaneously.  So it is incorporated by the specification as

14  being something that was conventional and not new as of the

15  time.

16        That's all I've got, Your Honor.  Thank you.

17        **THE COURT:**  It is 12:25 and we still have

18  infringement to talk about.  So what I would propose, subject

19  to you-all wanting to only take 15 minutes each on

20  infringement, which is -- if you want to do that, then, fine,

21  but I would say let's take about an hour for lunch and come

22  back at 1:30.  Is that all right?

23        **MR. FOUNTAIN:**  Yes, Your Honor.

24        **MS. HABERNY:**  Yes, Your Honor.

25        **THE COURT:**  And then you can each have about 30

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 79 of 156

1  minutes or so on infringement.

2          Does that give you enough time?

3          **MS. DURIE:**  One question.  What is Your Honor's

4  thinking with respect to inventorship?

5          **THE COURT:**  Well, my thinking on that is to deal with

6  it last, because assuming I say they didn't have -- they don't

7  have the inventors, it's not dispositive, but if you all --

8  that's my thinking, that is not my decision, right.  I'm happy

9  to hear from you on that point if that's not right and, you

10 know, and I don't know about inventorship.  I have to say that

11 has been both kind of the last thing that I have looked at, so

12 I'm not sure -- I don't think I even have a question about

13 inventorship.  So I don't know how long that is going to take.

14 You-all may want to talk about that.  I do have something at

15 three o'clock, but I can delay it if I need to.  I know you

16 mentioned that you have another pretrial --

17         **MS. DURIE:**  That's fine, I had to skip it because I

18 was here.  I would like to suggest on inventorship, it is a

19 very important issue for us, and I'm happy to explain why,

20 because I actually do think it is dispositive.

21         **THE COURT:**  We're not going to do that now, but I do

22 need to be finished by four o'clock, okay.  But if we come back

23 at 1:30 and we take about an hour on infringement and up to an

24 hour, if it needs it on inventorship, does that seem fair?

25         Do you think you are going to need more time than

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 80 of 156

1  that on either issue for the Plaintiff?

2          **MS. HABERNY:**  No, Your Honor.

3          **MS. DURIE:**  That's fine.

4          **THE COURT:**  Let's plan on that then.

5          We'll be in recess until 1:30.

6          (Luncheon recess taken from 12:30 to 1:25 p.m.)

7          **THE COURT:**  I'm sorry for that delay.  The court

8   reporter was having some difficulties with the system.  I am

9   ready to go forward.

10          **MS. MAROULIS:**  We have a brief housekeeping matter.

11  This morning we spoke about NeoGenomics' notice of narrowing

12  and their invalidity arguments, and as they proceeded to argue

13  the 101 motion, we request that the Court instruct them to drop

14  one of their four validity defenses.

15          **THE COURT:**  I haven't figured that out.  I just

16  wanted to go ahead and hear the argument so that I didn't have

17  to bring you-all in here again if I decided I was willing to

18  hear it.

19          **MS. MAROULIS:**  Understood, Your Honor.

20          **THE COURT:**  Okay.  Infringement.  Let's see.

21  Everybody moves on infringement.

22          **MS. HABERNY:**  No, Your Honor.  So this is Natera's

23  motion on infringement.  NeoGenomics did have a motion on

24  infringement that has been rendered moot.

25          **THE COURT:**  Eight, 10, 12 and 15, are all -- eight,

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 81 of 156

 1  10, 12 and 15 are all -- flow from One?  They moved on

 2  non-infringement on Claim One, which I remember we were talking

 3  about, and also, eight, ten, 12 and 15, are those, what's the

 4  word, not derivative -- dependent.

 5          **MS. HABERNY:**  We also dropped those claims.

 6          **THE COURT:**  So we don't have to address those.  So it

 7  is your motion only.

 8          **MS. HABERNY:**  That's correct, Your Honor.

 9          **THE COURT:**  Good.  That makes is easy for you to go

10  first.

11          **MS. HABERNY:**  For madam reporter, this is Sandra

12  Haberny.  Let's jump right in.  This is at the tab two, Your

13  Honor, of the binder that we handed up.  It is a binder with a

14  title Contents, Bench Trial, Natera's motion for summary

15  judgment on infringement and cross-motions for summary judgment

16  on inventorship.

17          **THE COURT:**  Notebooks look the same.  That's okay.

18  Go ahead.

19          **MS. HABERNY:**  This is at tab two at Slide 5, which is

20  just an overview of disputed claim terms.  Natera has moved for

21  summary judgment of infringement on Claims 14 of the '454

22  Patent, and of the '596 -- I'm sorry, Claim One of the '596

23  Patent, and they're really only a few terms that NeoGenomics

24  disputes that it practices.

25          I wanted to narrow the issues for Your Honor and

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 82 of 156

         1    focus only on NeoGenomics's non-infringement theories, and the

         2    reasons NeoGenomics contends that it does not infringe.

         3           We do have our other evidence for infringement cited

         4    in our briefing, but I won't spend time on that, because it is

         5    not in dispute.

         6           So in Claim 14 of the '454 Patent, NeoGenomics

         7    disputes that it performs the very last step, sequencing the

         8    amplicons to obtain sequence reads and detecting the sequence

         9    reads.  So it is what I'll refer to as the sequencing and

        10    detecting step for shorthand.

        11           In Claim One, of the '596 Patent, NeoGenomics

        12    disputes that it practices Step B, which is the step for

        13    evaluating results of the prior sequencing step to identify

        14    plurality of tumor specific mutations.  It disputes also, that

        15    it performs high input sequencing, the very last part of the

        16    claim of the amplified DNA to obtain sequence reads.

        17           There is no dispute of fact involved in this issue.

        18    There is no dispute regarding how RaDaR 1.1 works, and there is

        19    no dispute regarding what occurs in the RaDaR 1.1 test.

        20           So at Slide 6, that summarized the disputes and they

        21    all can be resolved as a matter of law, because they all boil

        22    down to claim constructions.  All of NeoGenomics'

        23    non-infringement positions would require this Court to either

        24    revisit constructions it has already issued, or perform

        25    additional claim constructions on terms that were never

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 83 of 156

1    requested previously.

2          Your Honor, a summary of what they're arguing is that

3    detecting SNVs from sequence reads is not done during

4    sequencing.  They contend that that's done at a different time,

5    and that is really just a relitigation of what Your Honor has

6    already construed the sequencing and detecting step to be

7    performed together in one step.  They want to construe

8    detecting at a sensitivity of .015 percent as recited in the

9    '596 Patent Claim One, as requiring error correction.  So they

10   want to read error correction into a construction of the term;

11   or that it requires sequencing in the same reaction volume as

12   amplifying was performed in, and that's another way they want

13   to read terms into a construction of the detecting term in the

14   '596 Patent, Claim One.

15         They also want to construe the term, sequencing the

16   amplicons, or sequencing the amplification products to exclude

17   intermediate steps.  This, Your Honor, is the fifth time they

18   are attempting to revisit Your Honor's prior constructions of

19   this term.

20         And then they want to construe, evaluating, for the

21   first time now.  They haven't asked for this to be construed

22   before.  They want to construe that in the '596 Patent, Claim

23   One to exclude any manual review that is performed in the

24   United States.

25         So I'll take these terms in turn.  The first is

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 84 of 156

1  NeoGenomics' attempt to re-construe the sequencing and

2  detecting step, and they want to do that to read-in data

3  processing that Your Honor has already ordered is not part of

4  that step.

5        I just want to give an overview of NeoGenomics'

6  shifting sands approach.  This is on Slide 8 of the deck, and

7  this is kind of a timeline of how NeoGenomics is taking

8  multiple bites at the apple of this construction and trying to

9  attack it from different angles.

10        So during the first claim construction, NeoGenomics

11  argued that sequencing and detecting in the claims are separate

12  steps, and the Court rejected that and ruled sequencing and

13  detecting occur in the same step.

14        In the second claim construction, NeoGenomics

15  admitted that sequence reads are made in the sequencer, but it

16  instead contended that further steps are needed after

17  sequencing to detect variants.  The Court again ruled that the

18  detecting occurs during sequencing, the downstream data

19  processing is not part of that, so that was rejected by the

20  Court.

21        Now, NeoGenomics is just trying again.  They are now

22  arguing that sequence reads are not made in the sequencer, but

23  they are made bioinformatically after.  It's just a different

24  way of arguing that data processing is part of the sequencing

25  and detecting step, and the court should reject that again.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 85 of 156

 1          So this is the sequencing and detecting step
 2   altogether.  Previously NeoGenomics tried to construe
 3   sequencing, the sequencing part of these and the detecting part
 4   of these to be different things, and now they are trying to
 5   construe the term sequence reads to use that as a backdoor way
 6   to separate sequencing and detecting.
 7          So what NeoGenomics wants to write in to this
 8   construction is that detection of the SNV mutations
 9   in cell-free DNA from the sequence reads happens after data
10   processing, wherein, the method is capable of detecting the SNV
11   mutations.  The reason they want to do that is because they
12   then want to argue that that data processing occurs outside the
13   United States, therefore, they don't infringe, but their
14   argument that they don't infringe because of data processing
15   outside U.S., writes in a requirement for this data processing
16   that is not there.
17          So on Slide 10, we see the Court's prior
18   construction.  The Court already construed detecting from
19   sequence reads to be part of sequencing, and this is what Your
20   Honor said.  The Court construes the term, "wherein an SNV
21   mutation is detected from the sequence reads to have its plain
22   and ordinary meaning, which includes that detection is part of
23   sequencing.  The detection from the sequence reads is part of
24   sequencing."
25          Slide 11, this is another quote from the Court's

1  prior order.  "The claim does not mention noise or data

2  processing, and the Court will not read unstated limitations

3  into claim language."

4          NeoGenomics' witnesses previously admitted detecting

5  occurs in the sequencer.  Your Honor saw during the *Markman*

6  proceedings, NeoGenomics' corporate representative said the

7  SNVs are detected through the sequencer.

8          Slide 13, this is Dr. Forshew, another one of

9  NeoGenomics' corporate representatives.  He admits detecting

10  occurs in the sequencer.  He says the sequencer detects a color

11  with certain base is added to a growing strand.  The sequencer

12  does measure, to my understanding, the most probable color.

13          Dr. Lennon, NeoGenomics' expert, this is Slide 14, he

14  also admits detecting occurs in the sequencer.  He describes

15  what happens in the sequencer.  He says, producing data as it

16  goes along, which are digital files, which incorporate with the

17  bases art in this contiguous stretch that we call a sequencing

18  read.  He is there describing a sequencing read being created

19  in the files that are in the sequencer.

20          And Slide 15, Dr. Lennon, NeoGenomics' expert says,

21  based on the incorporation of bases that you add as you go

22  along, you can interpret what were the initial bases on the

23  template, the piece of DNA that you want to sequence at those

24  locations, and that's what the sequencer does.  It says at this

25  cycle on this piece of DNA there's an A, at this cycle there's

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 87 of 156

1 a C, at this cycle there's a T.  He is describing the creation

2 of sequence reads inside of the sequencer and that is

3 NeoGenomics' own expert.

4          Your Honor may recall having seen this before, the

5 detection inside the sequencer occurs when a base is added

6 complementary to a base that's present, and there's a

7 fluorescent light of a certain color.  There's four different

8 colors in the sequencer.  Each color corresponds to a different

9 DNA base.  When the sequencer detects a certain color, it's

10 added.  It captures that.  It captures it in something called a

11 BCL file.  Then the next cycle, the sequencer captures the

12 colors at the next place down on the growing strand.  That's

13 another cycle, and it records those colors in a BCL.

14          Slide 17.  This is what it looks like on a small

15 scale cartoon, but at different places within this sequencer,

16 you see the different colors at each cycle.  Cycle one is one

17 position on the DNA being sequenced.  Cycle two is the next one

18 next to it on the DNA sequence.  Cycle three, the next one next

19 to cycle two, and that's the growing strand, the sequence.

20 This is the sequence of colors that are captured in these BCL

21 files.

22          Slide 18, sequence reads are generated iteratively in

23 each cycle, and they're translated into what are called

24 sequence reads in BCL files in the sequencer, so that's the

25 type of data format that they're captured in.  There is a BCL

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 88 of 156

1  file created for each cycle, and it records the identity of the

2  bases being added on each run strand at that cycle, and it has

3  an index indicating which cycle it is recording.

4           So each -- so you have the BCL cycle that says, I

5  record these four bases, this recording is cycle one.  You have

6  another BCL file that says, I record the next four bases.

7  These bases are at cycle two, and the indexes know that cycle

8  one is next to cycle two.  Every one agreed on this before, but

9  now there is a new dispute that NeoGenomics has raised to try

10 to avoid infringement.

11          So now NeoGenomics purports to dispute whether the

12 files that capture detections in the sequencer are sequence

13 reads as claimed.  So this is really a definitional question,

14 whether files in the sequencer, as they capture the sequence

15 being built are sequence reads.  This was not in dispute

16 before, but now this is an issue of claim construction for Your

17 Honor to resolve.

18          So there is a definition of sequence reads in the

19 patent, and this is on Slide 19.  So in the patent, the

20 specification defines sequence reads as data representing

21 sequence of nucleotide bases that were measured.  Data

22 representing a sequence of nucleotide bases.  This does not

23 limit the data to any file format, as long as the data,

24 collection, the BCL files represent the sequence of nucleotide

25 bases, and they do, because they record A, the identity of the

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 89 of 156

1  bases; and B, the cycle in which they were created, among other

2  things that are not exactly pertinent, but those things permit

3  this data to represent the sequence of nucleotide bases.

4  Again, there is no mention of any particular format type here.

5         So, again, NeoGenomics' new argument to avoid

6  infringement requires construction that sequence reads are not

7  made in the sequencer, and it is arguing that RaDaR 1.1 does

8  not obtain sequence reads in the sequencer.

9         What NeoGenomics is arguing is, that its sequence

10 reads are made later in a data processing step after sequencing

11 when the BCL files are compiled into a file type called FASTQ.

12 That's done outside of the sequencer doing data processing, and

13 that is flatly contradictory to the Court's prior construction.

14        On Slide 22, Your Honor said the claim does not

15 mention noise or data processing, and the Court will not read

16 an unstated limitation into claim language.  This was referring

17 to the term sequencing the amplicons to obtain sequence reads

18 and detecting the mutations from the sequence reads.

19        So Slide 23, NeoGenomics' expert, Dr. Lennon, has

20 agreed that sequence reads are contained in BCL files coming

21 out of the sequencer.  He said -- and this was in connection

22 with claim construction, each space in the sequence read in the

23 file that comes out.  He is saying the sequence read in the

24 file that comes out of the sequencer.

25        In his claim construction declaration on Slide 24,

Natera vs. NeoGenomics      1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 90 of 156

 1  Dr. Lennon referred to a publication from the Bruin Institute

 2  and how to figure, and he's explaining what happens during

 3  sequencing.  He says, instruments generate short reads.  Those

 4  are the sequence reads.  That's what is being generated in the

 5  instrument which is the sequencer.

 6          During claim construction, NeoGenomics, in their

 7  briefing, endorsed Dr. Metzker's explanation, and Dr. Metzker

 8  is Natera's expert of sequence reads.  They endorsed

 9  Dr. Metzker explaining -- there is a quote from NeoGenomics'

10  brief, that a sequencing machine, "can individually read which

11  base is there, and it determines what the order of the letters

12  are in the DNA sample, and we call that a sequence read or

13  reading the sequence."  NeoGenomics was embracing that and it

14  came from Natera's expert.

15          And so in sum, Your Honor, what NeoGenomics is

16  attempting to do is ask Your Honor to re-construe this claim.

17          If Your Honor doesn't have anymore questions about

18  that one, I'll move on to the next term.

19          **THE COURT:**  At the risk of asking a real stupid

20  question, because as I indicated, I haven't -- I only got so

21  far.  As I recall the sequencing machine, this is not quite

22  right, but it is like off-the-shelf.  There is these sequencing

23  machines and you can buy them.  So using a sequencing machine

24  cannot infringe, so I must be missing something.  I must not be

25  understanding something about your argument.  I mean, because

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 91 of 156

1    it sounds like what you are saying is, oh, they are using a

2    sequencing machine, well, that infringes.  That can't be right

3    so I must be missing something.

4            **MS. HABERNY:**  It is part of the claim.

5            **THE COURT:**  Using a sequence machine that you can buy

6    from Joe?  I mean, you can't buy it from Joe Blow, but, you

7    know, Joe Blow Complicated, LLC.  I mean, how is that -- how

8    can that possibly infringe?  Not everybody, but all of these

9    people use these sequencing machines.

10           **MS. HABERNY:**  What they do, if you look at the final

11   step, look at Claim 14 of the '454 Patent, one of the claim

12   steps is sequencing the amplicons to obtain sequence reads.

13   That's a claim step, and you use a sequencer to perform it,

14   just like you use a PCR thermocycler to perform the

15   amplification step, and you use a whole exome sequencing

16   apparatus to do the whole genome sequencing.

17           You need instruments to do these.  People can't do it

18   with their fingers, so using the sequencer is part of the

19   claim, and they do that.  They are trying to say now that they

20   don't, because the sequence reads that they previously admitted

21   were file types called BCL files in the sequencer.  Now they're

22   backtracking and saying, oh, no, never mind, those actually

23   aren't sequence reads.  The sequence reads really, for our

24   product, are FASTQ files which we process in a data process --

25   that data processing pipeline overseas.

1    They are just re-construing the claim, or

2 re-construing what sequence reads mean.  They previously said

3 it was files created in the sequencer, and that's what the

4 patent itself says, data representing the sequence, and now

5 they are saying, oh, it has to be a specific type of data, it

6 can't be BCL files, even though they previously admitted that

7 it was.

8    **THE COURT:**  I must not have explained my question

9 very well.  People sequence DNA in these machines, and there is

10 nothing -- I mean, that alone cannot infringe -- I mean, I

11 don't understand how that can infringe.  It sounds like you are

12 saying that that alone infringes, so I must be missing

13 something, because if you are saying that, that does not make

14 sense to me.

15    **MS. HABERNY:**  No, Your Honor.  So infringement

16 requires performance of all of the steps, and they are not

17 disputing that they perform the whole exome sequencing and

18 targeted multiplex amplification steps.  They don't dispute

19 that.  So I wanted to try to narrow the issues --

20    **THE COURT:**  This is what you said at the very

21 beginning.

22    **MS. HABERNY:**  I didn't want to have to walk through

23 everything that is not in dispute and have you waste your time.

24    **THE COURT:**  Well, that's probably true, and I

25 apologize for being dense.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 93 of 156

 1          **MS. HABERNY:**  I apologize, I should have explained it

 2 better.

 3          So, yes, they have to perform all of this, but to

 4 accomplish the last step, they use a sequencer that produces

 5 BCL files.  Those are sequence reads.  They want Your Honor to

 6 construe that term to exclude certain file types.

 7          **THE COURT:**  Uh-huh.

 8          **MS. HABERNY:**  I'll move on to Slide 26.  Okay.  So

 9 this is the next term and this is -- again, Your Honor, I'm

10 trying to identify only the terms that NeoGenomics said it

11 doesn't practice, so it would be practicing this term of

12 detecting mutants at a sensitivity level of 0.5 -- 0.15 percent

13 mutant frequency or less.  So it's detecting that very small

14 amount of DNA.

15          So they would have to perform that in addition to the

16 other steps of the '596 Patent, Claim One.  I'm focusing only

17 on this one which is in dispute.  And this, again, is another

18 attempt to seek a belated claim construction.

19          So here's where the term appears in the claim.  This

20 is Slide --

21          **THE COURT:**  You got about six or seven minutes.

22          **MS. HABERNY:**  Okay.  I'll go really fast then.

23          **THE COURT:**  Say whatever you want, but you have been

24 talking about 30 minutes.

25          **MS. HABERNY:**  Yes, Your Honor.  I'll try to go

1  quickly.

2          So at Slide 29, this shows what NeoGenomics is trying

3  to do.  They are trying to read limitations into the claim.

4  They are trying to read in a limitation that the sequencing has

5  to occur in the same reaction volume as the amplicons, and that

6  doesn't appear in the sequencing step.

7          So if Your Honor recalls, there are separate steps.

8  There's performing targeted multiplex amplification, that's the

9  top step listed here.  And then at the end of that, the claim

10 recites they are amplified together in the same reaction

11 volume.

12         The next step is sequencing the amplicons, but they

13 want to import that same reaction volume from the prior step

14 into the sequencing the amplicon step, and they offer no

15 support for construing the claims that way.

16         Then their second argument on this term is, detecting

17 the mutations present in the cell-free DNA, whereas after

18 bioinformatic error correction, then that method, and that

19 method is capable of detecting SNV, and be present in less than

20 or equal to 0.015% and so they want to say --

21         **THE COURT:**  You can't talk quite that fast, because I

22 can't understand you, nor can the court reporter, so you got to

23 slow down just a little bit.

24         **MS. HABERNY:**  Right.  So in the first attempt to

25 rewrite the claim, they want to read in a step in the same

1  reaction volume from the amplification.  They want to read in a
2  limitation in the same reaction volume from the amplification
3  step into sequencing the amplicons.  They want to say you
4  amplify them in the same reaction volume and then you have to
5  sequence that exact same reaction volume.

6          You can't maybe do replicates of amplification, which
7  is what they do, and then they are the identical replicates of
8  amplification and they put them together for sequencing, and
9  they're saying, Aha, it's no longer the same reaction volume,
10  but the claim doesn't require sequencing in the same reaction
11  volume.  It just requires amplifying in the same reaction
12  volume, and they don't dispute that they amplify in the same
13  reaction volume, so they are just reading that into the claim.

14          Their second non-infringement argument is, that
15  detecting these mutations present in less than or equal to .015
16  percent of the cell-free DNA, because that's such a low number,
17  the sequencer is actually detecting some errors and you won't
18  get to that number until you do bioinformatic error correction,
19  which is what we just talked about, Your Honor already rejected
20  reading error correction into the claims.

21          So there is more evidence and support for that, but
22  that's overall what the argument is.  If Your Honor has no more
23  questions, I'll just move on and let Your Honor review the
24  briefing for the support.

25          **THE COURT:**  Yes.  All right.  Thank you.

Natera vs. NeoGenomics      1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 96 of 156

 1          **MS. HABERNY:**  The next one, and this one should be a

 2    no-brainer.  Sequencing the amplicons.  Your Honor has

 3    construed this already numerous times in two claim

 4    constructions, also in denying NeoGenomics' motion for

 5    reconsideration following an IPR.

 6          Your Honor held that sequencing the amplicons can

 7    permit intervening steps.  So what that means is, you can

 8    perform the targeted multiplex amplification in a single

 9    reaction volume, do some intermediate steps that don't change

10    the amplicons, don't create different amplicons, I should say,

11    and then do the sequencing, that that's permitted.  Your Honor

12    has already ruled that multiple times.

13          Here on Slide 45 is NeoGenomics' new non-infringement

14    argument that they don't -- they don't practice that claim,

15    sequencing the amplicons, because after amplification, they do

16    three processes, basically; cleanup, size selection, and

17    pooling, but Your Honor's claim construction order here says,

18    "Claim One does not say that the method prohibits the

19    performance of additional steps on the amplicons for their

20    sequence."  So as looking as they don't pick different

21    amplicons, it's okay to do extra steps.

22          Your Honor was then addressing in terms of bar-coding

23    the PCR, but this is even further removed from what Your Honor

24    was addressing there.

25          So the bead cleanup step that they say takes them

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 97 of 156

1    outside of sequencing the amplicons, all that does is wash away

2    contaminants, wash away PCR reagents that weren't used, wash

3    away other things that are in the mixture that are going to

4    interfere with sequencing.  That does nothing to create

5    different amplicons.

6         In size selection that they say takes them outside of

7    the sequence in the amplicons limitation, all that does is

8    separate the DNA based on length.  So they're looking for DNA

9    of certain lengths.  That's their target DNA.  There's other

10   junk DNA floating around.  This just removes that junk DNA.

11   Those aren't the amplicons intended to be created.  Those are

12   just other spurious artifacts.  That doesn't create different

13   amplicons, that just makes sure that what you're loading from

14   different samples into the sequencer is loading in the same

15   amounts.  Again, you are not creating different amplicons.

16        **THE COURT:**  You got about like 30 seconds.

17        **MS. HABERNY:**  Let me jump to the last one, which is

18   our evaluating step.  So the last step in Claim One of the --

19   not the last step.  Step B in Claim One of the '596 Patent,

20   we're saying evaluating results of sequencing that they did on

21   a tumor biopsy to identify a plurality of tumor specific

22   mutations.

23        One way NeoGenomics does that is, by a manual quality

24   control review in its North Carolina laboratory.  It has human

25   beings that look at data that came from its pipeline and say,

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 98 of 156

okay, this data we're going to use.  We're going to use these

variants, identify this data, or it says, we're not going to

use them, we're going to go do it again, which is, we're going

to use some of them or we're not going to use any of them.

NeoGenomics says that doesn't count, that's not evaluating

according to this step.  The only way -- the only thing we do

to evaluate is purely bioinformatic in the Cloud in Europe and,

therefore, we don't do this in the United States.  But, Your

Honor, they do evaluate to determine a plurality of target loci

in the U.S.  Even if part of what they're doing is in the U.S.,

that's performing this claim step, and one analogy I give is,

say you want to paint a car, and you send it to Canada to get

half of it painted, and then it comes back into the United

States and you paint the other half.  You are painting the car,

even if you don't paint the whole car, and this doesn't say you

have to evaluate the entire plurality of target loci are

determined based on what you do in the United States.

So with that, I think I am out of time.

**THE COURT:**  Thank you.

For the Defendants.

**MR. FOUNTAIN:**  Thank you, Your Honor.  Aaron

Fountain, on behalf of Defendant NeoGenomics.

Now to be clear, NeoGenomics is not here to reargue

claim construction.  We're not here to dispute what the Court

has previously ruled the meaning of these claim terms are.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 99 of 156

1 What we're here to argue about is the application of the

2 Court's constructions and its instructions to the parties of

3 what these claim terms mean to the facts of how the RaDaR

4 product operates.  The experts dispute whether the operation of

5 that product matches up with the claims as construed by the

6 Court.

7        **THE COURT:**  If they dispute it, then they have a

8 trial.  I mean, then that's your position?

9        **MR. FOUNTAIN:**  That is correct, Your Honor.  For all

10 of the claims that remain in the case, we have not moved

11 affirmatively for summary judgment, if not infringement.  What

12 I'm here to talk to the Court about is why there are disputes

13 of material fact that necessitate a trial on these questions.

14        **THE COURT:**  Okay.  Glad to have that clear.

15        **MR. FOUNTAIN:**  Now on the first issue of whether

16 RaDaR 1.1 sequences and detects SNV mutations in one sequencing

17 step.  I have up on the screen the Court's construction.

18        **THE COURT:**  Can somebody push the button.

19        **THE COURT REPORTER:**  I'm so sorry.

20        **THE COURT:**  That's all right.  I know that I asked

21 you to do that.

22        Go ahead.

23        **MR. FOUNTAIN:**  My mistake, I apologize.

24        If Your Honor would prefer to look at the paper.  The

25 first page of the slide deck says, genuine disputes of material

1    fact exist.

2            **THE COURT:**  That's a pretty good clue that you think

3    there's a trial.

4            **MR. FOUNTAIN:**  We have the Court's construction.  The

5    Court was clear, these claims require that sequencing and

6    detecting precede as part of one sequencing step.

7            Now there is a bunch of things that opposing counsel

8    said that we do not dispute.  We do not dispute that the

9    sequencers in the RaDaR 1.1 process detect nucleotides.  We do

10   not dispute that the sequencers make base calls.  We don't

11   dispute that the sequencer makes BCL files.

12           Where I want to focus Your Honor is on your comment

13   that that sounds like an off-the-shelf sequencer.

14           The point is, the sequencers used in the RaDaR 1.1

15   process are not configured as an off-the-shelf sequencer.  They

16   work differently, and that's where the experts dispute the

17   issue of infringement.

18           To focus the Court's attention, it is the phrase,

19   "obtain sequence reads," that counsel was talking about.  Do

20   the RaDaR 1.1 sequencers obtain sequence reads as part of the

21   single sequencing step.  The specifications definition says,

22   the sequence read refers to data representing a sequence of

23   nucleotide bases that were measured.  That phrase, "that were

24   measured," bases that were measured, that's the base call.

25   That's the information that is stored in a BCL file.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 101 of 156

1          Now what Dr. Lennon did is, he looked at *Illumina's*

2     technical literature, the company that makes the sequencers

3     used in the RaDaR 1.1 product.  What that --

4          **THE COURT:**  *Illumina* being the party in that case we

5     talked about this morning?

6          **MR. FOUNTAIN:**  That's correct, Your Honor.

7          **THE COURT:**  Okay.

8          **MR. FOUNTAIN:**  I can say the sequencer manufacturer,

9     if it is more clear.

10         **THE COURT:**  Joe Blow Complicated, LLC.

11         **MR. FOUNTAIN:**  That one.

12         **THE COURT:**  Go ahead.

13         **MR. FOUNTAIN:**  What Joe Blow Complicated, LLC says

14    is, that the realtime analysis software on the instrument

15    stores the base call data in the form of individual base calls,

16    or BCL files.  When sequencing completes the base calls in the

17    BCL files, must be converted into sequence data.  This process

18    is called BCL to FASTQ conversion.

19         Now in his expert report, Dr. Lennon was very clear

20    that there are lots of different kinds of file formats where

21    you can take the individual cycle data from a BCL file and

22    convert it into sequence reads.  We are not arguing that these

23    claims are limited to FASTQ files.  What we're arguing is, you

24    got to find a sequence read as part of the sequence step to

25    meet the Court's construction.  This evidence from the

 1  manufacturer of the instrument says that process happens when

 2  the BCL single cycle data is converted to sequence data.

 3          Another piece of evidence from the manufacturer of

 4  the sequencers, unlike BCL files, which contain per cycle data,

 5  FASTQ files contain the per read data.  That's the reference to

 6  the sequence reads required by the claims.

 7          **THE COURT:**  So I apologize, maybe you're going to get

 8  there. How does this show that NeoGenomics does not infringe?

 9          **MR. FOUNTAIN:**  I'll go there now, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. FOUNTAIN:**  Now, some sequencers manufactured by

12  Illumina do exactly that, they take the DNA -- I'm on Slide 11.

13          **THE COURT:**  Okay.

14          **MR. FOUNTAIN:**  Some sequencers, the off-the-shelf

15  sequencer that Your Honor was referring to and my colleague was

16  speaking, take the DNA, they sequence it.  They call the bases

17  and store it in a BCL file, and they convert it to a FASTQ file

18  on the sequence read, all on the sequencer, all as part of a

19  single sequencing step.  NeoGenomics' sequencers, do not do

20  that.

21          The sequencers used in the RaDaR 1.1 workflow -- I'm

22  moving on to Slide 12 -- generate the BCL file and they stop.

23  They have the single base call per cycle data generated and

24  that is all they do.

25          **THE COURT:**  And then what happens?  You put them back

1  in the sequencer?

2      **MR. FOUNTAIN:**  Dr. Metzker answered that question for

3  you, Natera's expert.  Those raw sequencing outputs, the BCL

4  files from the Illumina sequencer --

5      **THE COURT:**  No, no.  What does NeoGenomics do with

6  them?

7      **MR. FOUNTAIN:**  He answers that.

8      **THE COURT:**  Okay.  I thought you were talking about

9  Illumina.

10     **MR. FOUNTAIN:**  I said Slide 12.  I'm on Slide 13.  I

11 apologize, Your Honor.

12     So what Dr. Metzker said was, that the raw sequencing

13 output, those PCL files from the Illumina sequencer, they sit

14 there in the Illumina Cloud until they, in Inivata AWS, or

15 Cloud pipeline withdraw step.

16     The RaDaR sequencers output the single base call data

17 in Inivata, using NeoGenomics.  That is the company that built

18 this technology that is now part of NeoGenomics.  That's a

19 separate software system.

20     So how do those get there?  Dr. Metzker says

21 NeoGenomics has to request those BCL files from the Illumina

22 software space, get them into its own system, and that's when

23 the sequence reads are obtained.

24     **THE COURT:**  I mean, are they sitting there and --

25     **MR. FOUNTAIN:**  That's correct.  We have an -- I'm

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 104 of 156

 1   sorry, I cut you off.

 2          **THE COURT:**  You know, I guess I don't get the

 3   technology, and I apologize for not having studied the briefs

 4   before we get here but, I mean, "obtained," what does that mean

 5   in this context?  That's when you look at them?  I mean, or are

 6   they already there and you're -- I'm not explaining this very

 7   well.  But I'm not --

 8          **MR. FOUNTAIN:**  I understand, Your Honor.  I

 9   understand.  I think I understand.

10          **THE COURT:**  I hope so.

11          **MR. FOUNTAIN:**  I'm jumping back to Slide 11.  The

12   sequence read is the sequence of letters.  It is the

13   compilation of each letter of a piece of DNA strung together in

14   a sequence.

15          **THE COURT:**  Is that not there when it is removed from

16   your sequencer?

17          **MR. FOUNTAIN:**  That's correct.

18          **THE COURT:**  So why is that not obtaining them, or

19   what is the magic word?

20          **MR. FOUNTAIN:**  It is not obtaining them, because that

21   sequence of letters stringing together the data representing

22   the sequence of bases, that's called -- that is on the screen

23   here, the ATCGTG.  That does not exist in the sequencing step.

24   The RaDaR system stops at the BCL files which contain one base

25   for each piece of DNA.  That's not a sequence read.

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 105 of 156

1          The way that this works, and here is a little

2 animation to illustrate what Dr. Marsico, who designed this

3 system, Dr. Metzker who examined the system, everybody agrees

4 as a matter of fact, that this is how the NeoGenomics RaDaR

5 system works.

6          On the sequencer, the DNA is read.  The base calls

7 are made, and the BCL files, one base per file is generated,

8 and outputs to the Illumina Cloud system.  They sit there.

9 This is what Dr. Metzger testified, until an operator at

10 NeoGenomics says, let's get those BCL files out of the Illumina

11 software.

12          **THE COURT:**  Out of what?  You turned your head.

13          **MR. FOUNTAIN:**  All right.  Sorry.  The sequencer

14 generates the BCL file.

15          **THE COURT:**  I got all that.  I just couldn't hear the

16 last few words you said.

17          **MR. FOUNTAIN:**  I understand.  There is no sequence

18 read at the point.  Those BCL files without a sequence read are

19 exported to the Illumina Software Cloud, and they sit there

20 until a RaDaR operator manually says, let's get them so that we

21 can convert them into sequence reads and start analyzing the

22 data.  That's a manual process, where somebody has to, in a

23 separate system, click a button to generate the data, transfer

24 those BCL files without sequence reads to the NeoGenomics'

25 software pipeline, and then convert those base call files to

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 106 of 156

 1   sequence read files.  This is not one sequencing step in

 2   accordance with the Court's construction.

 3            Any questions there, Your Honor?

 4            **THE COURT:**  I'm going to hope for the best.  Go

 5   ahead.

 6            **MR. FOUNTAIN:**  Me, too.

 7            Let me go to Slide 22, please.  The next issue that I

 8   would like to address is whether RaDAR 1.1 detects or is

 9   capable of detecting an SNV mutation that is present in less

10   than or equal to 0.015 percent of the cell-free DNA comprising

11   the SNV locus, and that is Slide 22 of the presentation, if

12   you're looking at the paper.

13            **THE COURT:**  Let me back up.  My law clerk says, if

14   every one agrees this is how NeoGenomics works, then what is

15   the disputed question of fact there?

16            **MR. FOUNTAIN:**  Our expert, the way I would describe

17   it is this way, the parties' experts dispute whether a sequence

18   read can be found in a BCL file.  Our expert looked at the

19   evidence --

20            **THE COURT:**  That's what I was asking earlier, I just

21   asked it -- that's what I meant to be asking earlier.  Okay.

22   That's helpful.  Thank you.  You can move on.

23            **MR. FOUNTAIN:**  Will do.  Thank you, Your Honor.

24            **THE COURT:**  To what you were trying to talk about.

25            **MR. FOUNTAIN:**  All right.  So on this limitation,

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 107 of 156

1   opposing counsel said the argument was based on error

2   correction and single volume limitations, and that is only

3   tangentially correct.  The real point here is the reference to

4   cell-free DNA.

5           At the bottom of the claim what needs to be detected

6   is an SNV mutation that is present in less than or equal to

7   0.015 percent of what?  Of the cell-free DNA comprising the SNV

8   locus, and that word "the" is important.  It means that this

9   term, cell-free DNA comprising the SNV locus, refers back to

10  something else earlier in the claim, and here what that is,

11  it's the SNV mutation from cell-free DNA in that multiplex

12  amplification step where the target loci are amplified together

13  in the same reaction volume.

14          Let me illustrate why that is important.  If I move

15  to Slide 23, what I have is a schematic representation --

16          **THE COURT:**  If you are obtaining it from something

17  different than that, how -- why aren't you detecting the cancer

18  or cancer precursors, cancer recurrence precursor in somebody's

19  body, if it's not the same?  I'm just curious whether that

20  matters or not, to ask you -- perhaps I was unable to stump

21  Mr. Morrow.

22          **MR. FOUNTAIN:**  If I can try to answer that.

23          **THE COURT:**  I apologize.  This is not my thing.

24          **MR. FOUNTAIN:**  What the RaDaR 1.1 workflow does is,

25  it takes the -- it extracts the cell-free DNA from the blood

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 108 of 156

1  sample.

2        **THE COURT:** Right.

3        **MR. FOUNTAIN:** And it takes a maximum of 20,000

4  copies of DNA from the blood sample, and it separates those

5  20,000 copies into four separate replicates.  Four separate

6  single reaction volumes, and each one of those replicates or

7  reaction volumes goes through this workflow process illustrated

8  in the middle of the screen, and at the end of that, the

9  amplified ligated amplified cleaned up DNA sample is put on to

10  a sequencer, and the sequencer generates sequence reads.

11        Our position is, that because only 5,000 copies of

12  the cell-free DNA are put into the reaction volume, the minimum

13  sensitivity of the RaDaR 1.1 workflow is 0.02 percent.  That's

14  one mutant DNA copy per the 5,000 total DNA copies that are

15  included in that reaction volume.

16        What Natera says is, we're not going to look at how

17  much mutant DNA is in the cell-free DNA, what we're going to do

18  is, we're going to look at the sequence reads, and we're going

19  to look for one mutant read in something less than 5,000 total

20  reads.  I think the number 10,000, that would be 0.01 percent.

21  That's the factual dispute.

22        The claim language says, an SNV mutation that is

23  present in less than or equal to 0.015 percent of the cell-free

24  DNA comprised the SNV loci.

25        Dr. Lennon looked at the cell-free DNA and says,

well, the most I can have is 5,000 copies, so the smallest
number or smallest percentage of an SNV mutation that I can
detect is 0.02 percent.  That's higher than the requirements of
the claim, therefore, NeoGenomics doesn't infringe.

What Dr. Metzker did is, he did not look at the
cell-free DNA.  He looked at the reads.  He looked at the reads
coming out of the sequencer and looked for an example where
there was a count of mutant reads per total reads that was
lower than 0.015 percent.

THE COURT:  That sounds familiar.

MR. FOUNTAIN:  I'll try to illustrate that a little
bit better.

THE COURT:  That sounds familiar.  I can't remember
why, though.  Go ahead.

MR. FOUNTAIN:  Can you go to Slide 38, please.

THE COURT:  You've got about -- well, you got a
little more than ten minutes left.

MR. FOUNTAIN:  Thank you, Your Honor.

I'm on Slide 38.  Right.  So to recap, Dr. Lennon
looked at the claim language which says, cell-free DNA, and
looked at the percentage of SNV mutations in the cell-free DNA,
and it said, RaDaR 1.1 doesn't do that.

What Dr. Metzker did is, he looked at the output of
the sequencer.  This is after multiplex amplification, after
ligation, after universal amplification, after amplification

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 110 of 156

and sequencing in the sequencer itself.  Each step can

introduce copies, errors, variances from what was in that

original test tube of cell-free DNA, and the analysis he

performed, which I got listed here on the bottom of the screen

is, he looked for a mutation that is present in less than or

equal to 0.015 percent of not the cell-free DNA, but the

sequence reads comprising the SNV locus.  That's the wrong

analysis for this claim language.  That would be the end of the

story, and perhaps we would have moved for summary judgment,

but that wouldn't have been correct, because the experts

dispute, do these sequence reads provide good evidence of what

was in that original test tube of cell-free DNA.

Dr. Metzker obviously thinks yes.  Dr. Lennon

disagreed.  He said a person of ordinary skill would look at

those sequence read numbers and understand that that variance

of the ill frequency that back the percentage is not a reliable

indicator or proxy for the amount of mutant that was in that

cell-free DNA sample because of the inevitable presence of

errors in those low, low, low numbers.

The experts dispute whether that evidence is

sufficient.  That is an issue that should be tried to Your

Honor.

If you jump to Slide 49, please.  I'm on Slide 49, if

you are looking at the paper.

I would like to address the dispute about whether

1   RaDaR 1.1 determines a plurality of target loci, specific to

2   the subject in the United States.

3           Now, this territorial aspect of in the United States

4   or out of the United States may sound picky.

5           **THE COURT:**  You-all talked to me about this before.

6   I remember.

7           **MR. FOUNTAIN:**  Understood.  Thank you, Your Honor.

8           **THE COURT:**  So I remember it can be important, but

9   that's what I just told you what I remember, it can be

10  important.

11          **MR. FOUNTAIN:**  Understood.

12          Now, I don't think Natera disputes that it can be

13  important, and the dispute here, the reason why they're focused

14  on manual QC review is, because that does occur in the United

15  States.  What the experts dispute is, does that manual QC

16  review evaluate the results of the sequencing on the tumor

17  biopsy to determine a plurality of target loci specific to the

18  subject.

19          The experts reviewed, what are the steps that the

20  reviewer conducts, and in those steps are they done for the

21  purpose of determining a plurality of target loci specific to

22  the subject?  Dr. Lennon reviewed the SOPS, looked at what

23  other reviewers do and concluded, no, they are checking

24  pass/fail flags to see if the sample is good enough, to see if

25  we have enough quantity or enough accuracy in order to approve

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 112 of 156

1   this panel to move forward.  If they conclude, no, they don't
2   go through and pick the target loci that they think should be
3   included, they say, you know what, software pipeline that's
4   over there in Ireland, do it again.  Find me a new set of
5   plurality of target loci specific to the subject.
6           Dr. Metzker looked at those same QC steps and reached
7   a different conclusion.  He said, those steps are in fact to
8   determine a plurality of target loci specific to the subject.
9   The experts disagree.  This, too, is an issue that warrants
10  trial in front of Your Honor.
11          The last thing that I would like to address, with the
12  little bit of time that I have left, if you could go to
13  Slide 62, please, is the question of whether amplicons
14  sequenced in RaDaR 1.1 are the amplicons from the targeted
15  multiplex amplification.
16          Now, it is correct, that this issue has in argue,
17  gone through some movement as we started in front of Your
18  Honor.  Your Honor got additional input from the PTAB, heard
19  Your Honor's ruling, and now we are evaluating how does the
20  product work.
21          What Dr. Lennon did is, he went through and looked at
22  what Natera and Dr. Metzker had said about which intervening
23  steps -- what kinds of steps between targeted multiplex
24  amplification and sequencing are okay, such that you are still
25  sequencing the amplicons from the targeted multiplex

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 113 of 156

1  amplification, and what kind of intervening steps are not okay.

2  What kind of intervening steps --

3         **THE COURT:**  When you say, "not okay," you mean

4  infringe and don't infringe?

5         **MR. FOUNTAIN:**  Yes, Your Honor.  I'll use real patent

6  lawyer words.

7         **THE COURT:**  Normally I don't object to plain

8  language, but I was just making sure I understood you.

9         **MR. FOUNTAIN:**  Thank you.

10         Natera has said if you do these five kinds of

11  intervening steps, you do not infringe, you do not practice the

12  claim.  The reason I stayed away from infringe is because they

13  made these statements in the context of evaluating the prior

14  art.

15         They say if the prior art performs an intervening

16  step that minimizes junk amplifications, the prior art doesn't

17  practice this claim.  If the prior art performs an intervening

18  step that creates new amplicons, the prior art doesn't practice

19  the claim.

20         So what Dr. Lennon did is, he took each one of those

21  steps and said, what is the evidence that RaDaR's intervening

22  steps, the bead cleanup, the size selection, the equimolar

23  pooling, do those fit with these steps that Natera and its

24  expert says, you don't practice the claims.  And he reviewed

25  the evidence and concluded, yes, size selection changes the

Natera vs. NeoGenomics     1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 114 of 156

 1  relative ratio of target amplicons, something that Natera says

 2  doesn't practice the claim.

 3          Bead cleanup, size selection, what do those do?  They

 4  minimize the junk amplicons, a step that Natera says doesn't

 5  practice the claim.

 6          Now Dr. Metzker disagrees.  He has looked at those

 7  steps and said, no, they don't.  Dr. Lennon says, size

 8  selection changes the relative ratio of target amplicons, I

 9  disagree.  But that's the dispute of the experts.  That

10  warrants a trial in front of Your Honor on this infringement

11  question.

12          If Your Honor has no questions, I'm happy to cede the

13  balance of my time.

14          **THE COURT:**  All right.  Thank you.  You used up all

15  your time, and I have to leave, as I indicated, by four o'clock

16  because I have to cook dinner.

17          So that takes us to inventorship.  Correct?

18          **MS. HABERNY:**  Correct.

19          **MS. DURIE:**  That's correct.

20          **THE COURT:**  And that's the Defendant's motion.

21          **MS. DURIE:**  Yes.  There is actually cross-motions,

22  but I'm happy to begin.

23          **THE COURT:**  Hold on a second.  Give me a moment to

24  try to get where I'm getting on this.  Cross-motions.  Right.

25          Well, these cross-motions, it's always hard to know

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 115 of 156

1  who goes first, but you've been champing at the bit. Tell me

2  why this matters.

3      **MS. DURIE:**  Terrific.  So we have a slide deck and

4  the cover says, The Court Can Correct Inventorship.

5      **THE COURT:**  Okay, I got it.

6      **MS. DURIE:**  So Your Honor asked whether at the end of

7  the day we were correct, the Court could correct inventorship,

8  and the answer in substance is, yes.

9      I want to start by talking to you about why this is

10 important, because Natera could solve this problem by simply

11 adding Dr. Jamal-Hanjani and Dr. Swanton as inventors to their

12 patent.

13     So the question is:  Why don't they want to do that,

14 and why is this so important to us?

15     So Dr. Jamal-Hanjani and Dr. Charles Swanton are both

16 researchers at the University College London.  They are both

17 also practicing oncologists.  Their desire is to have their

18 technology be used in the service of detecting and treating

19 cancer.

20     To the extent that they are named inventors, they are

21 allowed to practice their own technology.  By keeping them off

22 the patent, Natera is keeping them from being able to do that

23 work.  I'll explain in a moment why it is their work that

24 Natera is keeping them from being able to do.

25     Natera is also stopping them from being able to make

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 116 of 156

1 that work available to others, to provide tests, to look for

2 the recurrence of cancer.

3          I had hoped to be able to tell the Court that we had

4 this in hand, but what I can say to the Court is, I expect that

5 we will imminently have a license from University College

6 London.

7          **THE COURT:** I heard that coming.

8          **MS. DURIE:** Right. From, essentially, Dr.

9 Jamal-Hanjani and Dr. Swanton to allow NeoGenomics to use their

10 invention.

11          **THE COURT:** This is totally irrelevant, and I'm just

12 going to apologize, but I just finished this book about the

13 history of Bell Labs. It came out, I don't know, five or six

14 years ago. It was so interesting, because Bell Labs just

15 didn't patent stuff, they had a monopoly. It was part of the

16 deal, but they made all of these patents available, and then

17 that was the ultimate demise of their monopoly, but it was --

18 it raised some really interesting points about technology and

19 patent wars today.

20          Didn't have anything to do with DNA, I'm happy to

21 say, but it was interesting. Go ahead.

22          **MS. DURIE:** This is why Dr. Jamal-Hanjani and

23 Dr. Swanton care and why this is actually, as a practical

24 matter, a case dispositive issue, because to the extent that

25 the Court finds Dr. Jamal-Hanjani and Dr. Swanton should be

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 117 of 156

 1  added as inventors, and I want to be clear, we're not

 2  suggesting that the Natera people should not be named as

 3  inventors, too, but to the extent that they are added as

 4  inventors, then Natera -- either the patent is invalid or they

 5  get added, and at that point we would be licensed, and there

 6  would be no dispute.  So this does end up being a case

 7  dispositive issue.

 8          The Court may recall that Natera fought tooth and

 9  nail from taking the depositions of Dr. Swanton and

10  Dr. Jamal-Hanjani.

11          Now, it turns out, back in December of 2023, UCL's

12  counsel had sent Natera an email conveying in detail UCL's

13  belief that Dr. Jamal-Hanjani should be named as an inventor on

14  the '454 Patent.  We were not aware of that email at the time.

15          **THE COURT:**  And that is the patent you are saying

16  they should be named --

17          **MS. DURIE:**  Actually, both patents.

18          **THE COURT:**  Both, all right.

19          **MS. DURIE:**  We then, without knowing about that

20  letter, briefed the issue of taking Dr. Jamal-Hanjani and

21  Dr. Swanton's depositions, and Natera actually threatened Rule

22  11 with respect to --

23          **THE COURT:**  Okay.  Kind of get to the point.

24          **MS. DURIE:**  So the point is, the Court granted that

25  motion, and over a year later, Natera produced that email from

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 118 of 156

1  UCL.  This is set forth in the Metzger *Daubert* motion, which is

2  why I intend directing the Court to it because it has important

3  background to this dispute.

4          In substance, what we learned after the Court granted

5  that request for the deposition is that, in fact, UCL had been

6  taking the position all the way back in December of 2023, that

7  Dr. Jamal-Hanjani should have been an inventor.

8          **THE COURT:**  I mean, they can have that position all

9  they want, but can you get to the merits of it?  I mean, are

10 they an inventor or are they not?

11         **MS. DURIE:**  They are.

12         **THE COURT:**  Get to that.

13         **MS. DURIE:**  With respect to the timeline what we

14 learned from the depositions and evidence that was produced, it

15 is that UCL had been collaborating with two other companies,

16 Agena and Illumina; that in July of 2014.

17         **THE COURT:**  Apparently, I should buy stock in

18 Illumina.  They keep coming up.

19         **MS. DURIE:**  They do.

20         **THE COURT:**  And I will not do that because I don't

21 buy stock in individual companies because it causes me problems

22 with conflicts.  But go ahead.

23         **MS. DURIE:**  In July of 2014, Dr. Jamal-Hanjani

24 published a paper that discussed some of the work relating to

25 that collaboration.  Then in September 2014, they approached

1 Natera to participate in his LungTRACERx study, which was the

2 study of all of this ongoing work.

3 　　　　　**THE COURT:** Approached Natera?

4 　　　　　**MS. DURIE:** Approached Natera.

5 　　　　　UCL, Dr. Jamal-Hanjani and Dr. Swanton approached

6 Natera. Now, as Dr. Jamal-Hanjani explained in her deposition,

7 this is at Slide 4. The way that this TRACERx study worked, it

8 originated at UCL. UCL initially worked with Agena. It then

9 worked with Illumina. And then it went and approached Natera

10 as its third partner in this collaboration.

11 　　　　　Now this -- what I'm about to say is probably the

12 most critically important thing. At Dr. Metzker's deposition,

13 this is now at Slide 5, he admitted that if we take a look at

14 what UCL had already accomplished with Illumina as part of the

15 work on the TRACERx study, and we compare that to Claim One of

16 the '454 Patent, the only difference is the amplification of 10

17 target loci, rather than seven. That's it.

18 　　　　　What does that mean? If we go to the next slide,

19 what means is, that Dr. Metzker admitted that UCL and Illumina

20 had already done all of Claim One, except that instead of

21 amplifying ten to 500 target loci, it would have been

22 amplifying seven to 500 target loci.

23 　　　　　Before the collaboration with Natera, that's true

24 with respect to Claim One and the 50,000 per target locus. It

25 is also true with respect to the 0.15 percent sensitivity.

1          Dr. Metzker admitted that that had also been achieved
2  already in connection with the Illumina collaboration.

3          They had also achieved a number of the specific
4  requirements in some of the dependent claims, including the
5  idea of looking for clonal and subclonal mutations.  That is
6  Slide 7.

7          I have only included in the slides a couple of
8  examples, but in their deposition testimony, and I hope at
9  trial Your Honor will have the ability to hear directly from
10  each of these individuals in person.

11          Dr. Swanton and Dr. Jamal-Hanjani, testified that
12  this was in fact their project.  They originated the entire
13  project.  The purpose of the project was to look for the
14  detection of these clonal and subclonal mutations first in
15  patient samples, and then in plasma, to figure out whether they
16  could be detected in a personalized assay specific to a person.
17  Dr. Swanton talked about that, and Dr. Jamal-Hanjani said the
18  same thing.

19          The idea was to identify this tumor specific clonal
20  mutation from the tumor sample and then look for the same
21  mutation in a plasma sample.  They had that idea.  They were
22  the ones to communicate that idea to Natera.

23          If we take a look at Slide 11 -- actually, if we take
24  a look at Slide 11, we'll see that Dr. Jamal-Hanjani explained
25  that she provided to Natera the list of the particular variants

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 121 of 156

1    to look at.  She had done the work figuring out what was in

2    those tumor samples and whether the mutations were clonal or

3    subclonal, provided that information to Natera, and much of

4    that information, including the selection of these particular

5    mutants to look for, wound up going directly into the Natera

6    patent.

7          So not only had they already done essentially

8    everything that is in Claim One, except for that lower bound of

9    the number of loci, they had also identified these specific

10   loci to target.

11         If we can go to Slide 14, what we see is, we then

12   have claims in the Natera Patent that include claims directed

13   to these specific loci, which were -- and this fact is

14   undisputed, and this is why we moved for summary judgment,

15   because this fact is undisputed, which were first identified by

16   UCL in connection with this tumor-informed assay and

17   transmitted to Natera, and then included in the patent

18   application.

19         Now inventorship, and I'm now at Slide 15, is

20   determined claim by claim.  So it is possible to be an inventor

21   on one claim, but not another.  But while inventorship is

22   evaluated claim by claim, inventorship as to the patent, right,

23   follows.  So the failure to join an inventor of any one claim,

24   invalidates the patent, unless the inventor is added as an

25   inventor to the patent.

Natera vs. NeoGenomics      1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 122 of 156

1          So we looked to see, did Dr. Jamal-Hanjani and

2   Dr. Swanton contribute as joint or co-inventors to any claim,

3   and if so, they must be added to the patent.

4          **THE COURT:**  And then based on what you told me

5   earlier, it is your position that they can use all of the

6   patent.  They have the right to practice all of the patent.

7          **MS. DURIE:**  They absolutely do, and that, I think, is

8   not in dispute.  As a matter of law, if you are an inventor on

9   the patent, you have the right to practice.  You are full

10  owner, essentially of the patent, and you have the right to

11  practice it.

12         Now, Natera's response to our summary judgment

13  motion, in substance they have a number, but their main

14  response is, what the UCL inventors contributed was already in

15  prior art.  They parse through each of the individual things

16  and they say, well, clonal and subclonal mutations, those were

17  already known in the prior art.  These particular mutations,

18  there was a database of something like 17,000 mutations, those

19  mutations happen to be in that 17,000 database.  That's not the

20  right way to evaluate inventorship.  And if that were true,

21  given that they had already practiced every single thing that

22  is in the claim, you might well wonder what Natera brought to

23  the party and, in fact, there is a lot of briefing on the fact

24  that Natera's own witnesses admitted, as you just heard, the

25  technology they were using had already been made public and was

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 123 of 156

1  already in the prior art.

2       That's not the right way to evaluate an inventor

3  contribution, and that's the *Blue Gentian's* -- sorry, that's

4  the *Trovan* case, which is essentially saying it is not enough

5  to say that the contributions are mere explanations of the

6  state of the art, because they can depend on separating out

7  different contributed elements and attacking each one

8  individually.  The proper lense requires considering the

9  elements in combination.

10      Here, when we look at the elements in combination, it

11 was the scientists at University College London who came up

12 with the idea of doing exome sequencing on a tumor sample

13 looking to identify specific mutations in it, then looking to

14 see whether or not those same mutations could be identified in

15 the blood and classified as being clonal or subclonal, along

16 with all the other steps in the claim, and then identifying

17 these specific mutations as being mutations of interest.

18      So we can jump to 19.  In sum, with respect to our

19 summary judgment motion, we think the critical facts that we

20 think are undisputed are that for purposes of these claims, the

21 people who contributed, at a minimum, this is the undisputed

22 part.  We think they did more, but the undisputed part, we

23 think is, 10 to 500 target loci came from UCL, and in

24 particular, the 10 target loci came from UCL, because that was

25 the number of mutations that Dr. Jamal-Hanjani identified that

Natera vs. NeoGenomics     1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 124 of 156

1  then wound up being sequenced and being identified; that

2  specifically looking for clonal and subclonal mutations in the

3  context of this tumor-informed assay, came from these

4  scientists at UCL.  And, that these 14 specific mutations that

5  are listed in Claims Four and Seven of the '596 Patent, these

6  also came from UCL.

7          So for purposes of our summary judgment motion, that

8  is really what we think is undisputed.

9          Now in response to this, if we can jump to 41.

10  Natera has made what to us seems like an --

11          **THE COURT:**  But you have the burden of proof, right,

12  clear and convincing?

13          **MS. DURIE:**  Absolutely.  With respect to our summary

14  judgment motion, that's right.  We got the burden of proof.  We

15  need to establish clear and convincing evidence that the UCL

16  inventors were the ones to contribute those things to the

17  collaboration.

18          Again, we think they actually -- you know,

19  contributed virtually everything, but we think it is undisputed

20  that those particular things came from UCL, and that Natera

21  does not have any evidence that it identifies that it

22  previously contributed those things in the context of the

23  invention that is claimed.

24          **THE COURT:**  Well, okay, because on your previous

25  slide, which I know you didn't mention, to establish conception

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 125 of 156

1  a party must show, blah-blah-blah, and then --

2          **MS. DURIE:**  Let me go back.

3          **THE COURT:**  So who -- you know, sometimes parties

4  move for cross-summary judgment.  You got to show this to get

5  summary judgment, they have to show that.

6          **MS. DURIE:**  Right.  So that's why I started doing

7  this a little bit of out of order because I was trying to

8  separate our motion from their's.

9          Natera's response is to say we, Natera, have

10  already -- they don't dispute that the UCL inventors gave them

11  this information.  They can't, because it is documented.  So

12  Natera's position is, we had already conceived of the complete

13  invention before we even talked to UCL.

14          In order for Natera to prove that, which is to say to

15  prove prior conception of the entire invention, they have to

16  show that they had possession of every single claim

17  requirement, and that that was known to them at the time of the

18  alleged conception in the context of this overall invention.

19          So that is the point of the citation on Slide 17, and

20  that's also the point of the case law cited on Slide 18, which

21  is, in order for Natera to prove that now, their prior

22  conception, they have to prove that with corroborating evidence

23  by showing that there is actual evidence that they previously

24  had this prior conception, and there, there is a fact dispute,

25  I think for sure with respect to many of the claim limitations,

as to whether they have provided corroboration, documents that support their claim that this was something they had already invented before they met the UCL scientists, and that is one of the places where Dr. Metzker and Dr. Lennon disagree about what to make of Natera's evidence of alleged prior conception, and whether it actually shows, for example, the tumor-informed assay that we think is required by the claims.

If we can go to 55 -- I'm sorry, 41.  I want to spend a moment on this, because I think Natera has made a very significant pivot in its reply brief with respect to its summary judgment motion.

So throughout this case -- and I included a lot of the evidence in the slides, but I want to start with this conceptual point.  We have understood the claims and we think Natera's witnesses understand the claims to be referring to what we call a tumor-specific assay.  It is also sometimes called the personalized assay or a bespoke assay.  What that means is, you take the tumor sample from the patient.  You analyze it to look to see what mutations are present, and you then create essentially a personalized test for that patient that looks to see whether those specific mutations are present in that patient's bloodstream.

**THE COURT:**  After they have whatever cancer treatment they get?

**MS. DURIE:**  Exactly.  So you take the tumor they have

1   treated.  You look for mutations specifically to their tumor.

2          I want to be clear, because I think this is

3   confusing --

4          **THE COURT:**  That's how their product works, but

5   that's what the patent says is a different thing.

6          **MS. DURIE:**  No.  That is actually what I think is

7   exactly what the claims are directed to.

8          **THE COURT:**  All right.

9          **MS. DURIE:**  So if we take a look at the '454 Patent,

10  you perform whole exome sequencing or whole genome sequencing

11  to identify mutations, tumor-specific mutations.  So that's in

12  the tumor.  You're doing your sequencing.  The reason, and this

13  is important, that you are sequencing the whole genome or the

14  whole exome of the tumor is, you haven't decided upfront what

15  you are looking for.

16         **THE COURT:**  Right.  You have to have the tumor.

17         **MS. DURIE:**  You are looking to see everything that's

18  in the tumor, and then you look for certain tumor specific SNV

19  mutations that you have identified in the blood.

20         So the claim -- and I included in here a bunch of

21  evidence that I won't have time to go through of what the

22  parties have said throughout the case, but the claim is

23  directed to this bespoke assay.  You sequence the tumor.  You

24  took the whole exome sequencing of the tumor to identify the

25  mutations, you look for those two patient's own tumor specific

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 128 of 156

1  mutations in the blood.

2          That is different -- if we go back to Slide 42, from

3  a tumor-naive assay, where you start with candidate mutations,

4  and then you look to see whether those mutations that may be

5  commonly associated with, say, breast cancer, like BRCA.  You

6  look to see whether those common mutations are found in blood.

7  You might also look to see whether those kinds of mutations are

8  found in cancer -- I'm sorry, in the tumor, and look for what

9  is called the concordance.

10          We think a lot of the evidence that Natera is relying

11  on, and this is what Dr. Lennon says, is actually talking about

12  that kind of tumor-naive as assay, where you're not doing full

13  genome sequencing on the tumor, but you're instead using

14  massive multiplex PCR to look in both the tumor and the blood

15  for these mutations that are already known.

16          Can we go to 55.  This distinction is superimportant,

17  and Your Honor said, isn't that what the claim is directed to.

18  The claim was actually amended during prosecution to make this

19  clear.

20          So if we look at Slide 55, we'll see that at one

21  point in time the claim was directed to a method comprising

22  performing sequencing on a tumor biopsy sample -- I'm sorry, on

23  a cancer biopsy sample of the subject.

24          **THE COURT:**  Page 55.  Which --

25          **MS. DURIE:**  The crossed out.  It was originally the

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 129 of 156

1  crossed out.

2          **THE COURT:** Which patent is this, '454.

3          **MS. DURIE:** I think this is probably '454.

4          **THE COURT:** Claim what?

5          **MS. DURIE:** Probably Claim One, but Annie is going to

6  check me on that. It is '596. It is Claim One of the '596.

7          So originally it said, perform sequencing on a cancer

8  sample to identify cancer specific mutations. The patent

9  office rejected that. Natera amended the claims from

10 cancer-specific to tumor-specific. Cancer-specific meant

11 specific to say breast cancer. Tumor-specific mean to say

12 specific to the individual patient's tumor. They actually made

13 this clear in their remarks to the patent office.

14         So if we take a look at the next slide.

15         **THE COURT:** Can you tell me why this matters?

16         **MS. DURIE:** Yes. Because Natera is now arguing that

17 the claim actually doesn't require something that is

18 tumor-specific, that is specific to the patient's own tumor, a

19 personalized or bespoke assay. They are saying that this could

20 include a panel that is just looking for mutations that are

21 generally commonly found in a particular type of cancer, like

22 breast cancer.

23         They are essentially arguing that the patent claim is

24 directed to a cancer-specific, breast cancer-specific assay,

25 rather than a tumor-specific or a patient-specific assay, and

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 130 of 156

1  that is contrary to what they told the patent office.

2       **THE COURT:**  About the '596?

3       **MS. DURIE:**  About the '596, but the language is

4  essentially the same in both of them.  If we look on Slide 56,

5  in the context of the '596, they were distinguishing this piece

6  of art called *Diehn*.  There is lot of text here.  I won't read

7  all of it.  I'll let Your Honor and your clerk do that at your

8  leisure.

9       In substance what they said is, the prior art is

10  about this looking for these general cancer mutations.  We are

11  different, and it's that one sentence at the beginning of the

12  last paragraph, "Diehn does not teach, at least, the use of a

13  personalized set of target loci."  That is this idea of a

14  personalized test.

15       The reason, to be clear that the Natera is now taking

16  this position is, they think it helps with their prior

17  conception story.  They realized that they have a real problem

18  trying to show that they had thought of this idea of a

19  personalized assay where you take a look at the biopsy sample,

20  you look for mutations that are specific to that patient's

21  cancer, and you then look for those mutations in the

22  bloodstream.  They had not thought of that, and they recognize

23  that they have problems of proof in that regard, so now they're

24  trying to recharacterize their invention as being directed to,

25  oh, it's not a personalized assay, it's just a general cancer

1  panel, and that is contrary to what the words of the claim say

2  and the way that they explained the significance of those words

3  about that.

4          If I could just reserve my remaining five minutes.

5  Thank you.

6          **THE COURT:**  You may.  For the Plaintiff.

7          I have the right notebook already open to the right

8  tab.

9          **MS. HABERNY:**  Your Honor, this is tab three of our

10 notebook.

11         So I want to remind the Court of the very, very high

12 burden of proof that attaches to NeoGenomics' claims of

13 improper inventorship.  NeoGenomics must show by clear and

14 convincing evidence, that these UCL professors came up with the

15 entire invention in the claims, and gave the ideas to the

16 Natera inventors, and that the Natera inventors didn't

17 independently conceive of these claim methods on their own.

18 They absolutely cannot meet that burden.  It is a very high

19 burden.

20         I want to focus on the timeline of events that shows

21 Natera's independent conception of the claims, and

22 particularly, focus Your Honor on the three aspects that

23 counsel identified on Slide 19 of their declaration that they

24 claim the UCL professors contributed, which are 10 to 500

25 target loci clonal and subclonal mutations in tumor-informed

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 132 of 156

1  assay and SNV mutations in the 14 specific genes listed in

2  Claims Four and Seven, because I'm going to show Your Honor now

3  where Natera did in fact independently conceive of those and

4  all of the other elements of the claims, including this

5  tumor-informed approach to the assay that counsel was just

6  discussing.

7          So Natera's work on cancer cells actually began in

8  November of 2013.  Dr. Zimmerman, who is one of the named

9  inventors, recorded notes on this testing when they began to

10  test actual cancer samples.  He puts here in his notes,

11  November 2013, and this is months, many months before they ever

12  met Dr. Swanton or Dr. Jamal-Hanjani.  They are going to test

13  in plasma CT-DNA.  That's circulating tumor DNA, cancer DNA, to

14  achieve high sensitivity, and they want to look for recurrence

15  in these samples.

16          Now here is where the idea of using whole genome

17  sequencing, this is the personalized approach, you use whole

18  genome sequencing to identify the mutations present in a

19  particular patient.  I am on Slide 12.

20          The only purpose for doing the whole genome

21  sequencing, or you see here on Slide 12 in Dr. Zimmerman's

22  notes on --

23          **THE COURT:**  I'm not seeing -- some of the page

24  numbers are covered up by the calendar at the bottom, the years

25  at the bottom.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 133 of 156

 1          **MS. HABERNY:**  It is the slide that is titled November

 2  2013, Dr. Zimmerman notes describe --

 3          **THE COURT:**  I see that one.

 4          **MS. HABERNY:**  Panel number six on the left-hand

 5  panel, number seven on the right.

 6          I want to focus, Your Honor, on what is described

 7  here.  These are Natera's ideas months before they met

 8  Dr. Swanton or Dr. Jamal-Hanjani.  They say, detection

 9  technologies.  They are referring to detecting SNVs present in

10  a patient, whole genome sequencing.  That's in panel six on the

11  left.

12          In panel seven, Natera toolbox, they refer to exome

13  sequencing and analysis.  The only reason one would do genome

14  sequencing or exome sequencing analysis is to identify the

15  tumors -- tumor-specific variants present in a patient's

16  sample.  This is specifically recited as part of Claim One,

17  Claim -- 14 of the '454.  The '596 Patent is broader.  It just

18  says sequencing to identify the mutations.  But they're saying

19  right here, from November 13th, they thought of that.  And it

20  gets better.

21          So in panel seven, Dr. Zimmerman, in his 2013 notes,

22  specifically combines exome sequencing and analysis, and then

23  MPPCR below that.  Those are the -- that's the workflow of the

24  claims that counsel is asserting Natera never came up with,

25  Natera only came up with this panel off-the-shelf approach.

Case 1:23-cv-00629-CCE-JLW   Document 555   Filed 08/13/25   Page 134 of 156

1 Well, right here, in November 2013, you can see Dr. Zimmerman's

2 notes.

3       **THE COURT:** What does that stand for?

4       **MS. HABERNY:** I'm sorry, that MPPCR, that's the

5 multiplex PCR. Apologies, Your Honor.

6       So that's them connecting the dots. That is absolute

7 corroboration for the workflow that's described in these

8 claims, the tumor-informed workflow, you find out what tumors

9 are present in a patient through whole exome sequencing and

10 then you do MPPCR, multiplex PCR to look for them.

11       So on the next slide, which is Slide 13, this is a

12 January 2014 slide deck, and this was the internal presentation

13 on circulating tumor DNA, and it was discussing potential

14 applications to explore.

15       Here on Slide 76, Natera is describing looking for

16 tumor heterogeneity, which is this clonal and subclonal idea

17 that NeoGenomics contends the UCL professors provided to

18 Natera.

19       This is January 2014, still months before they ever

20 met Dr. Swanton or Dr. Hanjani. They're saying here, our tests

21 may capture tumor heterogeneity. This is not something new

22 that they learned from Charles Swanton or Dr. Jamal-Hanjani.

23 They clearly were contemplating it months before they met them.

24       In the same deck, here's another slide, and this one

25 refers to the Cosmic database, and what they are describing

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW   Document 555   Filed 08/13/25   Page 135 of 156

1  here is a database of publicly available mutations associated

2  with cancer.  So there were 10,000, they say here, mutations

3  associated with cancer.  They were public in this Cosmic

4  database.  Natera knew about that and knew where to look to

5  find publicly available information about mutations known to be

6  associated with cancer.

7          January 31st slide deck, you can see here from the

8  cover it is describing tumor cell-free DNA and circulation, and

9  here, on slide -- it is not numbered but there is a slide in

10  that deck that refers to targeted deep sequencing of point

11  mutations.

12          Point mutations are another way of saying variants.

13  Those are single nucleotide variants.  Natera is clearly, in

14  January 2014, discussing targeted deep sequencing of single

15  nucleotide variants, and that parenthesis there (AF greater

16  than 0.01 percent) that's the sensitivity that's the allele

17  frequency that is actually lower than the 0.15 percent

18  sensitivity, and it's recited in the claims.  So Natera was

19  already thinking of using -- had already conceived of using

20  analysis of variants to target very, very rare mutations.

21          The next slide, April 9, 2014 slide.  This is still

22  months before any one from Natera met Dr. Swanton or

23  Dr. Hanjani.  Natera is showing here, that they achieved depths

24  of read of at least 50,000.  This claim is no longer at issue,

25  I guess we dropped it, but this is part of the timeline.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 136 of 156

1        Natera was here, again, reaching the depth of

2  sensitivity as of April 9th, using their methods.

3  Dr. Zimmerman testified that that slide you were just looking

4  at showed what we achieved.  It shows that they achieved 50,000

5  and higher depth of read and he says we could have achieved

6  even higher than that.

7        May 14th, 2014, this is a SEC filing, a public

8  disclosure of Natera's plans for tumor-informed testing.  Now

9  how do we know this is talking about tumor-informed testing?

10 Let's look at what says.  Cancer recurrence monitoring.  So it

11 is looking for a test to detect minimal residual disease, the

12 same goal of the claimed methods, and it is describing this

13 tumor-informed overarching workflow.  They say in the very last

14 sentence, by analyzing the FFPE tumor issue.  FFPE just means

15 formal and fixed paraffin embedded, and that's just how you

16 preserve a piece of tumor tissue so you can later test it by

17 analyzing that tumor tissue from mutations.  So you're looking

18 for the mutations present in someone's tumor, and then seeking

19 the recurrence of those same mutations in the plasma that is

20 looking for them in the cell-free DNA floating around in the

21 plasma by multiplex PCR.  We believe that we can improve the

22 sensitivity of the recurrence monitoring test.

23        Here again, it is not ambiguous that you would only

24 analyze the tumor tissue from mutations, if you were going to

25 look for those mutations in the plasma; otherwise, why would

1 you even analyze the tumor for mutations?

2          Dr. Rabinowitz submitted a declaration in support of

3 our summary judgment motion, explaining exactly what that

4 sentence meant, a tumor-informed approach, given a specific

5 phrase analyzing the FFPE tumor tissue for mutations and

6 seeking the recurrence of those same mutations.

7          Dr. Rabinowitz was CEO of Natera at that time, and he

8 is the author of this SEC filing.  So he is telling the Court

9 exactly what that sentence meant.

10          Slide 20, this is where Dr. Swanton enters the

11 picture, late May, weeks after the SEC filing.  He testified

12 that the first time he met the Natera folks was at meetings in

13 2014, which occurred in late May.  So all of the rest of that

14 conception, the tumor-informed approach, tumor heterogeneity,

15 the genes known to be associated with cancer, all of that

16 happened before they ever met Dr. Swanton.

17          So what happened after Natera met Dr. Swanton?  Well,

18 he ended up very quickly joining their scientific advisory

19 board and he attended one, three hour scientific advisory board

20 meeting.  Before that meeting, Natera said to the members of

21 the board, the question that you see on Slide 21, these are

22 questions for the scientific advisory board to consider, and it

23 says here, detection of minimal residual disease in breast and

24 lung cancer.

25          Second question, should a clinically actionable

liquid biopsy for recurrence monitoring track mutations
identified in the primary tumor with great sensitivity, or look
more broadly at enlarged panel with less sensitivity. They had
thought of both. They clearly had thought of both. They were
asking a panel of doctors which one a doctor would rather
purchase; the sensitive one or the less sensitive.

They knew how to do both at this point. It was
Natera who gave the idea to Swanton, not the other way around.

Dr. Swanton clarifies that, he admits it. He says he
attended the board meeting, that's the board meeting where
those questions were posed. At the end of his answer he said,
"I think it is unlikely that I would have given away our idea
of tumor-informed CTDNA tracking at that meeting." He says
here, "There are competitors at the meeting." He didn't tell
anyone. He stayed silent. If he had that idea, he didn't tell
Natera about it. Natera had already come up with it, anyway,
and there is absolutely zero corroboration for the notion that
Dr. Swanton -- he hadn't even met Jamal-Hanjani yet.

There is zero corroboration for the notion that they
could have gotten the idea from Dr. Swanton that he didn't even
tell them before. Their own evidence says they knew about it.

Then a few days later, Natera -- he says he didn't
tell them anything. A few days later, Natera is discussing a
potential corroboration with Columbia University, and here is
what they are discussing doing. If you look at the two bullet

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 139 of 156

1  points here, that's, again, describing this tumor-informed

2  approach, which is the work below of the claims.  They are

3  proposing to Columbia University that they will perform -- WGS

4  is whole genome sequencing and I'm on Slide 23.

5          They are performing -- they want to perform whole

6  genome sequencing or whole exome sequencing by matched primary

7  tumor and germline DNA.  Why would you do that?  You do that to

8  identify which mutations the patient has.  And if you're not

9  going to later target those mutations, that would be a complete

10 waste.  No one would do it.

11         So that's why they're proposing it.  Then next they

12 want to target the identified loci using MMPPCR, which is

13 massively multiplexed PCR to interrogate cell-free DNA and

14 germline.  So now they're saying we want to look in the blood

15 for cell-free DNA using massively multiplexed PCR, exactly what

16 the claim says to do, and find those mutations that we

17 previously identified.  So all of that was mid to late June of

18 2014.

19         It was not until September, three months later, that

20 the people from Natera first met Dr. Jamal-Hanjani, so it is

21 utterly impossible that she could have given them an idea that

22 they were presenting to Columbia University three months before

23 they ever met her.  It is undisputed they didn't meet her until

24 September 10th.

25         So the timeline makes it absolutely clear.  I don't

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 140 of 156

know what the UCL professors claim they invented before they met Natera, but I know what Natera invented before they met the UCL professors, and it's what is in the claims. That's in all of that corroborating evidence.

So the UCL professors are not inventors because they did not make a significant contribution to the claimed invention. This is the law. Significant -- to be an inventor, someone must make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.

Now it's not disputed that Dr. Swanton and Dr. Hanjani gave samples to Natera. That is not significant, measured against the dimension of the invention, providing someone samples so they could perform their test on it is not significant.

It's not disputed that Dr. Jamal-Hanjani provided certain information about those samples that she obtained through a core sequencing facility, and someone else helped her with. Those are some of the genes that are in the dependent claims.

It's not disputed that she gave a list to Natera, but that's not significant, measured against the dimension of the full invention, because that was not inventive. It was providing information that was samples and information that was already there.

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 141 of 156

1          So what did the UCL clinicians provide?  Well, they

2     provided samples and then they provided some ideas that were in

3     the prior art that everybody already knew about.

4          This is not a significant contribution, a whole exome

5     sequencing to identify variants, clonal heterogeneity, all of

6     that, targeted genes, all of that was known.  That's not enough

7     to confer mentorship.

8          Dr. Charles Swanton admitted that exome sequencing to

9     identify variants was in the prior art.  This is in our

10    briefing.  Dr. Jamal-Hanjani also admitted it was in the prior

11    art.  She is not the first to figure that out.

12         **THE COURT:**  Well, if it is in the prior art, then

13    neither are you, neither is Natera.

14         **MS. HABERNY:**  Those certain aspects, that's correct,

15    but the combination of the claims, we did invent, and that is

16    inventive, as we discussed earlier.

17         You can have certain prior art elements, but the

18    combination would be patentable and patent eligible.

19    NeoGenomics' expert, he admits that all of the genes that are

20    in those dependent claims were in the Cosmic public database

21    before 2014.  There was nothing new about them.

22         Natera already knew that its technology could target

23    variants that were in that same exact database.

24         Dr. Jamal-Hanjani agrees the whole exome sequencing

25    was in the prior art.  Clonal heterogeneity was in the prior

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 142 of 156

1    art.

2            This is Dr. Swanton saying so, Slide 36.  Clonal

3    variants in cell-free DNA, Dr. Swanton admits that was in the

4    prior.

5            Slide 37, tracking tumor specific variants in

6    cell-free DNA, that was the prior.  Everything they claim,

7    everything NeoGenomics claims they contributed was in the prior

8    art, and Natera was already aware of the same prior art, so

9    they didn't tell anything new to Natera that Natera wasn't

10   already aware of.

11           Natera made a specific combination of elements that

12   only it could make and only it could carry out, but it did not

13   get these ideas from the UCL professors.

14           So onto the specific genes that are in the dependent

15   claims of the '596 Patent.  So Dr. Jamal-Hanjani got that list

16   from someone else.  Dr. Jamal-Hanjani provided a list of 40

17   variants, not 14, to Natera.  She got that list -- she

18   first -- she didn't even do the whole exome sequencing.  She

19   sent it to a sequencing corp.  That's a facility that just

20   receives samples, conveyer belts them through and then collects

21   some money for sequencing them.  That's all he did.  She didn't

22   do anything special there.  And then someone named -- this a

23   Charles Swanton talking about what happened, when how the

24   mutants were identified.  Someone named Garrett Wilson ran the

25   computation on that.  She didn't even do that.  She didn't do

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 143 of 156

1 anything special to come up with the list of 40 variants that

2 she gave to Natera.

3       All she did that she might claim is special is, run

4 the information she got from a guy name Garrett in her lab

5 through a genome browser that's a publicly available database.

6 She did not do anything inventive or special, and she didn't

7 even specify the 14 genes. She gave a big list to Natera, and

8 Natera identified 14 genes.

9       So another reason that the UCL professors are not

10 inventors is, they didn't have a definite and permanent idea of

11 the invention. They didn't know any of the details of Natera's

12 method, and they admit that. That's Dr. Jamal-Hanjani. She

13 said, she starts working with the Natera folks in a

14 collaboration, and this is now September 24th, so they begin

15 working together. She says, has your method been published?

16 She doesn't even know what it is. It will be great to have

17 more details, science or method section in a paper. I didn't

18 find much on the Natera website. She didn't even know what

19 they were doing. She couldn't have had a definite and

20 permanent idea of some way to make it work with her ideas.

21       Dr. Swanton in fact called what Natera was doing a

22 black box. He said they had this highly sensitive multiplex

23 PCR assay that was relatively a black box. That's not a person

24 who invented something and knows what they invented. You don't

25 call your invention a black box.

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 144 of 156

1          Again, she said in deposition -- I asked her, you had

2    no firm and definite idea that any of the mutations you

3    provided to Natera would work in a cell-free tumor DNA

4    analysis?  She says, correct.  She gave them a list and, in

5    fact, she said you pick from the list whatever you want to

6    test, and she didn't know of any of them before.

7          Here again, the number ten, so NeoGenomics is

8    claiming there is something special about the lower limit of

9    ten in the claims.  Well, if in fact Jamal-Hanjani had

10   contributed to some lower limit number to the claim, it would

11   have been seven, because, apparently, that's all she could

12   accomplish with someone before Natera.  Definitely not ten to

13   500, but she didn't come up with any lower limit.

14         This -- now you are looking at exactly what she said,

15   and this is Slide 46.  She said -- she's talking about how many

16   mutants to target in the assay.  She says, We could start with

17   one or two.  We could see if we're able to detect.  With the

18   details required we can look at all or select a few.  That's

19   hardly pointing out, hey, guys, there is something really

20   special about the number ten.  We should have a lower limit of

21   ten.  She says, one or two, all or select a few.

22         **THE COURT:**  You got about six minutes left.

23         **MS. HABERNY:**  All they did was present a problem,

24   present a result to be accomplished, and that's not enough to

25   be an inventor.

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 145 of 156

1    So NeoGenomics' claims that the UCL professors did
2  all of this before coming to Natera.  That's not what they
3  said.  That's an attorney argument that is baseless, and it is
4  contradictory to the allegedly omitted inventor himself.  He
5  said, We provided what we thought were reasonable sensitive
6  assays, but we fell short of the mark.  He says they failed.
7  They didn't accomplish this great feat that NeoGenomics is
8  claiming.  The purported inventor says he failed.  Then he was
9  asked, you went to Natera in your collaboration, and then he
10  says, yes, because we wanted a sensitive assay.  They didn't
11  have a sensitive assays.  They came to Natera to get one.  Then
12  he said, he actually thought Natera's method would fail.

13    Now, these are not the words of someone who had a
14  definite and permanent idea of some method that they think is
15  going to work.  He says, I was not that optimistic, in all
16  honesty, about it working, although I don't know the
17  intricacies of Natera's assay.  That is absolutely not a
18  definite permanent idea, he thought it was going to fail it.

19    Now NeoGenomics makes a few different arguments in
20  their briefing.  They say, oh, Natera doesn't have
21  corroboration for its prior conception because it has seven
22  different documents that contain all of the information, but
23  there is no law to support this alleged requirement that
24  everything has to be contained in the same document.  It is --
25  in fact, it's normal course in science to keep the different

1    information in different documents.  That's just pulled out of

2    thin air.

3         This fixed panel argument is a strong strawman.  I

4    already showed Your Honor that Natera did come up with the idea

5    of looking at a person's tumor, identifying their mutations,

6    and then looking for those mutations in the cell-free DNA, but

7    even if they hadn't, nothing in this claim says you can't

8    use -- you can't also use a panel of commonly occurring SNV's.

9    You can find out which mutants a person has by sequencing their

10   tumor, then have a panel with 10,000 mutants on it and look for

11   those mutations in that panel.  That's also part of the claim.

12        They are, again, limiting the claim to something that

13   it doesn't support.

14        So they also point to example 13 as the inclusion of

15   Natera's data in the patent as some evidence that the UCL

16   professors are inventors, but data in a patent that was

17   generated -- they used UCL samples, but they used their -- they

18   actually compared the Natera assay, to the assay that the UCL

19   professors used and found that their assay worked better, and

20   look how it worked better.  These are the genes at the very

21   end.  It is not highlighted, but I am on Slide 59, and at the

22   end of this callout of example 13, those are the genes that are

23   listed in Claims Four and Seven.  You know why they are listed

24   in those dependent claims?  Because Natera was able to detect

25   them and UCL was not.

Natera vs. NeoGenomics      1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 147 of 156

 1          This is a comparison.  In fact, if anything, they're
 2  showing that their test is superior to anything that the UCL
 3  professors could do, and the UCL professors didn't know they
 4  could make those genes work, that's why they are here.
 5          So with that -- I have 30 seconds left.  The one
 6  other argument that they make is that Natera's contribution was
 7  prior art.  They say -- they are so farfetched now that they
 8  claim that Natera didn't contribute anything.
 9          THE COURT:  Okay.  Calm down.
10          MS. HABERNY:  But the Natera method was not --
11          THE COURT:  Now you have one minute left.
12          MS. HABERNY:  The Natera method was not prior art,
13  and Dr. Zimmerman never said that it was.  So they claim that
14  Natera is the one that contributed only prior art and that its
15  massively multiplex PCR techniques were already published in
16  the literature, and that is absolutely not what Dr. Zimmerman
17  said.  This is just misconstruing his testimony.  They asked
18  him if a protocol that they believed was used in the
19  collaboration with UCL had been published.  Exhibit 7 is a
20  prior patent by Natera, one of Natera's own prior patents.  He
21  said, no, not really.  They are interpreting, no, not really,
22  to mean yes.  They ask again, is that standard?  He said, no.
23  They asked him directly, Is the design that they think was used
24  in the collaboration in the prior art?  He says, no.  And then
25  they ask him, massively multiplex PCR, was this thing known?

1 And he said, No, I think outside of Natera, people were not
2 able to do massively multiplex PCR.  That's something only
3 Natera knew how to do.
4          Dr. Zimmerman, this is Slide 65, Dr. Zimmerman put in
5 a declaration, in fact, testifying to this, and testifying to
6 NeoGenomics' mischaracterization of his testimony.
7          Finally, I want to end with the same slide that I
8 showed you before.  Dr. Jamal-Hanjani did not know what Natera
9 was doing.  The UCL professors didn't know.  They made no
10 contribution, had no definite and permanent idea of this
11 invention.
12          **THE COURT:**  Thank you.
13          I think you got five minutes left.
14          **MS. DURIE:**  Thank you.  Our contention is, that
15 Dr. Jamal-Hanjani and Dr. Swanton are joint inventors.  They
16 don't need to come up with the entire invention.  They don't
17 need to have a definite and fixed impression of the whole
18 invention.  The standard for joint inventorship is, that a
19 joint invention is simply the product of a joint collaboration
20 between two or more persons working together to solve the
21 problem addressed.  That is what happened here.
22          The UCL scientists didn't just give samples to
23 Natera.  They invited Natera to participate in an ongoing study
24 in which they were working with Illumina and had already done
25 essentially everything that is in the claim.  Dr. Metzker

Natera vs. NeoGenomics     1:23CV629
August 8, 2025       Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 149 of 156

1    admitted that.  That is actually an undisputed fact.

2           UCL inventors characterized it as a failure because
3    it wasn't sensitive enough for a commercial assay, but that
4    doesn't mean that it didn't meet the requirements of the claim,
5    because it did.  That is undisputed.  The significance of
6    Natera's evidence is not.

7           If we could take a look at Slide 22, and if we could
8    flip over to our slides.

9           We've included in the slide deck some of Dr. Lennon's
10   testimony explaining the significance of the evidence that
11   Natera showed.  He explains, for example, that Natera's S1 is
12   talking about using massively multiplexed PCR technology, and
13   that that means it has to be talking about a panel assay,
14   rather than a personalized assay.  It is looking for known
15   mutations, not mutations identified in the patient.  That is
16   true of much of Natera's evidence.

17          If we can go to Slide 25.  He also explains that this
18   presentation from June of 2014 is also not talking about a
19   personalized assay, but it's talking about doing whole exome
20   sequencing to look for mutations that you could identify and
21   then include in a panel that you would use.  In this assay
22   development, you're looking for mutations to include a panel.

23          Now this is a dispute of fact, but Dr. Metzger and
24   Dr. Lennon disagree about the interpretation of these
25   questions.  That is going to be a factual dispute for this

Natera vs. NeoGenomics    1:23CV629
August 8, 2025    Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 150 of 156

1 Court.

2          At the end of the day, we think the evidence will

3 support the proposition that the UCL inventors were working on

4 this personalized assay development, that Natera was not, and

5 that those ideas, as well as many of these more specific

6 concepts came from UCL.

7          We heard a suggestion that Natera gave these ideas to

8 Dr. Swanton.  That makes no sense.  Dr. Swanton and Dr.

9 Jamal-Hanjani had been working on the TRACERX study for months

10 and months and months before Dr. Swanton attended that meeting

11 with UCL.

12          I think in short, Your Honor, we don't think that

13 there is any evidence with respect to certain of the specific

14 claim limitations, which is why we think as a matter of

15 undisputed fact, they should be added to the patent.

16          The record is rife with factual disputes as to the

17 significance of the earlier evidence that Natera has shown you,

18 and whether they had conceived of all of these elements of a

19 personalized bespoke assay before the scientists at UCL

20 presented to them the study on which they were working on and

21 invited Natera to join.

22          **THE COURT:**  Okay.  Thank you.  So I'll take it all

23 under advisement.  No, you are not getting any decisions out of

24 me today, except that I am going to continue the trial and

25 extend the pretrial deadlines, because the one thing that is

Natera vs. NeoGenomics    1:23CV629
August 8, 2025      Motions Hearing

Case 1:23-cv-00629-CCE-JLW    Document 555    Filed 08/13/25    Page 151 of 156

1 clear to me today is, that I need some time.  I know what else

2 I have going on, including criminal matters, which as you know,

3 I'm required to give priority.

4         Now that said, I, like you, want the case resolved.

5 So do you all.  Part of the problem is, I just really don't

6 have a grip on when I'm going to be able to figure this all

7 out.

8         My present inclination is to start with

9 the patentable material, do it in order, at least start with,

10 is this patentable, and resolve that, and maybe even let you

11 know that when I resolve that, even if I haven't gotten to the

12 other issues.

13         So I think I'm not even going to have you all talk

14 about a schedule at this point.  It really doesn't seem

15 productive until I have a better idea and am able to give you

16 some -- at least a goal date for when I can get your summary

17 judgment decision.

18         I am going to look for something from you-all next

19 week, if possible.  If you need a little more time at this

20 point, I'm not going to scream about it, you know, but to work

21 out getting something on the record resolving the things that

22 you-all have resolved today, and helping to clarify for me.

23         Let's see, on mediation, I think I did give you a

24 deadline.  Did I enter an order -- usually what I do about

25 mediation is, I say your first mediation must be.  Is that what

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 152 of 156

1  I did here?

2      **MS. MAROULIS:**  Yes, Your Honor.  We had mediation

3  back in May, per your order, and the next deadline is September

4  3rd, so we're actually discussing the dates for that.

5      **THE COURT:**  You all go ahead.

6      **MS. DURIE:**  We may ask you to move that a little bit,

7  just for scheduling reasons.

8      **THE COURT:**  If you need a few more days, I'm not

9  going to jump up and down.  I'm glad to know I did what I

10  usually do in big complicated cases and kind of required you to

11  do it over time.

12      Now, that said, I don't actually expect you-all to

13  settle.  I'm going to assume you are not.  But if you do,

14  please let me know immediately so I can stop.  You know, I'm

15  not making you settle it.  If you don't settle it, I am

16  available to resolve this dispute, and I'll do it as quickly as

17  I can.  If you want me to resolve it quickly, you should write

18  the president and two senators from North Carolina, and tell

19  them to give us some new judges, and that would make it much --

20  you know, much more likely that I would be able to do it,

21  because that is my problem right now.

22      In theory, I'm on senior status and I'm supposed to

23  be working less, and that has not happened, but I'm trying

24  hard, and I'm going to do the best that I can.  But, you know,

25  that's my reality.

Natera vs. NeoGenomics     1:23CV629
August 8, 2025     Motions Hearing

Case 1:23-cv-00629-CCE-JLW     Document 555     Filed 08/13/25     Page 153 of 156

1    So the clerk will put it in the minute entry that all

2  pretrial deadlines are suspended and held in abeyance.  I'm not

3  going to do an order on it.  That should be sufficient, unless

4  you-all want to give me an order, in which case, go ahead,

5  joint proposed order.

6    What else would be helpful in the ten minutes that I

7  have left?  Anything else for the Plaintiff?

8    **MS. MAROULIS:**  Your Honor, is it correct that the

9  pretrial conference that was loosely scheduled for the week of

10 September 22nd --

11    **THE COURT:**  Canceled.

12    **MS. MAROULIS:**  Understood.

13    **THE COURT:**  Canceled.  Thank you for clarifying that.

14    **MS. DURIE:**  Nothing from us, Your Honor.

15    **THE COURT:**  So let me just repeat again, I really

16 appreciate you-all.  I'm doing my best with this complicated

17 matter.  The procedural stuff, I'm good, you know.  I got a

18 grip on all of that, but the science does take me a little

19 while, and I think I may have an easier time with the, is it

20 patentable.  The hard part for me, I think, is going to be

21 infringement.  That's what it looks like is going to be

22 difficult for me.  I'm not saying what is actually hard, you,

23 that's just where I am.

24    I say that, to the extent it helps you all in your

25 settlement negotiations.  But, you know, I haven't made up my

1   mind about anything.

2            I will be in touch.  Court is adjourned.

3            (Court was adjourned at 3:50 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **C E R T I F I C A T E**

2

3           I, J. ALLEN, RPR, United States District Court

4   Reporter for the Middle District of North Carolina, DO HEREBY

5   CERTIFY:

6

7           That the foregoing is a true and correct transcript of

8   the proceedings had in the above-entitled matter.

9

10

11  August 13, 2025

12

13              *J. ALLEN*

14              J. Allen, RPR
                United States Court Reporter
15              324 W. Market Street
                Greensboro, NC  27401
16

17

18

19

20

21

22

23

24

25